**UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Case No. 23-80078** |
| **PROTECH METALS, LLC,** | ) | |
| | ) | **Chapter 11** |
| Debtor. | ) | |
| | ) | |

**EXPEDITED MOTION OF ACCESSHEAT, INC. TO DISMISS**
**CHAPTER 11 BANKRUPTCY PETITION**

NOW COMES, AccessHeat, Inc. ("AccessHeat"), by and through its undersigned counsel, and hereby moves the Court to dismiss this Chapter 11 case. In support of its Motion, AccessHeat respectfully shows the Court as follows:

**SUMMARY OF RELEVANT FACTS**

1.     On April 27, 2023 (the "Petition Date"), Protech Metals, LLC (the "Debtor") filed a petition for relief (the "Petition") under Chapter 11 of the Bankruptcy Code with this Court. [Dkt. No. 1].

2.     The Court has jurisdiction over this matter and the Debtor pursuant to 28 U.S.C. §§ 157 and 1334, and this is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 157(b)(2)(A).

3.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The statutory predicates for the relief requested herein are, *inter alia*, 11 U.S.C §§ 105(a) and 1112(b), and Rule 9014 of the Federal Rules of Bankruptcy Procedure.

A.     Negotiation and Closing of Transaction Whereby AccessHeat Purchased 100% of Membership Interests in Debtor

5.     Upon information and belief, the Debtor is a limited liability company organized and existing under the laws of the State of North Carolina, formed for the purpose of operating a metals fabrication business (the "Business").

1

6.      AccessHeat is a Delaware corporation that owns and operates companies engaged in the business of manufacturing and fabrication.  As a part of its business model, AccessHeat identified the Debtor as a company of interest for the purpose of acquisition.  Ultimately, AccessHeat submitted a letter of intent (the "Letter of Intent") to the Debtor describing its proposal to purchase the membership interests of the Debtor from William R. Hall ("Mr. Hall"), who represented that he owned 100% of those membership interests.  The Letter of Intent was dated March 4, 2022 and was executed by Ruth Berenstein ("Ms. Berenstein") as a representative of AccessHeat and Mr. Hall as a representative of the Debtor.   A true and correct copy of the Letter of Intent is attached hereto as **Exhibit A**.

7.      After the Letter of Intent was executed by AccessHeat and the Debtor, AccessHeat engaged in due diligence to determine the viability of the potential purchase of the membership interests of the Debtor.  As a part of that due diligence process, AccessHeat reviewed the Debtor's 2021 federal tax return to determine (1) the Debtor's financial strength and feasibility and (2) to confirm the Debtor's corporate structure and ownership.

8.      A review of the 2021 tax return confirmed that Mr. Hall was, in fact, the owner of 100% of the outstanding membership interests of the Debtor.  At all times during the due diligence process and related negotiations, Mr. Hall represented to Ms. Berenstein and AccessHeat that he was, in fact, the sole member of the Debtor.  A true and correct copy of pertinent portions of the Debtor's 2021 tax return is attached hereto as **Exhibit B**.

9.      After completing its due diligence, AccessHeat elected to proceed with the purchase of 100% of the membership interests of the Debtor, all owned by Mr. Hall, for the sum of $1,150,000 (the "Transaction").   All documents evidencing or otherwise relating to the Transaction (the "Transaction Documents"), including but not limited to that certain Purchase

Agreement dated June 9, 2022 entered into between AccessHeat, Mr. Hall, and the Debtor (the "Purchase Agreement") and that certain Promissory Note in the amount of $1,150,000 dated June 9, 2022, whereby the Debtor agreed to make payments to Mr. Hall if specific conditions were met (the "Promissory Note"), were prepared based on AccessHeat's reliance on Mr. Hall's representation that he owned 100% of the membership interests of the Debtor, as confirmed by the Debtor's 2021 filed federal tax return. A true and correct copy of the Purchase Agreement is attached hereto as **Exhibit C**. A true and correct copy of the Promissory Note is attached hereto as **Exhibit D**.

10.     At no time during the due diligence period, the negotiations, or the execution of the Transaction Documents, did Mr. Hall ever state or suggest that there were any other owners of the Debtor. Specifically, Mr. Hall never mentioned that his wife, Myra D. Hall ("Dr. Hall," and together with Mr. Hall, the "Halls"), had any ownership interest in the Debtor. Furthermore, in the Purchase Agreement, Mr. Hall specifically warranted and represented to AccessHeat that he was, in fact, the 100% owner of the Debtor.

11.     In connection with the Transaction, the Debtor entered into the Promissory Note agreeing to pay Mr. Hall, in his capacity as the sole shareholder of the Debtor, the principal amount of $1,150,000. The Promissory Note provided that the Debtor would pay Mr. Hall, for the first 36 months of the duration of the Promissory Note, the sum equal to a percentage of net profit/EBITDA per month. Pursuant to the Promissory Note, if the Debtor did not achieve the profit threshold, no monthly payments were due to Mr. Hall. The Promissory Note also contained a "true up" provision stating that the total sum of $1,150,000, plus accrued interest, would be due at the end of the 36-month period with the Debtor receiving credit for any previous payment made during the 36-month period.

12.     Also in connection with the Transaction, Mr. Hall executed that certain Share Transfer Agreement, dated June 9, 2022, on behalf of himself and the Debtor (the "Share Transfer Agreement").  In the Share Transfer Agreement, Mr. Hall again represented and warranted to AccessHeat that he was the 100% owner of the Debtor.  A true and correct copy of the Share Transfer Agreement is attached hereto as **Exhibit E**.

13.     Also in connection with the Transaction, the Debtor entered into that certain Employment Agreement dated June 9, 2022 with Mr. Hall (the "Employment Agreement"), a true and correct copy of which is attached hereto **Exhibit F**.

14.     Also in connection with the Transaction, AccessHeat, not the Debtor, entered into that certain Lease Agreement with WRH Holdings, LLC ("WRH") dated June 9, 2022 (the "Lease"), a true and correct copy of which is attached hereto as **Exhibit G**.  Upon information and belief, WRH is owned by Mr. Hall.  The Lease relates to the real property upon which the Debtor operates its Business (the "Real Property").

15.     Following the closing of the Transaction, which occurred on June 9, 2022, the Debtor continued to own and operate the Business, and AccessHeat was, and currently is, the Debtor's sole owner.  Following the closing of the Transaction, except for the last approximately three weeks, Ms. Berenstein personally operated the Debtor on behalf of AccessHeat.

B.     The Debtor's Termination of Mr. Hall

16.     Mr. Hall's post-closing employment with the Debtor did not last long.  As a result of Mr. Hall's conduct as an employee of the Debtor, which included appearing at the office intoxicated and disrupting the Business, his employment was terminated on June 21, 2022.  A true and correct copy of the letter terminating Mr. Hall's employment with the Debtor is attached hereto as **Exhibit H**.  Although Mr. Hall was terminated for cause, the Debtor has continued to pay Mr.

Hall his salary as reflected in the Employment Agreement even though he engaged in conduct that breached the Employment Agreement to the detriment of the Debtor and AccessHeat.

C.    Mr. Hall's Change of Heart and Filing of Lawsuit

17.    Following Mr. Hall's termination, in late July of 2022, Dr. Hall, Mr. Hall, and purportedly the Debtor filed suit against AccessHeat and Ms. Berenstein in the Moore County Superior Court claiming, in effect, that the Purchase Agreement is null and void because Dr. Hall was actually a 51% owner of the Debtor at the time of the Transaction and did not approve the Transaction (the "State Court Action").  In fact, the Halls and their attorney attempted to obtain a temporary restraining order (the "TRO Motion") and preliminary injunction allowing the Halls to take possession of the Real Property and prohibiting AccessHeat and Ms. Berenstein from "going on the business property."  They also requested that AccessHeat be prohibited from representing itself as the owner of the Debtor.

18.    As part of the State Court Action, Mr. Hall produced, for the first time, the following three documents purporting to evidence his transfer of 51% of the shares of the Debtor to Dr. Hall prior to the closing of the Transaction: (1) certain Minutes of Special Meeting of the Members and Managers of the Debtor, apparently held at the Debtor's office on Christmas Eve, December 24, 2020; (2) an Assignment of Membership Interest to Dr. Hall; and (3) the Consent by Members and Manager for "Reallocation of Membership Interests."  The documents are attached hereto as **Exhibits I**, **J**, and **K** respectively.  These documents were never produced or provided in connection with the Transaction, and AccessHeat reasonably relied upon Mr. Hall's representations regarding his 100% ownership of the Debtor.

19.     The TRO Motion was heard *ex parte* by the Superior Court Judge and denied.  Upon information and belief, the Halls have not taken any action in the State Court Action since the denial of the TRO Motion.

D.     Mr. Hall's Illegal Eviction of AccessHeat from the Real Property

20.     As stated above, the Debtor is not a party to the Lease of the Real Property where the Business is operated.  AccessHeat, the tenant under the Lease, is current on its obligations to WRH under the Lease.  WRH has never declared a default under the Lease or filed any claim or lawsuit attempting to eject or remove AccessHeat from the Real Property.  Notwithstanding this fact, approximately three weeks ago, Mr. Hall had the locks changed to the building in which the Debtor operates its Business to prevent Ms. Berenstein and other representatives of the Debtor and AccessHeat from entering the building and operating the Business.

21.     Upon information and belief, since Mr. Hall unlawfully took possession of the Real Property, equipment has been removed from the Real Property, and Ms. Berenstein has been unable to gain access to certain documents, accounts, and information that are necessary to operate the Business, including making payroll.  In effect, Mr. Hall has physically and unlawfully stolen the Business back.

E.     Mr. Hall's Testimony on May 2, 2023

22.     At the May 2, 2023 hearing in this bankruptcy case, Mr. Hall attempted to explain away the fact that at no time during the due diligence period, the negotiations, or the execution of the Transaction Documents did he ever state or suggest to AccessHeat that there were any other owners of the Debtor by stating that he merely "forgot" that he had transferred 51% of his

membership interest in the Debtor to Dr. Hall.  In fact, Mr. Hall referenced his forgetfulness on this point at least seven times during the hearing.[1]

## **RELIEF REQUESTED**

23.     This Chapter 11 case was filed by the Halls on behalf of the Debtor, without the requisite authority, in bad faith for the illegitimate purpose of maintaining a two-party dispute better left to state court.  As this Chapter 11 case was filed without the requisite authority and in bad faith—i.e., in the absence of good faith and for no possible reorganizational purpose—it should be dismissed pursuant to established precedent.

### A.        **The Debtor's case should be dismissed for lack of authority to file.**

24.     At the time of the filing of the Debtor's bankruptcy case, AccessHeat owned 100% of the membership interests of the Debtor, and the Debtor had terminated Mr. Hall from his employment with the Debtor, making it impossible for Mr. Hall to have had the requisite authority to file this bankruptcy case.  "[T]he necessary result of . . . an unauthorized petition is dismissal." In re Cabernet Holdings, LLC, Case No. 10-50602C-11W, 2010 WL 2540116, at *2 (Bankr. M.D.N.C. June 21, 2010) (recognizing that "where authority under local law is found lacking, the court 'has no alternative but to dismiss the petition.'") (citing Hager v. Gibson, 108 F.3d 35, 39 (4th Cir. 1997) (quoting Price v. Gurney, 324 U.S. 100, 106 (1945)).

---

[1] This position is reminiscent of the famous comedy routine of Steve Martin, American comedian:

You … can be a millionaire ... and never pay taxes! You can be a millionaire, and never pay taxes!
You say ... "Steve ... how can I be a millionaire, and never pay taxes?"
First ... get a million dollars.
Now ... you say, "Steve, what do I say to the tax man when he comes to my door and says, 'You have never paid taxes'?"
Two simple words. Two simple words in the English language: "I forgot!"
How many times do we let ourselves get into terrible situations because we don't say "I forgot"?
Let's say you're on trial for armed robbery. You say to the judge, "I forgot armed robbery was illegal."
Let's suppose he says back to you, "You have committed a foul crime. you have stolen hundreds and thousands of dollars from people at random, and you say, 'I forgot'?"
Two simple words: "Excuuuuuse me!!"

25.     With respect to any assertion that AccessHeat purchased fewer than 100% of the ownership interests in the Debtor, AccessHeat maintains that any transfer of interests between Mr. Hall and Dr. Hall, if one actually occurred as represented, is void as to AccessHeat under North Carolina law.  Mr. Hall is equitably estopped from asserting he did not completely own the Debtor at the time of the Transaction: Mr. Hall (1) had knowledge of the purported "real facts" of ownership, (2) misrepresented those facts repeatedly, and (3) intended for AccessHeat to rely on his representations, and AccessHeat (1) had no knowledge of the purported "real facts" of ownership, (2) relied upon Mr. Hall's repeated representations, and (3) acted to its own detriment based on those representations.  See Gore v. Myrtle/Mueller, 653 S.E.2d 400, 405 (N.C. 2007) (listing the elements of equitable estoppel under North Carolina law) (quoting Hawkins v. M & J Fin. Corp., 77 S.E.2d 669, 672 (N.C. 1953)).

26.     The Debtor's Petition should, thus, be dismissed as an unauthorized filing.

**B.      The Debtor's case should be dismissed for cause as a bad faith filing under Section 1112(b).**

27.     It is well settled in this circuit that lack of good faith in the filing of a bankruptcy petition may constitute cause for dismissal.  E.g., In re Hunter, 597 B.R. 287, 296 (Bankr. M.D.N.C. 2019) (citing Carolin Corp v. Miller, 886 F.2d 693, 698 (4th Cir. 1989)); In re RainTree Healthcare of Forsyth LLC, Case No. 17-51237, 2018 WL 770367, at *10 (Bankr. M.D.N.C. Feb. 7, 2018) (citing Carolin, 886 F.2d at 699), aff'd, 585 B.R. 777; In re Aronowitz Delaware 2 Fam. Ltd. P'ship, Case No. 21-50464, 2021 WL 4823520, at *4 (Bankr. M.D.N.C. Oct. 15, 2021) (citing Carolin, 886 F.2d at 699).

28.     The analysis for determining a lack of good faith was set forth by the United States Court of Appeals for the Fourth Circuit in Carolin and consists of two prongs: objective futility

and subjective bad faith.  886 F.2d at 700–01.  The Fourth Circuit observed in <u>Carolin</u> that the indicia of futility may indicate bad faith, and vice versa. 886 F.2d at 701.

29.    In this case, the "objective futility" and "subjective bad faith" analysis is bound up with the fact that this Chapter 11 case represents an inappropriate attempt by the Halls to continue a two-party dispute and, as such, constitutes an abuse of the bankruptcy process.  <u>In re Crown Fin., Ltd.</u>, 183 B.R. 719, 723 (Bankr. M.D.N.C. 1995) ("What has happened in this case is that a bitter, hotly contested controversy has boiled over from the state court into the bankruptcy court. Chapter 11 was not intended to provide an additional forum for the continuation of litigation over what is essentially a two-party dispute. An attempt to do so is an abuse of the bankruptcy process which warrants the dismissal of a Chapter 11 filing."); <u>see also</u> <u>In re Panache Dev. Co., Inc.</u>, 123 B.R. 929, 932 (Bankr. S.D. Fla. 1991) ("The bankruptcy court 'was not intended as an alternate forum for private disputes that only involve . . . disputants for which there [is] a well established albeit less expeditious forum.'"); <u>In re Donuts of Seekonk, Inc.</u>, 122 B.R. 172, 173 (Bankr. D.R.I. 1990) ("[T]he matter before this Court is nothing more than an attempt by the Debtor to resurrect its prior unsuccessful state court litigation, in another forum.  ...  We will not sanction the use of this Court for that purpose.").

30.    As was the case in <u>Aronowitz</u>, "[t]his case represents nothing more than a state court dispute in which one of the parties has attempted to utilize the automatic stay in bankruptcy as a litigation tactic after failing to obtain an injunction."  2021 WL 4823520, at *6.  The Halls tried to convince a Moore County Superior Court Judge to grant them a temporary restraining order to give them back their company; when that failed, they locked AccessHeat out and filed this case.  This situation is precisely the type of abuse of the bankruptcy system described by Judge Stocks in <u>Crown Financial</u>: the case was filed "to provide an additional forum for the continuation

of litigation over what is essentially a two-party dispute." <u>Crown Fin., Ltd.</u>, 183 B.R. at 723.

31.    Furthermore, the Debtor's case is objectively futile notwithstanding the question of authority to file.  Objective futility turns on whether the debtor has any realistic hope of a successful reorganization.  <u>In re Hunter</u>, 597 B.R. 287, 296–97 (Bankr. M.D.N.C. 2019) (citing <u>Carolin</u>, 886 F.2d at 701–02). To be sure, the least generous inference that can be drawn from the record before the Court is that Mr. Hall does not have any ownership interest in any of the Debtor's operations or assets—and an unauthorized petition cannot support a reorganization of any kind. <u>In re Cabernet Holdings, LLC</u>, Case No. 10-50602C-11W, 2010 WL 2540116, at *2 (Bankr. M.D.N.C. June 21, 2010).

32.    However, the most generous inferences that can be drawn from the record—if the Court presumes that Mr. Hall's testimony given May 2, 2023 regarding ownership was completely credible and accurate—are (1) the Debtor's majority owner (Dr. Hall) is a stranger to the Debtor's business, and (2) its minority owner (Mr. Hall) is at best reckless and forgetful with respect to business management and corporate records.

33.    According to his testimony, Mr. Hall directed a change-of-ownership event with his own wife to make the Debtor minority- and woman-owned—<u>then</u>, during the next eighteen months, forgot this major, intentional transaction at every juncture of the process to market and sell the Debtor's Business. <u>Presuming</u> that Mr. Hall did not intentionally misrepresent the Debtor's ownership to induce a buyer to consummate the Transaction—and <u>presuming</u> the purported sale of the Debtor's majority interest to Dr. Hall did in fact occur as represented—Mr. Hall's forgetful management of the Debtor's estate poses serious risks of waste to the detriment of that estate and its creditors.

34.    The Debtor's case was filed without proper authorization.  Regardless of the

authority issue, the Debtor's case was filed in bad faith, for an improper purpose, and no interpretation of the record before the Court evidences the likelihood of a successful reorganization.  Accordingly, the Debtor's case should be dismissed.

WHEREFORE, AccessHeat prays that this Court enter an order:

a)    Dismissing the Debtor's bankruptcy case on the ground that it was filed without the requisite authority; or, in the alternative,

b)    Dismissing the Debtor's bankruptcy case on the ground that it was filed in bad faith; and,

c)    Granting such other and further relief as is appropriate.

Respectfully submitted, this the 5th day of May, 2023.

**WALDREP WALL BABCOCK**
**& BAILEY PLLC**

*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
Jennifer B. Lyday (NC State Bar No. 39871)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27603
Phone: 336-717-1283
Fax: 336-717-1440
Email: notice@waldrepwall.com

- and -

**VAN CAMP, MEACHAM & NEWMAN, PLLC**

Thomas Van Camp (NC State Bar No. 16872)
2 Regional Circle
Pinehurst, NC 28374
Phone: 910-295-2525
Email: thomasv@vancamplaw.com

*Attorneys for AccessHeat, Inc.*

# EXHIBIT A

**ACCESSHEAT INC.**

**#200-913 N Market St**

**Wilmington, DE 19801, USA**

03 04 2022

**CONFIDENTIAL**

Protech Metals, LLC

3619 Murdocksville Road

Pinehurst, NC 28374

United States

Re:     Proposal to Purchase the of Shares of Protech Metals, LLC

Dear William R. Hall

This letter of intent (this "*Letter of Intent*") is intended to summarize the principal terms of a transaction being considered by AccessHeat, Inc., a Delaware corporation ("*AccessHeat*"), or one of its subsidiaries (such acquiring entity, the "*Buyer*"), regarding its possible acquisition of Shares, and certain specified liabilities, of Protech Metals LLC (the "*Business*") a North Carolina corporation (the "*Seller*"), which is owned and operated by William R. Hall, residents of North Carolina, United States (the "*Stockholder*"). The possible acquisition of the Business is referred to as the "*Transaction*" and Buyer and Seller are referred to collectively as the "*Parties*".

1.     Acquisition of Shares and Purchase Price.

(a)     Subject to the satisfaction of the conditions described in this Letter of Intent, at the closing of the Transaction, Buyer would acquire 100% of Shares, and certain specified liabilities, of the Business (the "*Share*"), free and clear of all encumbrances, at the purchase price set forth in Section 1(b).

(b)     The purchase price for the Shares would be $1,150,000USD (the "*Purchase Price*"), and payable:

(i)     by the delivery by the Buyer to the Seller of Buyer's promissory note (the "*Promissory Note*"), payable in 36 consecutive months equaling with a debt service coverage ratio of 1.35 starting 20-30 days post-closing;

[eg. (EBITDA) / (payment to seller) must equal to 1.35 at all times]

(ii)    by a balloon lump sum at the end of the 36 month term for the remaining balance of the purchase price

(c)    Buyer has calculated the Purchase Price on the basis of information provided by the Seller to Buyer and on the basis that the Seller's EBITDA is ~$192,000 USD

(d)    If Buyer determines in its sole discretion to obtain a quality of earnings report (the "*QofE*"), the Purchase Price is subject to the receipt by Buyer of a satisfactory QofE.

2.    Conditions.  Buyer's obligation to close the proposed Transaction will be subject to customary conditions, including, but not limited to:

(a)    Buyer's satisfactory completion of due diligence and, if procured by Buyer, receipt of the QofE;

(b)    the Parties' execution of the Definitive Agreement and the ancillary agreements;

(c)    Seller entering into employment agreements with Buyer on terms agreed with Buyer, provided, that such employment agreements shall have a term of at least 12 months;

3.    Due Diligence.  From and after the date of this Letter of Intent, Seller will authorize its management to allow Buyer and its advisors full access to the facilities, records, key employees, customers, suppliers, and advisors of the Business for the purpose of completing Buyer's due diligence review. The due diligence investigation will include, but is not limited to, a complete review of the financial, legal, tax, environmental, intellectual property and labor records and agreements of the Business, and any other matters as Buyer's accountants, tax and legal counsel, and other advisors deem relevant.

4.    Covenants of Seller. During the period from the signing of this Letter through the execution of the Definitive Agreement, Seller will and the Stockholder will cause Seller to: (i) conduct the Business in the ordinary course in a manner consistent with past practice, (ii) maintain its properties and other assets in good working condition (normal wear and tear excepted), and (iii) use its best efforts to maintain the Business and employees, customers, assets, and operations as an ongoing concern in accordance with past practice.]

5.    Termination; Binding Provisions. This letter will automatically terminate and be of no further force and effect upon the earlier of (i) execution of the Definitive Agreement by Buyer and Seller, (ii) mutual agreement of Buyer and Seller, and (iii) 3:00PM on 03 25 2022.

6.    Bid Expiration. This offer will remain in effect until 3:00PM, New York City time, on 03/25/2022, unless accepted or rejected by Seller, or withdrawn by Buyer prior to that time.

(WTC#)

RB

2

7. GOVERNING LAW **This Agreement and any non-contractual obligations arising out of or in connection with it shall be governed by, and construed in accordance with, American law.**

8. Confidentiality. This Letter is confidential to the Parties and their representatives.

9. No Third-Party Beneficiaries. Except as specifically set forth or referred to herein, nothing herein is intended or shall be construed to confer upon any person or entity other than the Parties and their successors or assigns, any rights or remedies under or by reason of this Letter.

10. Expenses. The Parties will each pay their own transaction expenses, including the fees and expenses of investment bankers and other advisors, incurred in connection with the proposed Transaction.

11. Miscellaneous. This Letter may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement. The headings of the various sections of this Letter have been inserted for reference only and shall not be deemed to be a part of this Letter.

*(Remainder of this page intentionally left blank; signatures begin on the next page.)*

If you are in agreement with the terms set forth above and desire to proceed with the proposed Transaction on that basis, please sign this Letter of Intent in the space provided below and return an executed copy to me.

Very truly yours,

ACCESSHEAT INC.

By: _____

Name: Ruth Berenstein
Title: Partner

Agreed to and accepted:
Protech Metals, LLC

By: _____

Name: William R. Hall
Title: Founder

**4**

# **<u>EXHIBIT B</u>**

**EXHIBIT B**

**NC K-1** (42)
**(CD-401S)**
8-17-21

**Shareholder's Share of
N.C. Income, Adjustments, and Credits**
North Carolina Department of Revenue

DOR
Use
Only

For calendar year   2021   or other year starting        21   and ending

| Part. 1 Information about the Corporation | Part. 2 Information about the Shareholder |
|---|---|
| A. Corporation's Employer Identification Number | A. Shareholder's Identifying Number |
| B. Corporation's Name, Address, and Zip Code | B. Shareholder's Name, Address, and Zip Code |
| PROTECH METALS, LLC<br>3619 MURDOCKSVILLE ROAD<br><br>PINEHURST          NC 28374 | WILLIAM R HALL<br>9391 ABERDEEN ROAD<br><br>ABERDEEN          NC 28315 |
| | C. Shareholder's percentage of stock ownership for tax year<br>100.0000 % |

| Part 3. Shareholder's Pro Rata Share Items | Amount | Individuals Filing Form D-400 Enter Amount on: |
|---|---|---|
| **All Shareholders** | | |
| 1. Share of corporation income (loss) | 125674 | This amount should already be included in federal taxable income |
| 2. Additions to income (loss) | 15725 | D-400, Schedule S; Part A |
| 3. Deductions from income (loss) | 6676 | D-400, Schedule S; Part B |
| 4. Share of tax credits | 0 | D-400TC; see D-400 Instructions |
| 5. Share of tax withheld from nonwage compensation paid for personal services performed in N.C. | 0 | D-400; Line 20 |
| **Nonresidents Only** | | |
| 6. Nonresident's share of N.C. taxable income (loss) | 0 | See D-400 Instructions |
| 7. Nonresident's share of separately stated items of income | 0 | This amount should already be included in federal taxable income |
| 8. Nonresident's share of net tax paid by the S Corporation | 0 | D-400; Line 21d |

Attach additional NC K-1s if needed.

**NC K-1** (42)
**Supplemental**
**Schedule**
12-1-21

**2021 Owner or Beneficiary's Share
of N.C. Additions and Deductions**
North Carolina Department of Revenue

DOR
Use
Only

A pass-through entity, estate, or trust that reported N.C. additions or N.C. deductions to an owner or beneficiary on a NC K-1 form must provide each owner or beneficiary the information necessary for the owner or beneficiary to prepare the appropriate N.C. tax return. The pass-through entity, estate, or trust may use this schedule to provide the necessary information to the owner or beneficiary. (For more information, see the instructions for the appropriate N.C. tax return.)

| Entity's Legal Name<br>Protech Metals, LLC | Federal Employer ID Number |
|---|---|
| Individual Owner or Beneficiary's First Name    M.I.<br>William R | Individual Owner or Beneficiary's Last Name<br>Hall | Individual Owner or Beneficiary's SSN |
| Non-Individual Owner or Beneficiary's Legal Name | Federal Employer ID Number |

**Part A.   Additions to Income**

| | | COLUMN A<br>Enter the Amount<br>from all Sources | COLUMN B<br>Enter the Amount<br>from N.C. Sources |
|---|---|---|---|
| 1. | Interest Income From Obligations of States Other Than North Carolina | 1. | 1. |
| 2. | Deferred Gains Reinvested Into an Opportunity Fund | 2. | 2. |
| 3. | Bonus Depreciation | 3.      15725 | 3. |
| 4. | IRC Section 179 Expense | 4. | 4. |
| 5. | S-Corporation Shareholder Built-in Gains Tax | 5. | 5. |
| 6. | Amount by Which Federal Basis Exceeds State Basis for Property Disposed of in 2021 | 6. | 6. |
| 7. | Unabsorbed Net Operating Loss Deduction | 7. | 7. |
| 8. | State, Local, or Foreign Income Tax Deducted by an S Corporation, Partnership, or Estate and Trust | 8. | 8. |
| 9. | Withdrawal of 529 Plan Contributions Not Used for Permissible Purpose | 9. | 9. |
| 10. | Discharge of Qualified Principal Residence Indebtedness | 10. | 10. |
| 11. | Qualified Education Loan Payments Paid by Employer | 11. | 11. |
| 12. | Business Meal Deduction in Excess of 50% | 12. | 12. |
| 13. | Discharge of Certain Student Loan Debt | 13. | 13. |
| 14. | Reserved for Future Use | 14. | 14. |
| 15. | Total Additions - Add Lines 1 through 14 | 15.      15725 | 15. |

Form **1125-E**

(Rev. October 2016)

Department of the Treasury
Internal Revenue Service

**Compensation of Officers**

▶ Attach to Form 1120, 1120-C, 1120-F, 1120-REIT, 1120-RIC, or 1120S.

▶ Information about Form 1125-E and its separate instructions is at *www.irs.gov/form1125e.*

OMB No. 1545-0123

Name

Protech Metals, LLC

Employer identification number

**Note:** Complete Form 1125-E only if total receipts are $500,000 or more. See instructions for definition of total receipts.

| (a) Name of officer | (b) Social security number (see instructions) | (c) Percent of time devoted to business | Percent of stock owned | | (f) Amount of compensation |
|---|---|---|---|---|---|
| | | | (d) Common | (e) Preferred | |
| 1  William R Hall | | 100.000 % | 100.000 % | % | 54,791 |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |

| | | | |
|---|---|---|---|
| **2** | Total compensation of officers | **2** | 54,791 |
| **3** | Compensation of officers claimed on Form 1125-A or elsewhere on return | **3** | |
| **4** | Subtract line 3 from line 2. Enter the result here and on Form 1120, page 1, line 12 or the appropriate line of your tax return | **4** | 54,791 |

**For Paperwork Reduction Act Notice, see separate instructions.**

Form **1125-E** (Rev. 10-2016)

DAA

671121

| | ☐ Final K-1 | ☐ Amended K-1 | OMB No. 1545-0123 |
|---|---|---|---|

**Schedule K-1**
**(Form 1120-S)**
Department of the Treasury
Internal Revenue Service

**2021**
For calendar year 2021, or tax year

beginning _____ ending _____

**Shareholder's Share of Income, Deductions, Credits, etc.** ▶ See separate Instructions.

| Part I | Information About the Corporation |
|---|---|

A  Corporation's employer identification number

B  Corporation's name, address, city, state, and ZIP code
Protech Metals, LLC

3619 Murdocksville Road
Pinehurst       NC   28374

C  IRS Center where corporation filed return
e-file

D  Corporation's total number of shares
Beginning of tax year ..................... 100
End of tax year ..................... 100

| Part II | Information About the Shareholder |
|---|---|

E  Shareholder's identifying number

F  Shareholder's name, address, city, state, and ZIP code
William R Hall
9391 Aberdeen Road

Aberdeen        NC   28315

G  Current year allocation percentage ............... 100.000000 %

H  Shareholder's number of shares
Beginning of tax year ..................... 100
End of tax year ..................... 100

I  Loans from shareholder
Beginning of tax year .................. $ 0
End of tax year .................. $ 0

For IRS Use Only

| Part III | Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| 1 | Ordinary business income (loss) | 149,394 |
| 2 | Net rental real estate income (loss) | |
| 3 | Other net rental income (loss) | |
| 4 | Interest income | 44 |
| 5a | Ordinary dividends | |
| 5b | Qualified dividends | |
| 6 | Royalties | |
| 7 | Net short-term capital gain (loss) | |
| 8a | Net long-term capital gain (loss) | 7,000 |
| 8b | Collectibles (28%) gain (loss) | |
| 8c | Unrecaptured section 1250 gain | |
| 9 | Net section 1231 gain (loss) | -30,764 |
| 10 | Other income (loss) | |
| 11 | Section 179 deduction | |
| 12 | Other deductions | |

| 13 | Credits | |
|---|---|---|
| 14 | Schedule K-3 is attached if checked ..................... ▶ ☐ | |
| 15 | Alternative minimum tax (AMT) items | |
| 16 | Items affecting shareholder basis | |
| C* | | 597 |
| D | | 50,000 |
| 17 | Other information | |
| A | | 44 |
| K* | | STMT |
| V* | | STMT |
| AC* | | STMT |

| 18 | More than one activity for at-risk purposes* |
| 19 | More than one activity for passive activity purposes* |

\* See attached statement for additional information.

For Paperwork Reduction Act Notice, see the Instructions for Form 1120-S.  www.irs.gov/Form1120S         Schedule K-1 (Form 1120-S) 2021
DAA

# **<u>EXHIBIT C</u>**

**EXHIBIT C**

# PURCHASE AGREEMENT

This Purchase Agreement (this "*Agreement*") is entered into as of June 9th 2022, by and among AccessHeat, Inc., a Delaware corporation ("*Purchaser*"),and William R. Hall, doing business as Protech Metals LLC, a North Carolina corporation (the "*Company*"), and William R. Hall, a resident of the State of North Carolina (the "*Stockholder*", and the Company and the Stockholder, individually and interchangeably, each a "*Seller*", and, in the aggregate, the "*Sellers*").

**Witnesseth:**

**Whereas**, Purchaser desires to purchase all of the issued and outstanding shares of capital stock of the Company (the "*Stock*") from the Stockholder and the Stockholder desires to sell all of the issued and outstanding shares of capital stock of the Company to Purchaser pursuant to the terms and subject to the conditions of this Agreement; and

**Now, therefore**, in consideration of the aforementioned premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

1.  **Definitions.**

    1.01   **Definitions.**

    The following terms have the meanings specified in this Section 1.01:

    "*Accounts Receivable*" means all trade and other accounts receivable and other indebtedness owing to the Company, including the benefit of all collateral, security, guaranties, and similar undertakings received or held in connection therewith and any claim, remedy, or other right related to the foregoing.

    "*Affiliate*" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.   The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

    "*Antitrust Law*" means the national and directly effective legislation of any jurisdiction that governs the conduct of companies or individuals in relation to restrictive or other anti-competitive agreements or practices (including cartels, pricing, resale pricing, market sharing, bid rigging, terms of trading, purchase or supply, and joint ventures), dominant or monopoly market positions (whether held individually or collectively), and the control of acquisitions or mergers.

    "*Books and Records*" means all business, employee and financial records, books, ledgers, files, correspondence, documents, lists, studies, and reports, including customer lists, supplier lists and equipment repair, maintenance, service, personnel, payroll, employee benefit, quality control, and insurance records, whether written, electronically stored, or otherwise recorded.

"*Business*" means the business conducted or planned to be conducted by the Company, including electrical services, the financial results of which are included in the Books and Records.

"*Business Day*" means any day that is not a Saturday, Sunday, or any other day on which banks are required or authorized by law to be closed in the State of North Carolina.

"*CERCLA*" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"*Code*" means the Internal Revenue Code of 1986, as from time to time amended.

"*Confidential Information*" means information concerning the Business or the Company, including information relating to customers, clients, suppliers, distributors, investors, lenders, consultants, independent contractors or employees, customer and supplier lists, price lists and pricing policies, cost information, financial statements and information, budgets and projections, business plans, production costs, market research, marketing plans and proposals, sales and distribution strategies, manufacturing and production processes and techniques, processes and business methods, technical information, pending projects and proposals, new business plans and initiatives, research and development projects, inventions, discoveries, ideas, technologies, trade secrets, know-how, formulae, technical data, designs, patterns, marks, names, improvements, industrial designs, compositions, works of authorship and other Intellectual Property, devices, samples, plans, drawings and specifications, photographs and digital images, computer software and programming, all other confidential information and materials relating to the Business or the Company, and all notes, analyses, compilations, studies, summaries, reports, manuals, documents, and other materials prepared by or for any Seller containing or based in whole or in part on any of the foregoing, whether in verbal, written, graphic, electronic, or any other form and whether or not conceived, developed, or prepared in whole or in part by any Seller for the Business or the Company. Confidential Information shall not include information that is already in the public domain through no wrongful act of any Seller.

"*Consent*" means any consent, approval, authorization, permission, or waiver of any Person.

"*Contract*" means any instrument, document, contract, obligation, understanding, commitment, lease, license, purchase order, bid, or other agreement, whether written or oral or whether express or implied, together with all amendments and other modifications thereto.

"*Debt*" means, as to the Company: (a) obligations for borrowed money; (b) obligations evidenced by bonds, notes, debentures, or other similar instruments; (c) obligations to pay the deferred purchase price of capital assets; (d) capitalized lease obligations; (e) guaranteed indebtedness or other obligations of others; (f) obligations secured by an Encumbrance existing on any property or asset owned by such Person; (g) reimbursement obligations relating to letters of credit, bankers' acceptances, surety or other bonds, or similar instruments; and (h) net payment obligations pursuant to any credit derivative agreement.

"*Employment Agreement*" means the Employment Agreement between the Company and the Stockholder, substantially in the form attached to this Agreement as Exhibit B.

"*Encumbrance*" means any lien, mortgage, deed to secure debt, pledge, encumbrance, charge, claim, community property interest, condition, equitable interest, option, security interest,

easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"*Environmental Claim*" means any Proceeding, Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification, and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Substances; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"*Environmental Laws*" means all Laws relating to the environment (including ambient air, soil, surface water or groundwater, or subsurface strata), public health or safety, pollution, damage to or protection of the environment, endangered or threatened species, environmental conditions, Releases or threatened Releases of Hazardous Substances into the environment, or the use, manufacture, processing, distribution, treatment, storage, generation, disposal, remediation, transport, or handling of Hazardous Substances, whether existing in the past or present. Environmental Laws shall include, but are not limited to, the following Laws, and the regulations promulgated thereunder, as the same have been amended from time to time: the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"*Environmental Permits*" shall mean all Permits required under or issued pursuant to Environmental Laws.

"*ERISA*" means the Employee Retirement Income Security Act of 1974 as from time to time amended, and the regulations promulgated thereunder.

"*ERISA Affiliate*" means all employers (whether or not incorporated) that would be treated together with the Company or any of its Affiliates as a "single employer" within the meaning of Section 414 of the Code.

"*Financial Statements*" means the consolidated financial statements of the Company referred to in Section 4.05.

"*GAAP*" means generally accepted accounting principles in the United States as set forth in pronouncements of the Financial Accounting Standards Board (and its predecessors) and the American Institute of Certified Public Accountants and, unless otherwise specified, as in effect on the date hereof or, with respect to any Financial Statements, the date such financial statements

were prepared.

"*Governmental Body*" means any federal, state, local, foreign, or other government or quasi-governmental authority or any department, agency, subdivision, court, or other tribunal of any of the foregoing.

"*Hazardous Substance*" means: (a) any substance, material, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, polychlorinated biphenyls and urea formaldehyde.

"*Insurance Policies*" means those insurance policies insuring the Business and identified in Schedule 4.23.

"*Intellectual Property*" means all intellectual property and industrial property rights and assets, and all rights, interests, and protections that are associated with, similar to, or required for the exercise of, any of the foregoing, however arising, pursuant to the Laws of any jurisdiction throughout the world, whether registered or unregistered, including any and all: (a) inventions (whether patentable or unpatentable and whether or not reduced to practice), improvements thereto, and patents, patent applications, and patent disclosures, together with reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof; (b) trademarks, service marks, trade dress, logos, trade names, and corporate names, together with translations, adaptations, derivations, and combinations thereof and including goodwill associated therewith, and applications, registrations, and renewals in connection therewith; (c) works of authorship, expressions, designs, and design registrations, whether or not copyrightable, copyrightable works, copyrights, and applications, registrations, and renewals in connection therewith; (d) mask works and applications, registrations, and renewals in connection therewith; (e) trade secrets and Confidential Information; (f) computer software, in object and source code format (including data and related documentation); (g) internet domain names, whether or not trademarks, registered in any top-level domain by any authorized private registrar or Governmental Body, web addresses, web pages, websites and related content, accounts with Twitter, Facebook, and other social media companies and the content found thereon and related thereto, and URLs; (h) software and firmware, including data files, source code, object code, application programming interfaces, architecture, files, records, schematics, computerized databases, and other related specifications and documentation; (i) other proprietary rights; and (j) copies and tangible embodiments and expressions thereof (in whatever form or medium), all improvements and modifications thereto, and derivative works thereof.

"*Inventory*" means all inventory wherever located, including raw materials, greige goods, greige goods delivered to third party for toll processing, work-in-process, finished goods, spare parts, goods-in-transit, products under research and development, demonstration equipment, and inventory on consignment.

"*IRS*" means the Internal Revenue Service.

"*Knowledge of Sellers*" or "*Sellers' Knowledge*" means (a) the actual knowledge of the Stockholder after due inquiry or (b) knowledge that would be expected to be obtained by the Stockholder after a reasonably comprehensive investigation of the matter at issue, which investigation shall include, but not be limited to, (i) review of the relevant Sections of this Agreement and, if applicable, corresponding Schedule, (ii) review of the files and other

documents and information in the possession or control of the Company, (iii) making reasonable inquiry of the directors, officers, and employees of the Company who would reasonably be expected to have knowledge of the particular subject matter, (iv) making due and appropriate inquiry of counsel to the Company with respect to matters involving questions of law, and (v) otherwise conducting a reasonable investigation regarding the matter in question.

"*Law*" means any federal, state, local, foreign, or other law, statute, ordinance, regulation, rule, regulatory or administrative guidance, Order, constitution, treaty, principle of common law, or other restriction of any Governmental Body.

"*Liability*" means any liability, obligation, or commitment of any kind or nature, whether liquidated or unliquidated, due or to become due, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured, or otherwise.

"*License*" means a Contract under which the Company is authorized to use the Intellectual Property of any Person.

"*Losses*" means losses, damages, liabilities, deficiencies, Proceedings, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers.

"*Material Adverse Effect*" means any event, occurrence, fact, condition, or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the Business, results of operations, properties, prospects, assets, liabilities, or condition (financial or otherwise) of the Company or (b) the ability of Sellers to consummate the Transactions on a timely basis.

"*Order*" means any order, award, decision, injunction, judgment, ruling, decree, charge, writ, subpoena or verdict entered, issued, made, or rendered by any Governmental Body or arbitrator.

"*Organizational Documents*" means (a) the articles of organization, (b) the bylaws, (c) any documents comparable to those described in clauses (a) and (b) as may be applicable pursuant to any Law, and (d) any amendment or modification to any of the foregoing.

"*Parties*" means Purchaser and Sellers.

"*Permit*" means any permit, license or Consent issued by, or required to be obtained from, any Governmental Body or pursuant to any Law.

"*Permitted Encumbrance*" means (a) any mechanic's, materialmen's, or similar statutory lien incurred in the ordinary course of business consistent with past practice for monies not yet due and that is not, individually or in the aggregate, material to the Business, (b) restrictions on use of the Intellectual Property under the Licenses; and (c) any lien for Taxes not yet due.

"*Person*" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Body, unincorporated organization, trust, association, or other entity.

"*Post-Closing Tax Period*" means any taxable period beginning at or after the Effective Time and, with respect to any taxable period beginning before and ending after the Effective Time, the portion of such taxable period beginning at the Effective Time.

"*Pre-Closing Taxes*" means Taxes of the Company for any Pre-Closing Tax Period.

"*Pre-Closing Tax Period*" means any taxable period ending before the Effective Time and, with respect to any taxable period beginning before and ending after the Effective Time, the portion of such taxable period ending before the Effective Time.

"*Proceeding*" means any proceeding, charge, complaint, claim, demand, notice, action, suit, litigation, hearing, audit, summons, subpoena, investigation, inquiry, arbitration, or mediation of any nature (in each case, whether civil, criminal, administrative, investigative, or informal).

"*Promissory Note*" means the promissory note substantially in the form of Exhibit A attached hereto.

"*Real Property*" means the real property owned or leased by the Company, together with all buildings, structures, and other improvements thereon (including all easements, rights-of-way, tenements, hereditaments, appurtenances, fixtures, and other real property rights appertaining thereto).

"*Release*" means any intentional or unintentional release, discharge, spill, leaking, pumping, pouring, emitting, emptying, discharge, injection, leaching, abandonment, disposal, escape, dumping or migration into or through the environment (including ambient air, surface water, groundwater, land surface, or subsurface strata or within any building, structure, facility, or fixture) of a Hazardous Substance.

"*Representative*" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants, and other agents of such Person.

"*Tax*" means any federal, state, local, foreign or other income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code § 59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, general service, alternative, or add-on minimum, estimated, or other tax of any kind whatsoever, however denominated, and will include any interest, penalty, or addition thereto, whether disputed or not.

"*Tax Benefit*" means, with respect to a taxable period, the excess, if any, of (a) the Purchaser Indemnitees' cumulative liability for Taxes through the end of such taxable period, calculated by excluding any Tax items attributable to a Loss from all taxable periods, less (b) the Purchaser Indemnitees' actual cumulative liability for Taxes through the end of such taxable period, calculated by taking into account any Tax items attributable to the Loss for all taxable periods, taking into account an appropriate measure of the time value of money.

"*Tax Returns*" means any return, declaration, report, claim for refund, information return, or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"*Transaction Documents*" means this Agreement, the Employment Agreement, and all other written agreements, documents, and certificates required to be executed and delivered by any of the Parties at Closing.

"*Transactions*" means the transactions contemplated by the Transaction Documents.

2.    **Purchase and Sale.**

**2.01    Purchase and Sale.**

Subject to the terms and conditions set forth herein, at the Closing, the Stockholder shall sell to Purchaser, and Purchaser shall purchase from the Stockholder, the Stock, free and clear of all Encumbrances, for the Purchase Price specified in Section 2.02.

**2.02    Purchase Price.**

In consideration for the sale of the Stock in accordance with Section 2.01, at the Closing, Purchaser shall pay to the Stockholder an aggregate purchase price equal to $1,150,000 (the "*Purchase Price*") payable in accordance with the terms of the Promissory Note.

**2.03.01    Closing.**

Subject to the terms and conditions of this Agreement, the purchase and sale of the Stock contemplated hereby shall take place at a closing (the "*Closing*") to be effective at 12:01 a.m., Eastern time, on the Closing Date (the "*Effective Time*"), which shall take place on the first Business Day following the full satisfaction or due waiver of all of the Closing conditions set forth in Article 12 hereof (other than those to be satisfied at the Closing), or on such other date as the Stockholder and Purchaser may mutually agree upon in writing (the day on which the Closing takes place being the "*Closing Date*"). The Parties may participate in the Closing remotely by use of telephone, e-mail, and facsimile transmission.

**2.03.02    Purchaser's Closing Deliveries.**

Subject to satisfaction or waiver of the conditions set forth in Section 12.01, at the Closing, Purchaser shall:

(a)    pay to the Stockholder the Purchase Price by issuance to the Stockholder of the Promissory Note,

**2.03.03    Sellers' Closing Deliveries.**

Subject to satisfaction or waiver of the conditions set forth in Section 12.02, at the Closing, the Stockholder shall deliver to Purchaser the following:

(a)    the Stockholder's Certificate and the documents contemplated by Section 12.01.03, Section 12.01.04, and Section 12.01.06.

3.    **Reserved.**

4.      **Representations and Warranties of Sellers.**

Sellers, jointly and severally, represent and warrant to Purchaser as follows:

**4.01    Organization and Qualification: Subsidiaries.**

Schedule 4.01 sets forth the jurisdiction of incorporation of the Company and the other jurisdictions in which the Company is qualified to do business, along with the officers and directors of the Company. The Company is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business as currently conducted makes such licensing or qualification necessary. The Company is a limited liability duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization, with full limited liability company power and authority to conduct the Business, as it has been and is now being conducted, to own or use the properties and assets that it purports to own or use and to perform all of its obligations necessary to the operation of the Business. The Company has delivered or made available to Purchaser correct and complete copies of its Organizational Documents. The minute books and ownership records of the Company, as delivered or made available to Purchaser, are correct and complete. The Company does not own or hold the right to acquire any stock, partnership interest, joint venture interest or other equity ownership interest in any other corporation, organization, entity, or Person.

**4.02    Capitalization.**

Schedule 4.02 sets forth the authorized equity interests of the Company, the number of equity interests that are issued and outstanding, and the number of shares of capital stock held by the Stockholder. There are no outstanding equity interests of the Company other than the equity interests owned by the Stockholder. All of the equity interests have been duly authorized and validly issued, are fully paid and nonassessable, are owned of record and beneficially solely by the Stockholder, free and clear of all Encumbrances, and were issued in compliance with all applicable federal and state securities laws. There are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal or similar rights), or agreements, arrangements, or understandings, orally or in writing, to purchase or acquire any equity interests of the Company or any securities convertible into, exercisable for, or exchangeable for equity interests of the Company or other rights, agreements, arrangements, or commitments of any character relating to the equity interests of the Company or obligating the Stockholder or the Company to issue or sell any equity interests of, or any other equity interest in, the Company. None of the equity interests were issued in violation of any Contract, arrangement, or commitment to which the Company or the Stockholder then was a party or then was subject to or in violation of any preemptive or similar rights of any Person. There are no voting trusts, stockholder agreements, proxies, or other Contracts or understandings in effect with respect to the voting or transfer of any of the equity interests. Upon consummation of the transactions contemplated by this Agreement, Purchaser shall own all of the Stock, free and clear of all Encumbrances.

**4.03    Authority.**

Each Seller has full power, capacity, and authority to execute and deliver this Agreement and the other Transaction Documents to which it or he is a party, to perform its or his obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

Each Seller's execution and delivery of this Agreement and the other Transaction Documents to which it or he is a party, such Seller's performance of its or his obligations hereunder and thereunder, and such Seller's consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite action of such Seller. This Agreement has been duly executed and delivered by each Seller, and constitutes a legal, valid, and binding obligation of each Seller enforceable against such Seller in accordance with its terms. When each other Transaction Document to any Seller is or will be a party has been duly executed and delivered by such Seller, such Transaction Document will constitute the valid and legally binding obligations of such Seller, enforceable against such Seller in accordance with the terms of such Transaction Document.

**4.04     No Conflicts.**

The execution, delivery and performance by each Seller of this Agreement and the other Transaction Documents to which such Seller is a party, and the consummation of the Transactions, do not and will not, directly or indirectly, with or without notice or lapse of time: (a) violate any Law to which any Seller is subject; (b) violate any Permit held by the Company or give any Governmental Body the right to terminate, revoke, suspend or modify any Permit held by the Company; (c) violate any Organizational Document of the Company or any resolution adopted by its board of directors or the Stockholder; (d) violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of or give any Person the right to accelerate the maturity or performance of, or to cancel, terminate, modify or exercise any remedy under, any Contract to which any Seller is a party or by which any Seller is bound; (e) cause Purchaser to have any Liability for any Tax; or (f) result in the creation or imposition of any Encumbrance upon any of the Company's properties or assets. Except as set forth on **Schedule 4.04**, Sellers are not required to notify, make any filing with, or obtain any Consent of any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents or in order to consummate the Transactions.

**4.05     Financial Statements.**

(a)     Sellers have delivered complete copies of the (i) annual reviewed financial statements of the Company for the year ended [2021], including balance sheet, statements of income and members equity, and statement of cash flows for the year then ended and (ii) compilation report for the year ended [2021], which Financial Statements are included in **Schedule 4.05.** The Financial Statements have been prepared in accordance with Sellers' customary accounting and bookkeeping practices applied on a consistent basis throughout the periods covered thereby and present fairly the assets and liabilities of the Company as of their respective dates and the results of operations for the respective periods covered thereby.

(b)     The Books and Records of the Company, all of which have been made available to Purchaser, and to the best of Sellers' knowledge, (i) are complete and correct in all material respects and all transactions to which it is or has been a party are accurately reflected therein in all material respects on an accrual basis, (ii) reflect all discounts, returns and allowances granted by the Company with respect to the periods covered thereby, (iii) have been maintained in accordance with customary and sound business practices in the Company's industry, (iv) form the basis for the Financial Statements, and (v) reflect in all material respects the assets, liabilities, financial position, results of operations, and cash flows of the Company on an accrual basis. All computer-generated reports and other computer output included in the Books and Records are

complete and correct in all material respects and were prepared in accordance with sound business practices based upon authentic data.

**4.06     Absence of Certain Changes.**

Except as set forth in Schedule 4.06, since December 31, 2021:

(a)      The Company has not (i) sold, leased, transferred or assigned any asset, other than for fair consideration and in the ordinary course of business consistent with past practice, (ii) purchased, leased, or acquired the right to own, use, or lease any property or assets, except for purchases of inventory or supplies in the ordinary course of business consistent with past practice, or
(iii) acquired by merger or consolidation with, or by purchase of a substantial portion of the assets or stock of, or by any other manner, any business or any Person or any division thereof;

(b)      The Company has not experienced any damage, destruction, or loss (whether or not covered by insurance) to its property or assets, individually or in the aggregate, in excess of $5,000;

(c)      No Encumbrance (other than any Permitted Encumbrance) has been imposed upon any asset, property, or securities of the Company (including the shares of Stock);

(d)      The Company has not made any loan to, guaranteed the debt of, or invested in, any other Person or joint venture;

(e)      The Company has not borrowed any money or incurred any Debt, except in the ordinary course of business consistent with past practice. The Company has not delayed or postponed the payment of accounts payable or any periodic payment due under any Debt instrument;

(f)      Except for trade claims settled in the ordinary course of business consistent with past practice, the Company has not canceled, compromised, waived, or released any right or claim (or series of related rights or claims) owed to it;

(g)      The Company has not (i) issued, sold, or otherwise disposed of any of its securities, (ii) granted any options, warrants, or other rights to acquire (including upon conversion, exchange, or exercise) any of its securities, (iii) split, combined, or reclassified of any its securities, (iv) declared or paid any dividends or distributions on or in respect of any of its securities, except for distributions to the Stockholder to allow the Stockholder to pay his Taxes and other distributions, all of which are reflected in the Financial Statements, or (v) redeemed, purchased, or acquired any of its securities;

(h)      The Company has not (i) conducted the Business outside the ordinary course of business consistent with past practice, (ii) made any loan to (or forgiven any loan to), or entered into any other transaction with, the Stockholder or current or former directors, officers, or employees of the Company, (iii) entered into any employment contract or modified the terms of any existing employment contract, except for employment agreements for sales personnel entered into in the ordinary course of business consistent with past practice and, if in effect, attached to Schedule 4.20.01, (iv) granted any severance, pension, bonus, whether monetary or otherwise, or increase in the base compensation, in respect of any of its current or former directors or officers, except as disclosed in Schedule 4.20.01, (v) adopted, amended, modified, or terminated any Benefit Plan or

other Contract for the benefit of any of its current or former directors, officers, employees,

independent contractors, or consultants, (vi) entered into any Contract that would constitute a Material Contract, (vii) accelerated, terminated, materially modified, or canceled any material Contract to which the Company is a party or by which it is bound, (viii) made any capital expenditures other than those made in the ordinary course of business consistent with past practice, (ix) entered into a new line of business or abandoned or discontinued any existing lines of business, (x) adopted any plan of merger, consolidation, reorganization, liquidation, or dissolution or filed a petition in bankruptcy under any provisions of federal or state bankruptcy law or consented to the filing of any bankruptcy petition against it under any similar law;

(i)    The Company has not (i) made a material change in its accounting methods or practices, (ii) made a material change in its cash management practices and its policies, practices, and procedures with respect to collection of accounts receivable, establishment of reserves for uncollectible accounts, accrual of accounts receivable, inventory control, prepayment of expenses, payment of trade accounts payable, accrual of other expenses, deferral of revenue, and acceptance of customer deposits, or (iii) taken any action to make, change, or rescind any Tax election, amended any Tax Return, or taken any position on any Tax Return, or taken any action, omitted to take any action, or entered into any other transaction that would have the effect of increasing the Tax liability or reducing any Tax asset of Purchaser or any of its Affiliates in respect of any Post-Closing Tax Period;

(j)    Except for worker's compensation claims that are covered by insurance and garnishments of employee wages and the Proceedings disclosed in Schedule 4.17, there have not been any Proceedings commenced nor, to the Knowledge of Sellers, threatened or anticipated relating to or affecting the Business or any property or asset owned or used by the Company;

(k)    There has not been (i) any material loss of any distribution channel, sales location, other customer, or other supplier, or source of supply of Inventory, utilities, or contract services or the receipt of any oral or written notice that such a loss may be pending or that there may be a material change in the relationship between the Company and any of the foregoing, (ii) any occurrence, event, or incident related to the Company outside of the ordinary course of business consistent with past practice, (iii) any Material Adverse Effect, or (iv) any amendment of the Organizational Documents of the Company; and

(l)    The Company has not agreed or committed to any of the foregoing.

**4.07    No Undisclosed Liabilities.**

Except as set forth in the Financial Statements, to the best of Sellers' knowledge, the Company has no Liabilities (and no basis exists for any Liability), except for current liabilities incurred in the ordinary course of business consistent with past practice since the Interim Balance Sheet Date (none of which results from, arises out of, relates to, is in the nature of, or was caused by any tort, infringement, or violation of Law) and which are not, individually or in the aggregate, material in amount.

**4.08    Title to and Sufficiency of Tangible and Intangible Assets.**

The Company has good and marketable title to, or a valid leasehold interest in, the tangible and intangible assets used or held for use in the operation of the Business, free and clear of any Encumbrances except Permitted Encumbrances. The tangible and intangible assets used or held for use in the operation of the Business are adequate for the continued conduct of the Business

after the Closing Date in the same manner as conducted prior to the Closing Date and constitute all of the rights, property, and assets necessary to conduct the Business as currently conducted.

**4.09    Tangible Personal Property; Condition of Purchased Assets.**

The tangible assets that are owned or leased by the Company are structurally sound, free from material defects, in good operating condition and repair, and adequate for the uses to which they are being put. None of such tangible assets is in need of maintenance or repairs, except for ordinary, routine maintenance and repairs that are not material in nature or cost to such tangible assets. All of the tangible assets owned or leased by the Company are located on the Real Property.

**4.10    Accounts Receivable.**

All Accounts Receivable that are reflected on the accounting records of the Company represent valid obligations arising from products actually sold or services actually performed by the Company in the ordinary course of business consistent with past practice. The Accounts Receivable are current and collectible in full within the 90-day period immediately following the Closing Date in accordance with their terms. To the best of Sellers' knowledge, there is no contest, claim, or right to set-off, other than returns, claims, and price and quantities discrepancies arising in the ordinary course of business consistent with past practice and that are not, individually or in the aggregate, material under any Contract with any obligor of an Account Receivable relating to the amount or validity of such Account Receivable. Schedule 4.10 contains a list of all Accounts Receivable as of the date of this Agreement and the aging of each Account Receivable.

**4.11    Inventory.**

The Inventory consists of a quality and quantity usable for its intended purpose and saleable in the ordinary course of business consistent with past practice, except for slow-moving and obsolete items and items of below-standard quality, all of which have been written off or written down to net realizable value with appropriate reserves on the accounting records and the Financial Statements. All Inventory not written off has been valued at the lower of cost or market value. The quantities of each type of Inventory are reasonable in the present circumstances of the Company and are not materially more or less than normal Inventory levels necessary to conduct the Business in the ordinary course of business consistent with past practice. All of the Inventory is located on the Real Property.   All such Inventory is owned by the Company, free and clear of all Encumbrances, except Permitted Encumbrances.

**4.12    Real Property.**

The Company does not own any Real Property. The real property at the addresses listed on Schedule 4.12 (the "***Leased Real Property***") constitutes all of the Real Property leased by the Company. The leases under which the Company leases each Leased Real Property (the "***Real Property Leases***") are in full force and effect, and the Company holds a valid leasehold interest in the Leased Real Property, to which each Real Property Lease relates, subject to the application of any bankruptcy or creditor's rights Laws. Schedule 4.12 also sets forth a complete and accurate list of the Real Property Leases. Sellers have delivered to Purchaser complete and accurate copies of each Real Property Lease. The Company is not in default under any of such Real Property Leases, including all amendments and modifications thereto (to the extent any such amendment

or modification has been made other than in writing then such amendment or modification has been fully and accurately described in Schedule 4.12), and, to Seller's Knowledge, no landlord or other party is in default under any such Real Property Leases. To Sellers' Knowledge, there are no pending or threatened condemnation Actions relating to any Leased Real Property, the Company has not entered into, and is not aware of, any subleases, licenses or other agreements, oral or written, granting any other Person the right to use or occupy any portion of the Leased Real Property and, to Sellers' Knowledge, there are no outstanding options or rights of first refusal to purchase any portion of the Leased Real Property or any interest therein.

**4.13    Contracts.**

**4.13.01    Purchases of Raw Materials and Sales of Inventory.**

The Company purchases all raw materials by purchase order and without a supply agreement.

**4.13.02    Leases of Tangible Personal Property.**

The Company leases the tangible personal property identified in Schedule 4.13.02.

**4.13.03    Licenses for Intellectual Property.**

Attached as Schedule 4.13.03 is a list of all Licenses, with a true and complete copy of each License attached thereto. The Company has performed all of its obligations under each License, and there are no grounds for termination of any License by virtue of a default on the part of the Company.

**4.13.04    Guaranties.**

The Company has not guaranteed the obligations of any Person.

**4.13.05    Indemnification Agreements.**

The Company does not have any Contracts that obligate it to indemnify another Person for any Loss or expense for any reason, except for the indemnification provisions contained in its Organizational Documents for its officers and directors.

**4.13.06    The Company's Deposit Accounts.**

The Company has the deposit accounts set forth in Schedule 4.13.06.

**4.13.07    Reserved.**

**4.13.08    Other Material Contracts.**

Schedule 4.13.08 lists each of the following Contracts of the Company (such Contracts, collectively with all Contracts of the Company described in the above subsections of this Section 4.13, the Real Property Leases and the employment agreements attached to Schedule 4.20.01, the "*Material Contracts*"):

(i)    all Contracts with Material Customers and all Contracts with Material Suppliers;

(ii)     all Contracts that require the Company to purchase its total requirements of any product or service from a third party or that contain "take or pay" provisions;

(iii)    all Contracts that provide for the assumption of any Tax, environmental, or other Liability of any Person;

(iv)    all Contracts that relate to the acquisition or disposition of any business, a material amount of stock or assets of any other Person, or any real property (whether by merger, sale of stock, sale of assets, or otherwise);

(v)     all broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing consulting, and advertising Contracts to which the Company is a party;

(vi)    all Contracts with independent contractors or consultants (or similar arrangements) to which the Company is a party;

(vii)   all Contracts relating to Debt or related to any Encumbrance (except for Permitted Encumbrances) on any of the assets of the Company;

(viii)  all Contracts with any Governmental Body to which the Company is a party;

(ix)    all Contracts that limit or purport to limit the ability of the Company to compete in any line of business or with any Person or in any geographic area or during any period of time;

(x)     all Contracts to which the Company is a party that provide for any joint venture, partnership, or similar arrangement by the Company;

(xi)    all Contracts between or among the Company, on the one hand, and the Stockholder or any Affiliate of the Stockholder, on the other hand; and

(xiii)  any other Contract that is material to the Company or the Business and not previously disclosed pursuant to this Section 4.13.

**4.13.09    Enforceability of Material Contracts; No Breach.**

Each Material Contract is valid and binding on the Company in accordance with its terms and is in full force and effect.   Neither the Company nor, to Sellers' Knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Material Contract. No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. Complete and correct copies of each Material Contract (including all modifications, amendments, and supplements thereto and waivers thereunder) have been delivered or made available to Purchaser.

**4.14    Intellectual Property.**

Schedule 4.14 contains a list of all Intellectual Property that is owned by the Company. With the licensed Intellectual Property described in Schedule 4.13.03, the Company has valid rights to all the Intellectual Property used in, held for use in connection with, necessary for the conduct of, or otherwise material to, the Business. The Company exclusively owns or has the right to use, pursuant to a license listed in Schedule 4.13.03, all of the Intellectual Property, free from any Encumbrances and free from any requirement of any past, present, or future royalty payments, license fees, charges or other payments, or conditions or restrictions whatsoever. The Company has not licensed any owned Intellectual Property to a third party. To the Knowledge of Sellers, the Company has not violated or infringed upon, or otherwise come into conflict with, any Intellectual Property of third parties, and the Company has not received any notice alleging any such violation, infringement, or other conflict. To the Knowledge of Sellers, no Person has violated, infringed upon, or otherwise come into conflict with any Intellectual Property of the Company. All registrations for owned Intellectual Property are in good standing, except for common law copyrights for original printed carpet designs, which are not registered. The consummation of the Transactions will not result in the loss or impairment of or payment of any additional amounts with respect to, nor require the consent of any other Person in respect of, the Company' right to own, use, or hold for use any Intellectual Property as owned, used, or held for use in the conduct of the Business as currently conducted. The Company has taken all reasonable steps to maintain its owned Intellectual Property and to protect and preserve the confidentiality of all trade secrets included therein. With respect to each website included in the Intellectual Property of the Company, the Company has taken commercially reasonable steps to: (i) maintain what it believes are adequate computer resources to help ensure that no service outages will occur due to insufficient data-storage, memory, server response levels, or other related reasons (except outages that are at industry acceptable levels); (ii) protect the confidentiality, integrity, and security of such websites against any unauthorized use, access, interruption, modification, or corruption, as the case may be; and (iii) obtain consent for its acquisition, storage, transfer, and use of personal information as required by applicable Law.

**4.15    Taxes.**

    **4.15.01    Tax Returns.**

The Company has delivered to Purchaser true, correct, and complete copies of all federal and state income Tax Returns filed by the Company for all taxable periods ending on or after December 31, 2014. The Company has made available to Purchaser for inspection all other Tax Returns for all taxable periods ending on or after December 31, 2014. All Tax Returns with respect to Taxes required to be filed by the Company have been timely filed (giving effect to extensions granted with respect thereto), and to the Knowledge of Sellers, all such Tax Returns are true, correct, and complete in all material respects. The Company has timely paid all Taxes due or claimed to be due from it by any Governmental Body and no deficiency for any Taxes has been proposed, asserted, or assessed against the Company that has not been resolved and paid in full. Except for Permitted Encumbrances, there are no Encumbrances for Taxes upon any of the assets of the Company or otherwise relating to the Business. No claim has been made by any taxing authority in any jurisdiction where the Company does not file Tax Returns that it is, or may be, subject to Tax by that jurisdiction. No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of the Company.

    **4.15.02    Reserved.**

**4.15.03    Audit.**

No audit or other Proceeding by any Governmental Body is presently pending or, to the Knowledge of Sellers, threatened or contemplated with respect to any Taxes or Tax Return of the Company and Sellers have not received written notice of any pending, threatened, or contemplated audits or Proceedings. The Company's federal and state income Tax Returns have never been audited.

**4.15.04    Withholding Taxes.**

The Company has complied with all applicable Laws relating to the payment and withholding of Taxes and has, within the time and the manner prescribed by Law, withheld from employee wages and paid over to the proper Governmental Bodies all amounts required to be so withheld and paid over under applicable Laws. The Company has withheld and paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any independent contractor, creditor, customer, shareholder, or other party, and complied with all information reporting and backup withholding provisions of applicable Law.

**4.15.05    FIRPTA.**

No Seller is a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2. The Company is not, nor has it been, a United States real property holding corporation (as defined in Section 897(c)(2) of the Code) during the applicable period specified in Section 897(c)(1)(a) of the Code.

**4.15.06    Other Tax Matters.**

The Company is not a party to, or bound by, any Tax indemnity, Tax sharing, or Tax allocation agreement. No private letter rulings, technical advice memoranda, or similar agreement or rulings have been requested, entered into, or issued by any taxing authority with respect to the Company. The Company has not been a member of an affiliated, combined, consolidated, or unitary Tax group for Tax purposes. The Company has no Liability for Taxes of any Person (other than the Company) under Treasury Regulations Section 1.1502-6 (or any corresponding provision of state, local, or foreign Law), as transferee or successor, by Contract or otherwise. The Company will not be required to include any item of income in, or exclude any item or deduction from, taxable income for any taxable period or portion thereof ending after the Closing Date as a result of: (i) any change in a method of accounting under Section 481 of the Code (or any comparable provision of state, local, or foreign Tax Laws), or use of an improper method of accounting, for a taxable period ending on or prior to the Closing Date; (ii) an installment sale or open transaction occurring on or prior to the Closing Date; (iii) a prepaid amount received on or before the Closing Date; (iv) any closing agreement under Section 7121 of the Code, or similar provision of state, local, or foreign Law; or (v) any election under Section 108(i) of the Code. The Company has not been a "distributing corporation" or a "controlled corporation" in connection with a distribution described in Section 355 of the Code. The Company is not, and has not been, a party to, or a promoter of, a "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011-4(b).

4.16    Legal Compliance; Permits.

To the Knowledge of Sellers, the Company is, and since its inception, has been, in compliance in all material respects with all applicable Laws and Permits relating to the operation of the Business. No Proceeding is pending, has been filed or commenced, against the Company alleging any failure to comply with any applicable Law or Permit. To the Knowledge of Sellers, no event has occurred or circumstance exists that (with or without notice or lapse of time) may constitute or result in a violation by any Seller of any Law or Permit relating to the Business. No Seller has received any notice or other communication from any Person regarding any actual, alleged, or potential violation by the Company of any Law or Permit or any cancellation, termination, or failure to renew any Permit held by the Company relating to the Business. The Company has not engaged in any agreement, arrangement, practice, or conduct that amounts to an infringement of Antitrust Law of any jurisdiction in which the Company conducts business and no director of the Company is engaged in any activity that would be an offense or infringement under any such Antitrust Law. The Company is not affected by any existing or pending Orders of any relevant Governmental Body responsible for enforcing the Antitrust Law of any jurisdiction and the Company has not given any undertakings or commitments to such bodies that affect, or could affect, the conduct of the Business. To the Knowledge of Sellers, all Permits required for the Company to conduct the Business have been obtained by it and are valid and in full force and effect. To the Knowledge of Sellers, all fees and charges with respect to such Permits have been paid in full. The Company holds the Permits identified in Schedule 4.16 that are utilized in the Business, which Schedule includes the respective dates of issuance and expiration. To the Knowledge of Sellers, the Company is in material compliance with the terms of each Permit.

4.17    Litigation; Orders.

Except as set forth on Schedule 4.17, there is no Proceeding pending or, to the Knowledge of Sellers, threatened or anticipated relating to or affecting (a) the Company, the Stockholder, the Business, or any asset owned or used by it or (b) the Transactions. To the Knowledge of Sellers, no event has occurred or circumstance exists that would reasonably be expected to give rise to or serve as a basis for the commencement of any such Proceeding. There are no outstanding Orders and no unsatisfied judgments, penalties, or awards against or affecting the Company or any of its properties or assets.

4.18    Product and Service Warranties.

To the Knowledge of Sellers, each product manufactured and/or sold by the Company has been in conformity with all applicable contractual commitments and all express and implied warranties. While there are warranty claims in the ordinary course of business consistent with past practice, those claims, in the aggregate, have not exceeded $25,000 annually. No product manufactured and/or sold by the Company is subject to any guarantee, warranty, or indemnity beyond the applicable standard terms and conditions of sale, a true and complete copy of the form of which has been made available to the Purchaser.

4.19    Environmental Matters.

4.19.01    Compliance with Environmental Laws.

To the Knowledge of Sellers, Sellers have operated and are currently operating the Business in compliance in all material respects with all Environmental Laws and the

Environmental Permits and no Seller has received from any Person any Environmental Claim.

**4.19.02    No Release.**

To the Knowledge of Sellers, there have been no Releases of Hazardous Substances on the Leased Real Property (or any real property formerly owned, operated, or leased by the Company) or in connection with the operation of the Business.

**4.19.03    Notices.**

No Seller has received any written notice, or, to Knowledge of Sellers, any oral notice, from any Person that any Seller, the Leased Real Property, or the operation of the Business: (i) is in violation of the requirements of any Environmental Laws; (ii) is the subject of a Proceeding or Order arising under any Environmental Laws; (iii) has actual or potential Liability under any Environmental Laws; or (iv) in respect of any Environmental Claim. No Seller has received any written notice, or to the Knowledge of Sellers, any oral notice, from any Person that any Leased Real Property (or real property formerly owned, operated, or leased in connection with the Business), including soils, groundwater, surface water, buildings, and other structures located on any such real property, has been contaminated with any Hazardous Substances that could reasonably be expected to result in a Proceeding or Environmental Claim under any Environmental Law against, or a violation of any Environmental Law by, the Company.

**4.19.04    No Reporting or Remediation Obligations.**

To the Knowledge of Sellers there are no environmental conditions arising out of or relating to the Company, the Business, or the use, operation, or occupancy of the Leased Real Property that result or reasonably could be expected to result in (i) any obligation of the Company to file any report or notice, to conduct any investigation, sampling, or monitoring or to effect any environmental cleanup or remediation, whether on-site or offsite or (ii) Liability, either to Governmental Bodies or third parties, for damages (whether to person, property, or natural resources), cleanup costs, or remedial costs of any kind or nature whatsoever. None of the Leased Real Property or any real property formerly owned, operated, or leased by the Company is listed on, or has been proposed for listing on, the National Priorities List (or CERCLIS) under CERCLA, or any similar state list.

**4.19.05    Storage Tanks.**

The Company does not own or operate any active or abandoned aboveground or underground storage tanks.

**4.19.06    Facilities.**

Schedule 4.19.06 contains a complete and accurate list of all off-site Hazardous Substances treatment, storage, or disposal facilities or locations used by the Company, and none of these facilities or locations has been placed or proposed for placement on the National Priorities List (or CERCLIS) under CERCLA, or any similar state list, and no Seller has received any environmental notice regarding potential Liabilities with respect

to such off-site Hazardous Substances treatment, storage, or disposal facilities or locations used by the Company.

### 4.19.07    Other Environmental Matters.

To the Knowledge of Sellers, the Company has not retained or assumed, by Contract or operation of Law, any Liabilities of third parties under any Environmental Law. Seller has provided or otherwise made available to Purchaser and listed in Schedule 4.19.07: (i) any and all environmental reports, studies, audits, records, sampling data, site assessments, risk assessments, economic models, and other similar documents with respect to the business or assets of the Company or any currently or formerly owned, operated, or leased real property that are in the possession or control of any Seller related to compliance with Environmental Laws, Environmental Claims, or an environmental notice or the release of Hazardous Substances and (ii) any and all material documents concerning planned or anticipated capital expenditures required to reduce, offset, limit, or otherwise control pollution and/or emissions, manage waste, or otherwise ensure compliance with current or future Environmental Laws (including, without limitation, costs of remediation, pollution control measures, and operational changes). No Seller is aware of or reasonably anticipates, as of the Closing Date, any condition, event, or circumstance concerning the release or regulation of Hazardous Substances that might, after the Closing Date, prevent, impede, or materially increase the costs associated with the ownership, lease, operation, performance, or use of the Business, properties, or assets of the Company as currently carried out.

## 4.20    Employee Matters.

### 4.20.01    Employees.

The Company employs all employees utilized by it. Attached as Schedule 4.20.01 is a schedule that reflects the following information for each current employee, independent contractor, and consultant of the Company: name, the last four digits of his or her social security number, hire date, job description, full- or part-time status, current rate of base compensation, bonus or other incentive-based compensation, and whether the employee has an employment agreement. Copies of all employment agreements between the Company and its employees are attached to Schedule 4.20.01. Except for the employment agreements attached to Schedule 4.20.01, there are no outstanding Contracts of the Company with respect to any compensation, commissions, or bonuses. The Company does not have employees outside of the United States.

### 4.20.02    Employee Fringe Benefits.

Attached as Schedule 4.20.02 are the fringe benefits available to each employee of the Company.

### 4.20.03    Compliance with Employment Laws.

To the Knowledge of Sellers, the Company is and has been in compliance in all material respects with all Laws relating to employment practices, including terms and conditions of employment, equal employment opportunity, nondiscrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages,

hours, overtime compensation, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, benefits, collective bargaining, the payment of social security and similar Taxes, occupational safety and health, workers' compensation, leaves of absence, and unemployment insurance. To the Knowledge of Sellers, the Company is not liable for the payment of any Taxes, fines, penalties, or other amounts, however designated, for failure to comply with any of the foregoing legal requirements. The Company has not been the subject of any inspection or investigation relating to its compliance with or violation of Laws relating to employment practices. All individuals characterized and treated by the Company as independent contractors or consultants are properly treated as independent contractors under all applicable Laws. All employees of the Company are classified as exempt under the Fair Labor Standards Act and state and local wage and hour laws are properly classified. There are no Proceedings against the Company pending or, to the Sellers' Knowledge, threatened to be brought or filed, by or with any Governmental Body in connection with the employment of any current or former applicant, employee, consultant, or independent contractor of the Company.

### 4.20.04   No Collective Bargaining Agreement.

The Company is not, and has not been, a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council, or labor organization (collectively, "**Union**"), and there is not, and has not been, any Union representing or purporting to represent any employee of the Company, and no Union or group of employees is seeking or has sought to organize employees for the purpose of collective bargaining. The Company has not experienced, nor received any threat of, any strike, slowdown, picketing, work stoppage, employee grievance process, claim of unfair labor practice, or other collective bargaining dispute. There is no lockout of any employees by the Company, and no such action is contemplated by the Company. The Company has not committed any unfair labor practice. To the Knowledge of Sellers, (a) no event has occurred or circumstance exists that could provide the basis for any work stoppage or other labor dispute and (b) there is no organizational effort presently being made or threatened by or on behalf of any Union with respect to employees of any Seller.

## 4.21   Employee Benefit Matters.

### 4.21.01   Employee Benefit Plans.

Schedule 4.21.01 contains a true and complete list of each pension, benefit, retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, performance award, phantom equity, stock or stock-based, change in control, retention, severance, vacation, paid time off, welfare, fringe-benefit, and other similar agreement, plan, policy, program, or arrangement (and any amendments thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not tax-qualified and whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by the Company for the benefit of any current or former employee, officer, director, retiree, independent contractor, or consultant of the Company or any spouse or dependent of such individual, or under which the Company or any of its ERISA Affiliates has or may have any Liability, or with respect to which Purchaser or any of its Affiliates would reasonably be expected to have

any Liability, contingent or otherwise (as listed on Schedule 4.21.01, each, a "**Benefit Plan**"). The Company has separately identified in Schedule 4.21.01 each Benefit Plan that contains a change in control provision.

**4.21.02    Access to Plan Documents.**

With respect to each Benefit Plan, Seller has made available to Purchaser accurate, current, and complete copies of each of the following:   (i) where the Benefit Plan has been reduced to writing, the plan document together with all amendments; (ii) where the Benefit Plan has not been reduced to writing, a written summary of all material plan terms; (iii) where applicable, copies of any trust agreements or other funding arrangements, custodial agreements, insurance policies and contracts, administration agreements and similar agreements, and investment management or investment advisory agreements, now in effect or required in the future as a result of the transactions contemplated by this Agreement or otherwise; (iv) copies of any summary plan descriptions, summaries of material modifications, employee handbooks, and any other written communications (or a description of any oral communications) relating to any Benefit Plan; (v) in the case of any Benefit Plan that is intended to be qualified under Section 401(a) of the Code, a copy of the most recent determination, opinion, or advisory letter from the Internal Revenue Service; (vi) in the case of any Benefit Plan for which a Form 5500 is required to be filed, a copy of the two most recently filed Form 5500, with schedules and financial statements attached; (vii) actuarial valuations and reports related to any Benefit Plans with respect to the two most recently completed plan years; (viii) the most recent nondiscrimination tests performed under the Code; and (ix) copies of material notices, letters, or other correspondence from the IRS, Department of Labor, Pension Benefit Guaranty Corporation, or other Governmental Body relating to the Benefit Plan.

**4.21.03    Compliance with Law.**

To the Knowledge of Sellers, each Benefit Plan and related trust has been established, administered, and maintained in accordance with its terms and in compliance with all applicable Laws. To the Knowledge of Sellers, each Benefit Plan that is intended to be qualified under Section 401(a) of the Code (each, a "**Qualified Benefit Plan**") is so qualified and has received a favorable and current determination letter from the IRS, or with respect to a prototype plan, can rely on an opinion letter from the IRS to the prototype plan sponsor, to the effect that such Qualified Benefit Plan is so qualified and that the plan and the trust related thereto are exempt from federal income taxes under Sections 401(a) and 501(a), respectively, of the Code, and nothing has occurred that could reasonably be expected to adversely affect the qualified status of any Qualified Benefit Plan. To the Knowledge of Sellers, nothing has occurred with respect to any Benefit Plan that has subjected or could reasonably be expected to subject the Company or any of its ERISA Affiliates or, with respect to any period on or after the Closing Date, Purchaser or any of its Affiliates, to a penalty under Section 502 of ERISA or to Tax or penalty under Section 4975 of the Code. All benefits, contributions, and premiums relating to each Benefit Plan have been timely paid in accordance with the terms of such Benefit Plan and all applicable Laws and accounting principles, and all benefits accrued under any unfunded Benefit Plan have been paid, accrued, or otherwise adequately reserved to the extent required by, and in accordance with, Sellers' ordinary and customary bookkeeping and accounting practices.

#### 4.21.04    Plan Liabilities.

Neither the Company nor any of its ERISA Affiliates has (i) incurred or reasonably expects to incur, either directly or indirectly, any material Liability under Title I or Title IV of ERISA or related provisions of the Code or applicable local Law relating to employee benefit plans; (ii) failed to timely pay premiums to the Pension Benefit Guaranty Corporation; (iii) withdrawn from any Benefit Plan; or (iv) engaged in any transaction that would give rise to liability under Section 4069 or Section 4212(c) of ERISA.

#### 4.21.05    No Multiemployer Plan, Etc.

With respect to each Benefit Plan, (i) no such plan is a multiemployer plan within the meaning of Section 3(37) of ERISA; (ii) no such plan is a "multiple employer plan" within the meaning of Section 413(c) of the Code or a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA); (iii) no Proceeding has been initiated by the Pension Benefit Guaranty Corporation to terminate any such plan or to appoint a trustee for any such plan; and (iv) no such plan is subject to the minimum funding standards of Section 412 of the Code or Title IV of ERISA, and none of the assets of the Company or any ERISA Affiliate is, or may reasonably be expected to become, the subject of any lien arising under Section 302 of ERISA or Section 412(a) of the Code.

#### 4.21.05    Modification.

Each Benefit Plan can be amended, terminated, or otherwise discontinued after the Closing in accordance with its terms, without material liabilities to Purchaser, the Company, or any of their Affiliates other than ordinary administrative expenses typically incurred in a termination event. The Company has no commitment or obligation and has not made any representations to any employee, officer, director, independent contractor, or consultant, whether or not legally binding, to adopt, amend, modify, or terminate any Benefit Plan or any collective bargaining agreement, in connection with the consummation of the Transactions.

#### 4.21.06    Post-employment Obligations.

Other than as required under Section 601, et seq. of ERISA or other applicable Law, no Benefit Plan provides post-termination or retiree welfare benefits to any individual for any reason, and neither the Company nor any of its ERISA Affiliates has any Liability to provide post-termination or retiree welfare benefits to any individual or ever represented, promised, or contracted to any individual that such individual would be provided with post-termination or retiree welfare benefits.

#### 4.21.07    Proceedings.

There is no pending or, to Sellers' Knowledge, threatened Proceeding relating to a Benefit Plan (other than routine claims for benefits) and no Benefit Plan has been the subject of an examination or audit by a Governmental Body or the subject of an application or filing under or is a participant in, an amnesty, voluntary compliance, self-correction, or similar program sponsored by any Governmental Body.

#### 4.21.08    No Amendment

There has been no amendment to, announcement by Seller or any of its Affiliates relating to, or change in employee participation or coverage under, any Benefit Plan that would increase the annual expense of maintaining such plan above the level of the expense incurred for the most recently completed fiscal year with respect to any director, officer, employee, independent contractor, or consultant, as applicable.

#### 4.21.09    409A Compliance.

To the Knowledge of Sellers, each Benefit Plan that is subject to Section 409A of the Code has been administered in compliance with its terms and the operational and documentary requirements of Section 409A of the Code and all applicable regulatory guidance (including notices, rulings, and proposed and final regulations) thereunder. To the Knowledge of Sellers, the Company does not have any obligation to gross up, indemnify, or otherwise reimburse any individual for any excise taxes, interest, or penalties incurred pursuant to Section 409A of the Code.

#### 4.21.10    Independent Contractor Classification.

Each individual who is classified by the Company as an independent contractor has been properly classified for purposes of participation and benefit accrual under each Benefit Plan.

#### 4.21.11    Effect of Transactions.

Neither the execution of this Agreement nor any of the Transactions will (either alone or upon the occurrence of any additional or subsequent events): (i) entitle any current or former director, officer, employee, independent contractor, or consultant of the Company to severance pay or any other payment; (ii) accelerate the time of payment, funding, or vesting, or increase the amount of compensation due to any such individual; (iii) limit or restrict the right of the Company to merge, amend, or terminate any Benefit Plan; (iv) increase the amount payable under or result in any other material obligation pursuant to any Benefit Plan; (v) result in "excess parachute payments" within the meaning of Section 280G(b) of the Code; or (vi) require a "gross-up" or other payment to any "disqualified individual" within the meaning of Section 280G(c) of the Code.

### 4.22    Transactions with Related Persons.

Except as set forth on Schedule 4.22, neither the Stockholder (or Affiliate thereof) nor any officer, director, or employee of the Company (a) owns or has owned any interest in any asset used or held for use in the Business, (b) is or has been involved in any business transaction with the Company except as an employee, (c) engages or has engaged in competition with the Company, (d) has borrowed any monies from or has outstanding any indebtedness or other similar obligation to the Company, or (e) is currently a party to any Contract with the Company.

### 4.23    Insurance.

Schedule 4.23 sets forth the following information with respect to each Insurance Policy: the name of the insurer, the policy number, the name of the policyholder, the period of coverage, and

the amount of coverage. True and complete copies of such Insurance Policies have been made available to Purchaser. All premiums relating to the Insurance Policies have been timely paid or, if due and payable prior to Closing, will be paid prior to Closing in accordance with the payment terms of each Insurance Policy. The Company does not have any self-insurance programs. The Company has been covered during the past 10 years by insurance in scope and amount customary and reasonable for the businesses in which it has engaged during such period and sufficient for compliance with all applicable Laws and Contracts to which the Company is a party or by which it is bound. The Insurance Policies are in full force and effect and shall remain in full force and effect following the consummation of the Transactions. No Seller has received any written notice of cancellation of, premium increase with respect to, or alteration of coverage under, any of such Insurance Policies. The Insurance Policies do not provide for any retrospective premium adjustment or other experience-based liability on the part of the Company. All such Insurance Policies (a) are valid and binding in accordance with their terms; (b) are provided by carriers who are financially solvent; and (c) have not been subject to any lapse in coverage. There are no claims pending under any such Insurance Policies as to which coverage has been questioned, denied, or disputed or in respect of which there is an outstanding reservation of rights. The Company is not in default under, and has not otherwise failed to comply with, in any material respect, any provision contained in any such Insurance Policy.

**4.24    Brokers' Fees.**

Sellers are responsible for 50% of any fee, commission, or payment to any broker, finder, or agent with respect to the Transactions.

**4.25    Debt.**

Schedule 4.25 sets forth a true and complete list as of the date of this Agreement of all Debt of the Company and provides (a) the names of the original lender and current holder (to the extent that the Company has received a written notice of the assignment thereof) and (b) outstanding principal balances and all accrued and unpaid interest as of the date hereof. The information contained in Schedule 4.25 is complete and accurate in all respects and the Company does not have any Debt other than the Debt set forth in Schedule 4.25. True, correct, and complete copies of all Contracts and other instruments (including all amendments, supplements, waivers, and consents) evidencing, providing security for, and relating to such Debt have been made available to Purchaser. Following payment of the Closing Debt Amount at Closing pursuant to Section 2.06.02, there will be no outstanding Debt (including any prepayment fees, exit fees, rescheduling fees, or penalties) of the Company arising from obligations created by the Company prior to the Closing.

**4.26    Material Customers and Suppliers.**

**4.26.01    Material Customers.**

Schedule 4.26.01 sets forth (i) the 25 largest customers of the Company based upon the aggregate consideration paid to the Company for goods or services rendered during each of the two most recent fiscal years (each, a "***Material Customer***") and (ii) the amount of consideration paid by each Material Customer during such periods. The Company has not received any notice, and To the Knowledge of Sellers, has no reason to believe that any Material Customer has ceased, or intends to cease, to use its goods or services or to otherwise terminate or materially reduce its relationship with the Company.

#### 4.26.02   Material Suppliers.

Schedule 4.26.02 sets forth (i) the 10 largest suppliers of the Company based upon the consideration paid by the Company for goods or services rendered for each of the two most recent fiscal years (each, a "*Material Supplier*") and (ii) the amount of purchases from each Material Supplier during such periods. The Company has not received any notice, and has no reason to believe, that any Material Supplier has ceased, or intends to cease, to supply goods or services to the Company or to otherwise terminate or materially reduce its relationship with the Company.

### 4.27   Full Disclosure.

To the Knowledge of Sellers, no representation or warranty by Seller in this Agreement and no statement contained in the Schedules to this Agreement or any certificate or other document furnished or to be furnished to Purchaser pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

## 5.   Representations and Warranties of Purchaser.

Purchaser represents and warrants to Sellers as follows:

### 5.01   Organization and Authority.

Purchaser is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware. Purchaser has full corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder. The execution and delivery by Purchaser of this Agreement and each other Transaction Document to which Purchaser is a party and the performance by Purchaser of its obligations hereunder and thereunder have been duly authorized by all requisite action of Purchaser. This Agreement has been duly executed and delivered by Purchaser, and constitutes a legal, valid, and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms. When each other Transaction Document to which Purchaser is or will be a party has been duly executed and delivered by Purchaser, such Transaction Document will constitute the valid and legally binding obligations of Purchaser, enforceable against Purchaser in accordance with its terms.

### 5.02   No Conflicts.

Neither the execution and delivery of this Agreement nor any other Transaction Document to which Purchaser is a party nor the performance of Purchaser's obligations hereunder and thereunder will, directly or indirectly, with or without notice or lapse of time: (a) violate any Law to which Purchaser is subject; (b) violate any Organizational Document of Purchaser; or (c) violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of, or give any Person the right to accelerate the maturity or performance of, or to cancel, terminate, modify, or exercise any remedy under, any contract to which Purchaser is a party or by which Purchaser is bound or the performance of which is guaranteed by Purchaser. Purchaser is not required to notify, make any filing with, or obtain any Consent of any Person in order to perform the Transactions.

**5.03 Litigation.**

There is no Proceeding pending or, to the knowledge of Purchaser, threatened or anticipated against Purchaser relating to or affecting the Transactions.

**5.04 Brokers' Fees.**

Purchaser is responsible for 50% of any fee, commission, or payment to any broker, finder, or agent with respect to the Transactions.

**6. Covenants of Sellers.**

From and after the date of this Agreement and until the Closing, Sellers covenant and agree that:

**6.01 Ordinary Course of Business.**

The Business shall be operated in the ordinary course of business consistent with past practice and in accord and in compliance with the representations and warranties set forth in Section 4. Sellers shall use reasonable best efforts to maintain and preserve intact the current organization and business of the Company and to preserve the rights, goodwill, and relationships of its employees, customers, lenders, suppliers, regulators, and others having business relationships with the Company. Without limiting the foregoing provisions of this Section 6.01, Sellers shall: (a) cause the Company to preserve and maintain all of its Permits; (b) cause the Company to pay its debts, Taxes, and other obligations when due; (c) cause the Company to maintain the properties and assets owned, operated, or used by the Company in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear; (d) cause the Company to continue in full force and effect without modification all Insurance Policies, except as required by applicable Law; (e) cause the Company to defend and protect its properties and assets from infringement or usurpation; (f) cause the Company to perform all of its obligations under all Contracts relating to or affecting its properties, assets, or business; (g) cause the Company to maintain its Books and Records in accordance with past practice; (h) cause the Company to comply with all applicable Laws; and (i) cause the Company not to take or permit any action that would cause any of the changes, events, or conditions described in Section 4.06 to occur.

**6.02 Books and Records, Financial Statements, and Access.**

The Books and Records and Financial Statements of the Company shall be maintained consistent with prior reporting periods. Monthly Financial Statements shall be delivered to Purchaser. Sellers shall (a) allow Purchaser and its Affiliates, Representatives, and prospective sources of the Financing reasonable access to its financial managers who maintain the Books and Records and Financial Statements, (b) afford Purchaser and its Affiliates, Representatives, and prospective sources of the Financing reasonable access to and the right to inspect all of the Real Property, properties, assets, premises, Books and Records, Contracts, and other documents and data related to the Company; (c) furnish Purchaser and its Affiliates, and Representatives with such financial, operating, and other data and information related to the Company as Purchaser or its Affiliates, or Representatives may reasonably request; and (d) instruct the Representatives of the Company to cooperate with Purchaser and its Affiliates, and Representatives in their investigation of the Company and the Business. Any investigation pursuant to this Section 6.02 shall be conducted in such manner as not to interfere unreasonably with the conduct of the Business.

**6.03    Capital Expenditures.**

The Company shall not make any capital expenditures without obtaining Purchaser's prior written consent, which consent shall not be unreasonably withheld.

**6.04    Consultation with Purchaser.**

Sellers shall consult with Purchaser about current trends in sales, distribution, and manufacturing to identify opportunities to expand the Business. Sellers shall allow Purchaser reasonable access to its sales and manufacturing managers.

**6.05    Notice of Material Adverse Effect and Certain Other Events.**

Sellers shall promptly (but not later than 24 hours following the occurrence of such an event) notify Purchaser in writing of (a) any fact, circumstance, event, or action the existence, occurrence, or taking of which has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or impact any representation or warranty set forth in Section 4; (b) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions; (c) any notice or other communication from any Governmental Body in connection with the Transactions; and (d) any Proceedings commenced or, to Sellers' Knowledge, threatened against, relating to, or involving or otherwise affecting any Seller or the Business that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.17.

**6.06    No Solicitation of Other Bids.**

Sellers shall not, and shall not authorize or permit any of their respective Affiliates or any of their Representatives to, directly or indirectly, (i) encourage, solicit, initiate, facilitate, or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal. Sellers shall immediately cease and cause to be terminated, and shall cause their respective Affiliates and all of their Representatives to immediately cease and cause to be terminated, all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that could lead to, an Acquisition Proposal. For purposes hereof, "*Acquisition Proposal*" shall mean any inquiry, proposal, or offer from any Person (other than Purchaser or any of its Affiliates) concerning (i) a merger, consolidation, liquidation, recapitalization, share exchange, or other business combination transaction involving the Company; (ii) the issuance or acquisition of shares of capital stock or other equity securities of the Company; or (iii) the sale, lease, exchange, or other disposition of any significant portion of the properties or assets of the Company. In addition to the other obligations under this Section 6.06, Sellers shall promptly (and in any event within three Business Days after receipt thereof by any Seller or its Representatives) advise Purchaser orally and in writing of any Acquisition Proposal, any request for information with respect to any Acquisition Proposal, or any inquiry with respect to or which could reasonably be expected to result in an Acquisition Proposal, the material terms and conditions of such request, Acquisition Proposal or inquiry, and the identity of the Person making the same. Sellers agree that the rights and remedies for noncompliance with this Section 6.06 shall include having such provision specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury

to Purchaser and its Affiliates and that money damages would not provide an adequate remedy to Purchaser.

7.    Reserved.

8.    **Other Covenants of the Parties.**

The Parties agree as follows:

8.01    **Employment of Stockholder.**

Subject to and effective as of the Closing, the Company shall enter into the Employment Agreement with the Stockholder.

8.02    **Promissory Note.**

Subject to and effective as of the Closing, the Parties shall enter into the Promissory Note.

8.04    **Closing Conditions.**

From the date hereof until the Closing, each Party shall use reasonable best efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in Article 12 hereof.

8.05    **Public Announcements.** Unless otherwise required by applicable Law or stock exchange requirements, no Party shall make any public announcements in respect of this Agreement or the Transactions or otherwise communicate with any news media without the prior written consent of, in the case of any such public announcement or communication by Purchaser or any of its Affiliates, the Stockholder, and, in the case of any such public announcement or communication by any Seller (excluding the Company after the Closing), Purchaser, and in each case which consent shall not be unreasonably withheld, delayed, denied, or conditioned, and the Parties shall cooperate as to the timing and contents of any such announcement.

8.05    **Further Assurances.** Following the Closing, each of the Parties shall, and shall cause their respective Affiliates to execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Transactions.

8.06    **Tax Matters.**

8.06.01    **Changes in Tax Elections or Tax Returns.**

Without the prior written consent of Purchaser, Sellers and their respective Representatives shall not, to the extent it may affect, or relate to, the Company, make, change, or rescind any Tax election, amend any Tax Return, or take any position on any Tax Return, take any action, omit to take any action, or enter into any other transaction that would have the effect of increasing the Tax liability or reducing any Tax asset of Purchaser or the Company in respect of any Post-Closing Tax Period. The Stockholder agrees that Purchaser is not to have any Liability for any Tax resulting from any such action referenced in this Section 8.06.01 of any Seller or any of its Representatives, and

agree to indemnify and hold harmless Purchaser and, after the Closing Date, the Company against any such Tax or reduction of any Tax asset.

**8.06.02    Transfer Taxes.**

Any transfer, documentary, sales, use, stamp, registration, value added, and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by equally by the Stockholder and Purchaser when due. The Stockholder and Purchaser shall cooperate to timely file any Tax Return or other document with respect to any such Taxes or fees, the costs and expenses of which shall be shared equally by the stockholder and Purchaser.

**8.06.03    Tax Returns Filed After the Closing Date.**

The Stockholder shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for the Company for all periods ending prior to the Effective Time that are filed after the Effective Time. Any such Tax Returns shall be prepared in a manner consistent with past practice (unless otherwise required by Law) and without a change of any election or accounting method and the Stockholder shall include any income, gain, loss, deduction or other tax items for such periods on his Tax Returns. Purchaser shall prepare, or cause to be prepared, all Tax Returns required to be filed by the Company after the Effective Time with respect to any Straddle Period. Any such Tax Returns shall be prepared in a manner consistent with past practice (unless otherwise required by Law) and without a change of any election or accounting method. Purchaser shall permit the Stockholder a reasonable opportunity to review and comment on each such Tax Return prior to filing, which such comments Purchaser shall consider in good faith. Purchaser shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for the Company for all periods beginning at or after the Effective Time.

**8.06.04    Termination of Existing Tax Sharing Agreements.**

Any and all existing Tax sharing agreements (whether written or not) binding upon the Company shall be terminated as of the Closing Date.

**8.06.05    Tax Indemnification.**

The Stockholder shall indemnify Purchaser Indemnitees and hold them harmless from and against (a) any Loss attributable to any breach of or inaccuracy in any representation or warranty made in Section 4.15; (b) any Loss attributable to any breach or violation of, or failure to fully perform, any covenant, agreement, undertaking, or obligation in this Section 8.06; (c) all Taxes of the Company, the Stockholder or relating to the Business for all Pre-Closing Tax Periods; (d) all Taxes of any member of an affiliated, consolidated, combined, or unitary group of which the Company (or any predecessor of the Company) is or was a member on or prior to the Closing Date by reason of a liability under Treasury Regulation Section 1.1502-6 or any comparable provisions of foreign, state, or local Law; and (e) any and all Taxes of any Person imposed on the Company arising under the principles of transferee or successor liability or by Contract, relating to an event or transaction occurring before the Closing Date; in each of the above cases, together with any out-of-pocket fees and expenses (including reasonable attorneys' and

accountants'

fees) incurred in connection therewith. The Stockholder shall reimburse Purchaser for any Taxes of the Company that are the responsibility of the Stockholder pursuant to this Section 8.06 within five Business Days after payment of such Taxes by any Purchaser Indemnitee. Purchaser agrees to give written notice to the Stockholder promptly upon the receipt of any written notice by the Company, Purchaser, or any of Purchaser's Affiliates that involves the assertion of any claim, or the commencement of any Proceeding, in respect of which an indemnity may be sought by Purchaser pursuant to this Section 8.06 (a "*Tax Claim*"); *provided, that* failure to comply with this provision shall not relieve the Stockholder of his indemnification obligations, except and only to the extent that the Stockholder forfeits rights or defenses by reason of such failure. Purchaser shall control the contest or resolution of any Tax Claim; *provided, however*, that Purchaser shall obtain the prior written consent of the Stockholder (which consent shall not be unreasonably withheld, delayed, denied, or conditioned) before entering into any settlement of a Tax Claim or ceasing to defend such Tax Claim; and, *provided, further*, that the Stockholder shall be entitled to participate in the defense of such Tax Claim and to employ counsel of his choice for such purpose, the fees and expenses of which separate counsel shall be borne solely by the Stockholder.

**8.06.06    Straddle Period.**

In the case of Taxes that are payable with respect to a taxable period that begins before and ends after the Effective Time (each such period, a "***Straddle Period***"), the portion of any such Taxes that are treated as Pre-Closing Taxes for purposes of this Agreement shall be: (a) in the case of Taxes (i) based upon, or related to, income, receipts, profits, wages, capital, or net worth, (ii) imposed in connection with the sale, transfer, or assignment of property, or (iii) required to be withheld, deemed equal to the amount which would be payable if the taxable year ended as of the Effective Time and (b) in the case of other Taxes, deemed to be the amount of such Taxes for the entire period multiplied by a fraction, the numerator of which is the number of days in the period ending on the date immediately preceding the Closing Date and the denominator of which is the number of days in the entire period.

**8.06.07    Cooperation and Exchange of Information.**

The Stockholder and Purchaser shall provide each other with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return pursuant to this Section 8.06 or in connection with any audit or other proceeding in respect of Taxes of the Company. Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers, and documents relating to rulings or other determinations by tax authorities. Each of the Stockholder and Purchaser shall retain all Tax Returns, schedules, work papers, records, and other documents in its possession relating to Tax matters of the Company (but excluding individual Tax Returns, schedules to individual Tax returns, and similar documents) for any taxable period beginning before the Closing Date until the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate, without regard to extensions except to the extent notified by the other Party in writing of such extensions for the respective Tax periods. Prior to transferring, destroying, or discarding any Tax Returns, schedules, work papers, records, and other documents in its possession relating to Tax matters of the Company for any taxable period beginning before the Closing Date that are required to be retained

pursuant to the immediately preceding sentence, the Stockholder or Purchaser (as the case may be) shall provide the other Party with reasonable written notice and offer such other Party the opportunity to take custody of such materials.

**8.06.07    Tax Refunds; Amended Returns**.

Purchaser shall promptly pay or cause to be paid to the Stockholder any Tax refunds or credits for the overpayment of Taxes for any Pre-Closing Tax Period that are received by, or credited to, Purchaser or the Company (or any successor thereof). At the Stockholder's reasonable request, Purchaser shall cooperate with the Stockholder in all commercially reasonable respects in obtaining any such refunds, including through the filing of amended Tax Returns or refund claims as prepared by the Stockholder at his own expense on his behalf. Purchaser shall not amend any Tax Return of, or file any refund claim on behalf of, the Company with respect to a Pre-Closing Tax Period (or portion thereof) ending prior to the Closing Date without the prior written consent of the Stockholder (not to be unreasonably withheld, delayed, denied, or conditioned).

**8.06.08    Tax Treatment of Indemnification Payments**.

Any indemnification payments pursuant to this Section 8.06 shall be treated as an adjustment to the Purchase Price by the Parties for Tax purposes, unless otherwise required by Law.

**8.06.09    Survival**.

Notwithstanding anything in this Agreement to the contrary, the provisions of Section 4.15 and this Section 8.06 shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation, or extension thereof) plus 60 days.

**8.06.10        Overlap**.

To the extent that any obligation or responsibility pursuant to this Section 8.06 may overlap with an obligation or responsibility pursuant to Section 10, the provisions of this Section 8.06 shall govern.

**8.07    Reserved**.

**8.08    Confidential Information**.

From and after the Closing, the Stockholder agrees to, and shall cause his Representatives to: (i) treat and hold as confidential (and not disclose or provide access to any Person to) all information, whether written or oral, relating to the Business, the Company, Purchaser, or its Affiliates, (ii) in the event that the Stockholder or any Representative thereof becomes legally compelled to disclose any such information, provide Purchaser with prompt written notice of such requirement so that Purchaser or the Company may seek a protective order or other remedy or waive compliance with this Section 8.08, and (iii) in the event that such protective order or other remedy is not obtained, or Purchaser waives compliance with this Section 8.07, furnish only that portion of such confidential information that is legally required to be provided and exercise his reasonable best efforts to obtain assurances that confidential treatment will be accorded such information; *provided*, *however*, that this sentence shall not apply to any information that, at the

time of disclosure, is available publicly and was not disclosed in breach of this Agreement by the Stockholder or his Representatives.

**8.09    Joint Privilege**

The Stockholder and Purchaser acknowledge and agree that the attorney-client privilege, attorney work product doctrine, and expectation of client confidence involving the Business or the Company and arising prior to the Closing for the benefit of both the Stockholder and the Company shall be subject to a joint privilege between the Stockholder, on the one hand, and the Company, on the other hand, and the Stockholder and the Company shall have equal right to assert all such joint privilege and protection and no such joint privilege may be waived by (a) the Stockholder without the prior written consent of the Company or (b) the Company without the prior written consent of the Stockholder.

**8.10    Consents.**

Sellers shall use reasonable best efforts to give all notices to, and obtain all Consents from, all Persons that are set forth in Schedule 4.04. If any Consent necessary to preserve any right or benefit under any Contract to which the Company is a party is not obtained prior to the Closing, the Stockholder shall, subsequent to the Closing, reasonably cooperate with Purchaser and the Company in attempting to obtain such Consent as promptly thereafter as practicable. If such Consent cannot be obtained, the Stockholder shall use his reasonable best efforts to provide the Company with the rights and benefits of the affected Contract for the term thereof, and, if the Stockholder provides such rights and benefits, the Company shall assume all obligations and burdens thereunder.

**8.11    Non-Compete and Non-Solicit Covenants.**

**8.11.01 Definitions.**

For purposes of this Section 8.11:

"**Compete**" means to, directly or indirectly, own, manage, control, or participate in the ownership, management, or control of, or be employed or engaged by or otherwise affiliated or associated as a consultant, independent contractor, or otherwise with, any Competitor, or otherwise directly or indirectly engage in any Restricted Business targeted to the Restricted Area.

"**Competitor**" means any person or entity (other than Purchaser or its Affiliates) who undertakes any Restricted Business in the Restricted Area, regardless of whether or not the Competitor is physically located inside or outside the Restricted Area.

"**Customer**" means any current, former, or prospective customer of the Company.

"**Restricted Area**" means the State of North Carolina..

"**Restricted Business**" means any business that is competitive with the Business in the Restricted Area.

"**Restriction Period**" means the period commencing on the Closing Date and ending on the later of (i) the date that is the fifth anniversary of the Closing Date and (ii) the date of termination of the Stockholder's Employment Agreement.

### 8.11.02    Non-Compete.

During the Restriction Period, the Stockholder shall not, nor shall he permit any of his Affiliates to, Compete. Notwithstanding the foregoing, the Stockholder is permitted to own up to two percent (2.0%) of the outstanding capital stock or other equity interests of any publicly-traded entity that is a Competitor.

### 8.11.03    Non-Solicit.

During the Restriction Period, the Stockholder shall not, nor shall he permit any of his Affiliates to, directly or indirectly, for himself or another, (i) solicit Customers for any purpose related to a Restricted Business or (ii) solicit the employment of, assist in the soliciting of the employment of, or otherwise solicit the association in business with, any employee or officer of Purchaser or any Affiliate thereof, or induce any person who is an employee, officer, agent, or contractor of Purchaser or any Affiliate thereof, to terminate such relationship, or to join with such Stockholder or any other Person for the purpose of leaving the employ or such other relationship with Purchaser or any Affiliate thereof, and undertaking any form of business.

### 8.11.03    Acknowledgments.

The Stockholder acknowledges that a breach or threatened breach of this Section 8.11 would give rise to irreparable harm to Purchaser, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by the Stockholder of his obligations under this Section 8.11, Purchaser shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond). The Stockholder acknowledges that the restrictions contained in this Section 8.11 (i) are directly related to the amount that Purchaser is willing to pay for the Purchased Units, (ii) are reasonable and necessary to protect the legitimate interests of Purchaser, and (iii) constitute a material inducement to Purchaser to enter into this Agreement and consummate the transactions contemplated by this Agreement.

## 8.12 Post-Closing Actions

Immediately following the Closing, the Stockholder agrees to, and shall cause his Representatives too, take such actions with respect to the Company and the Business as the Purchaser may request, adding Representatives of Purchaser as signatories to the Company's bank accounts, making introductions to the Company's accountants and other service providers and customers and suppliers, and any other actions or changes requested by Purchaser.

## 9.    Certain Post-Closing Covenants.

The Parties agree as follows:

### 9.01    Access to Books and Records and Financial Statements.

For a period of two years following the Closing, Purchaser shall allow the Stockholder, during regular business hours, reasonable access to the Books and Records and Financial Statements of the Company with respect to periods prior to the Closing, to the extent that such access may be reasonably required by the Stockholder (i) to facilitate the investigation, litigation, and final disposition of any claims that may have been or may be made in writing against the Stockholder

by any third-party (including any Purchaser Indemnitee pursuant to Section 10) or (ii) for any other reasonable purpose.

**9.02    Life Insurance on the Stockholder.**

If Purchaser elects to purchase a key man insurance policy on the Stockholder to be owned by Purchaser, the Stockholder shall cooperate with Purchaser in the life insurance application process.

**10.    Indemnification by the Stockholder.**

The Stockholder shall indemnify and defend Purchaser and its Affiliates (including the Company after the Closing) and their respective Representatives (collectively, the "*Purchaser Indemnitees*") from and against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Purchaser Indemnitees based upon, arising out of, with respect to, or by reason of (a) any inaccuracy in or breach of the representations and warranties set forth in Section 4 or in any instrument, document, agreement, or certificate delivered by the Stockholder pursuant to this Agreement (other than in respect of Section 4.15, it being understood that the sole remedy for any such inaccuracy in or breach thereof shall be pursuant to Section 8.06); (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Sellers pursuant to this Agreement (excluding (i) covenants, agreements, and obligations to be performed by the Company after the Closing and (ii) any covenant, agreement, or obligation in Section 8.06, it being understood that the sole remedy for any such breach, violation, or failure shall be pursuant to Section 8.06); and (c) any Liability not reflected on the Financial Statements.

**10.01    Reserved.**

**10.02    Survival.**

The representations and warranties contained in Section 4 (other than any representations or warranties contained in Section 4.15, which are subject to Section 8.06) shall survive the Closing and shall remain in full force and effect until the date that is 18 months from the Closing Date (the "*Survival Period*"); *provided, that* the representations and warranties in (a) Section 4.01, Section 4.02, Section 4.03, and Section 4.24, shall survive indefinitely and (b) Section 4.19 and Section 4.21 shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation, or extension thereof) plus 60 days. All covenants and agreements of Sellers contained herein (other than any covenants or agreements contained in Section 8.06, which are subject to Section 8.06) shall survive the Closing until the date that is 18 months from the Closing Date, or for the period explicitly specified therein; and *provided, further*, that a claim based upon fraud or intentional misrepresentation on the part of Sellers shall survive indefinitely. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from any Purchaser Indemnitee to the Stockholder prior to the expiration date of the applicable survival period set forth in this Section 10.02   shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

**10.03    Indemnification Procedures.**

The Purchaser Indemnitee making a claim under this Section 10 is referred to as the "*Indemnified Party*."

### 10.03.01    Third-Party Claims.

If any Indemnified Party receives notice of the assertion or commencement of any Proceeding made or brought by any Person who is not a Party or an Affiliate of a Party or a Representative of the foregoing (a "*Third-Party Claim*") against such Indemnified Party with respect to which the Stockholders are obligated to provide indemnification under this Section 10, the Indemnified Party shall give the Stockholder reasonably prompt written notice thereof, but in any event not later than thirty (30) days after receipt of such notice of such Third-Party Claim. The failure to give such prompt written notice shall not, however, relieve the Stockholder of its indemnification obligations, except and only to the extent that the Stockholder forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third-Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnified Party shall have the right to control the defense of any Third-Party Claim. The Stockholder shall promptly reimburse the Indemnified Party for the reasonable costs and expenses of defending such Third-Party Claim upon submission of periodic bills.

### 10.04    Reserved.

### 10.05    Offset.

Once a Loss is finally determined to be payable by the Stockholder pursuant to this Agreement, Purchaser shall, within five Business Days after such determination, notify the Stockholder of the amount of such payment and, at Purchaser's option (i) require the Stockholder to pay such amount to Purchaser in cash or (ii) offset it against any payments due to the Stockholder under the Promissory Note. All indemnification payments made under this Section 10 shall be treated by the Parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

### 10.06    No Circular Recovery.

The Stockholder hereby agrees that he will not make any claim for indemnification against any Purchaser Indemnitee by reason of the fact that the Stockholder or any of his Affiliates was a controlling person, director, employee, or representative of the Company or was serving as such for another Person at the request of the Company (whether such claim is for Losses of any kind or otherwise) with respect to any claim brought by a Purchaser Indemnitee against the Stockholder under this Agreement or otherwise relating to this Agreement. With respect to any claim brought by a Purchaser Indemnitee against the Stockholder under this Agreement or otherwise relating to this Agreement, the Stockholder expressly waives any right of subrogation, contribution, advancement, indemnification, or other claim against the Company with respect to any amounts owed by the Stockholder pursuant to this Section 10 or otherwise.

## 11.    Indemnification by Purchaser.

Purchaser shall indemnify the Stockholder from any Loss arising from any breach of Purchaser's representations, conditions and warranties set forth in this Agreement.

12.  **Conditions to Close.**

12.01   **Purchaser's Conditions to Close.**

Purchaser shall have no obligation to close the transactions contemplated by this Agreement unless and until the following conditions precedents are satisfied or waived in writing by Purchaser:

12.01.01     **Bring-down of Representations and Warranties; Compliance with Agreement; Stockholder's Closing Certificate.**

(a)     Other than the representations and warranties of Sellers contained in Section 4.01, Section 4.02, Section 4.03, Section 4.05, and Section 4.24, the representations and warranties of Sellers contained in this Agreement and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made on and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Sellers contained in Section 4.01, Section 4.02, Section 4.03, Section 4.05, and Section 4.24 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made on and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)     Sellers shall have duly performed and complied in all material respects with all agreements, covenants, and conditions required by this Agreement to be performed or complied with by them prior to or on the Closing Date.

(c)     The Stockholder shall have executed and delivered to Purchaser a certificate, dated the Closing Date (the "***Stockholder's Certificate***"), certifying that each of the conditions set forth in Section 12.01.01(a) and 12.01.01(b) have been satisfied.

12.01.02     **Reserved.**

12.01.03     **Execution and Delivery of the Other Transaction Documents.**

Purchaser shall have received true and complete copies of the Employment Agreement duly executed by the Stockholder.

12.01.05     **Other Deliveries.**

The Stockholder shall have delivered the following to Purchaser: (i) share certificates representing the Stock, free and clear of Encumbrances, endorsed in blank or accompanied by stock powers or other instruments of transfer duly executed in blank; (ii) current "good standing" certificates for the Company; (iii) a Secretary's Certificate from the Company certifying (A) that attached thereto are true and complete copies of all resolutions adopted by the board of directors and the Stockholder authorizing the execution, delivery, and performance of this Agreement and the other Transaction Documents and the consummation of the Transactions, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the Transactions and (B) as to the names and signatures of the officers of the Company authorized to sign this Agreement, the Transaction Documents, and the other documents to be delivered hereunder and thereunder; (iv) resignations of the directors of the Company; (v) a certificate from the Stockholder pursuant to Treasury Regulations Section 1.1445-2(b) that the Stockholder is not a foreign person within the meaning of Section 1445 of the Code; (vi) the certificate contemplated under Section 2.03.03(b); (vii) a Stockholder Release from the Stockholder, dated the Closing Date, in the form of Exhibit D (the "***Stockholder Release***"); and (viii) such other documents or instruments as Purchaser reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

**12.01.06    No Proceedings**.

No Proceeding shall have been commenced or threatened against Purchaser, any of its Affiliates, or any Seller (i) involving any challenge to, or seeking damages or other relief in connection with, any of the Transactions or (ii) that may have the likely effect of preventing, delaying, making illegal, or otherwise interfering with any of the Transactions. No Order shall have been issued by any Governmental Body, and be in effect, which restrains or prohibits any of the Transactions. There shall not have been made or threatened by any Person any claim asserting that such Person (i) is the holder or the beneficial owner of, or has the right to acquire or to obtain beneficial ownership of, any voting, equity, or ownership interest in, the Company, or (ii) is entitled to all or any portion of the Purchase Price.

**12.01.07    Third-party Consents**.

All Consents that are listed on Schedule 4.04 shall have been received and executed counterparts thereof shall have been delivered to Purchaser at or prior to the Closing.

**12.01.09    Due Diligence**.

Purchaser shall be satisfied, in its sole and absolute discretion, with the results of its due diligence investigation of the Company and the Business.

**12.02    Sellers' Conditions to Close.**

The Sellers shall have no obligation to close the transactions contemplated by this Agreement unless and until the following conditions precedents are satisfied or waived in writing by the Stockholder:

### 12.02.01   Bring-down of Representations and Warranties; Compliance with Agreement; Purchaser's Closing Certificate.

(a)   Other than the representations and warranties of Purchaser contained in Section 5.01 and Section 5.04, the representations and warranties of Purchaser contained in this Agreement and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality) or in all material respects (in the case of any representation or warranty not qualified by materiality) on and as of the date hereof and on and as of the Closing Date with the same effect as though made on and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Purchaser contained in Section 5.01 and Section 5.04 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)   Purchaser shall have duly performed and complied in all material respects with all agreements, covenants, and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

### 12.02.03   Execution and Delivery of the Other Transaction Documents.

The Stockholder shall have received true and complete copies of the Promissory Note and Employment Agreement.

### 12.02.04   Other Deliveries.

Purchaser shall have (a) delivered the following to the Stockholder: (i) a current good standing certificate for Purchaser and (ii) a Secretary's Certificate from Purchaser certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors of Purchaser authorizing the execution, delivery, and performance of this Agreement and the other Transaction Documents and the consummation of the Transactions, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the Transactions.

### 12.02.05   No Order.

No Order shall have been issued by any Governmental Body, and be in effect, that restrains or prohibits any material transaction contemplated hereby.

## 13.   Termination.

### 13.01   Termination.

This Agreement may be terminated at any time prior to the Closing:

(a)   by the mutual written consent of Purchaser and the Stockholder;

(b)   by Purchaser by written notice to the Stockholder if: (i) Purchaser is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in, or

failure to perform any representation, warranty, covenant, or agreement made by any Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Section 12.01 and such breach, inaccuracy, or failure has not been cured by Sellers within 10 days of the Stockholder's receipt of written notice of such breach from Purchaser or (ii) any of the conditions set forth in Section 12.01 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by [July 25th], 2022, unless such failure shall be due to the failure of Purchaser to perform or comply with any of the covenants, agreements, or conditions hereof to be performed or complied with by it prior to the Closing;

(c)   by the Stockholder by written notice to Purchaser if: (i) no Seller is then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in, or failure to perform any representation, warranty, covenant, or agreement made by Purchaser pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Section 12.02 and such breach, inaccuracy, or failure has not been cured by Purchaser within ten (10) days of its receipt of written notice of such breach from Sellers or (ii) any of the conditions set forth in Section 12.02 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by [July 25th], 2022, unless such failure shall be due to the failure of any Seller to perform or comply with any of the covenants, agreements, or conditions hereof to be performed or complied with by it prior to the Closing; or

(d)   by Purchaser, on the one hand, or the Stockholder, on the other hand, in the event that (i) there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited or (ii) any Governmental Body shall have issued an Order restraining or enjoining the Transactions and such Order shall have become final and non-appealable.

**13.02   Effect of Termination.**

In the event of the termination of this Agreement in accordance with Section 13.01 hereof, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except: (a) as set forth in this Section 13 or in Section 14 hereof and (b) that nothing herein shall relieve any Party from liability for any breach of any provision hereof or fraud or intentional misrepresentation.

**14.   Miscellaneous.**

**14.01   Titles Descriptive; Interpretation.**

Titles and headings are descriptive and not substantive parts of this Agreement. Where the context so requires or permits, the use of the singular form includes the plural, and the use of the plural form includes the singular. For purposes of this Agreement, (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (i) to Sections, Schedules, and Exhibits mean the Sections of, and Schedules and Exhibits attached to, this Agreement; (ii) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (iii) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any

regulations promulgated thereunder. The Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein. Any matter or item disclosed on one Schedule shall not be deemed to have been disclosed on any other Schedule unless an explicit cross-reference is set forth thereon. Any capitalized term used but not defined in any Schedule shall have the meaning given to such term in this Agreement.

**14.02   Negotiated Agreement.**

The Parties have each been represented by counsel of their choice and this Agreement has been negotiated and shall not be construed against one Party or the other.

**14.03   No Third-Party Beneficiaries; No Recourse to Financing Sources.**

Except for the Purchaser Indemnities, this Agreement does not confer any rights or remedies upon any Person (including any employee of the Company) other than the Parties and their respective successors and permitted assigns.

**14.04   Governing Law.**

This Agreement shall be governed by North Carolina law without regard to its choice of law provisions.

**14.05   Severability.**

If any portion of this Agreement is held illegal or unenforceable, such portion or portions shall be absolutely and completely severable from all other provisions of this Agreement, and such other provisions shall constitute the agreement of the Parties with respect to the subject matter hereof. On such determination that a portion of this Agreement is illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**14.06   Notice.**

Any notices, requests, consents, claims, demands, waivers, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if (i) delivered in person, (ii) transmitted by facsimile or e-mail (with confirmation of transmission) during regular business hours during a business day, or (iii) sent by a nationally recognized overnight courier service to the Party at the physical or e-mail address or facsimile number shown below. Notices personally delivered in accordance with clause (i) above shall be deemed to have been given on the date so delivered; notices transmitted in accordance with clause (ii) above shall be deemed delivered on the same Business Day, if sent during regular business hours, and, if not, on the next Business Day; and notices sent in accordance with clause (iii) above shall be deemed to have been given on the next Business Day after delivery to the courier.

If to Purchaser:                    AccessHeat Inc.
                                    913 N MARKET ST UNIT
                                    200 WILMINGTON, DE
                                    19801

Attention: Ruth Berenstein
Email: Rberenstein@accessheatmail.com

If to the Company:

Protech Metals, LLC
c/o William R. Hall
3619 Murdocksville Road
Pinehurst, NC 28374
Email: *Rick@PRotechmetals.net*

With a copy
(which shall not constitute notice) to:

*(WRH)*

*6.9.2022*

### 14.07   Counterparts and Signatures.

This Agreement may be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts shall together constitute one and the same agreement. The Agreement may be executed via signature exchanged by facsimile or pdf, which signature shall be as valid as an original.

### 14.08   Expenses.

Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of legal counsel and other Representatives, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses.

### 14.09   Representations, Warranties, and Covenants to Survive.

Subject to Section 10.02, all representations, warranties, and covenants of any Party shall survive the Closing.

### 14.10   No Waiver; Amendment.

No waiver shall be effective against any Party unless signed by the Party against whom the waiver is asserted. No amendment to this Agreement shall be effective unless signed by all Parties.   No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

### 14.11   Time is of the Essence.

Time is of the essence in the performance of this Agreement.

**14.12    Specific Performance.**

Each Party acknowledges that the other Parties would be damaged irreparably and would have no adequate remedy of law if any provision of this Agreement is not performed in accordance with its specific terms or otherwise is breached. Accordingly, each Party agrees that the other Parties will be entitled to an injunction to prevent any breach of any provision of this Agreement and to enforce specifically any provision of this Agreement, in addition to any other remedy to which they may be entitled and without having to prove the inadequacy of any other remedy they may have at law or in equity and without being required to post bond or other security.

**14.13    Entire Agreement.**

This Agreement and the other Transaction Documents are the sole and entire agreement among the Parties as to the matters addressed herein and therein and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits, and Schedules (other than an exception expressly set forth as such in the Schedules), the provisions of this Agreement will control.

**14.14    Successors and Assigns.**

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns. No Party may assign his or its rights or obligations hereunder without the prior written consent of the other Parties, which consent shall not be unreasonably withheld, delayed, denied, or conditioned; *provided, however,* that Purchaser may collaterally assign any or all of its rights and obligations hereunder to any of its Affiliates.

*(Remainder of this page intentionally left blank; signatures begin on the next page.)*

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

**Purchaser**:

ACCESSHEAT, INC.

By: _____

Ruth Berenstein, Partner

**Company**: Protech Metals, LLC

By: _____

William R. Hall

**Witness:** Jack Harrison (Chairman)

By: _____

**Exhibit A**

Forms of Employment

Agreement (attached)

## EMPLOYMENT AGREEMENT

This Employment Agreement (this "*Agreement*") is made and entered into as of June 9th, 2022, by and between William R. Hall (the "*Operations Manager*") and Protech Metals, LLC, a North Carolina corporation (the "*Company*").

WHEREAS, the Company desires to employ the Operations Manager on the terms and conditions set forth herein, and

WHEREAS, the Operations Manager desires to be employed by the Company on such terms and conditions.

NOW, THEREFORE, in consideration of the mutual covenants, promises, and obligations set forth herein, the parties agree as follows:

1.    Term. The Operations Manager employment hereunder shall be effective as of the date hereof and shall continue until the first anniversary thereof, unless terminated earlier pursuant to Section 5 of this Agreement. The period during which the Operations Manager is employed by the Company hereunder is hereinafter referred to as the "*Employment Term*".

2.    Position and Duties.

2.1    Position. During the Employment Term, the Employee shall serve as the Operations Manager of the Company, reporting to the Chief Executive Officer (the "*AccessHeat CEO*") of AccessHeat, Inc., a Delaware corporation ("*AccessHeat*"), the parent of the Company. In such a position, the Operations Manager shall have such duties, authority, and responsibilities as shall be determined from time to time by the AccessHeat CEO.

2.2    Duties. During the Employment Term, the Operations Manager shall devote substantially all of Operations Manager business time and attention to the performance of the Operations Manager duties hereunder and will not engage in any other business, profession, or occupation for compensation or otherwise which would conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of the Board. Notwithstanding the foregoing, the Operations Manager will be permitted to with the prior written consent of the Board act or serve as a director, trustee, committee member, or principal of any type of business, civic, or charitable organization as long as such activities are disclosed in writing to the AccessHeat CEO, provided that such activities do not interfere with the performance of the Operations Manager duties and responsibilities to the Company as provided hereunder, including, but not limited to, the obligations set forth in Section 2 hereof.

3.    Place of Performance. The principal place of Operations Manager employment shall be the Company's principal executive office currently located at 3619 Murdocksville Rd. Pinehurst, NC 28374; provided that the Operations Manager may be required to travel on Company business during the Employment Term.

4.    Compensation.

4.1    Base Salary. The Company shall have been deemed to pay the Operations Manager an annual base salary of $54,000

4.2    Fringe Benefits and Perquisites. During the Employment Term, the Operations Manager shall be entitled to fringe benefits and perquisites consistent with the practices of the Company

and governing benefit plan requirements (including plan eligibility provisions), and to the extent the Company provides similar benefits or perquisites (or both) to similarly situated executives of the Company.

4.3    Employee Benefits. During the Employment Term, the Operations Manager shall be entitled to participate in all employee benefit plans, practices, and programs maintained by the Company, as in effect from time to time (collectively, *"Employee Benefit Plans"*), to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. The Company reserves the right to amend or terminate any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law.

4.4    Vacation; Paid Time Off. During the Employment Term, the Operations Manager shall be entitled to [2] weeks of paid vacation day per calendar year (prorated for partial years) in accordance with the Company's vacation policies, as in effect from time to time.

4.5    Business Expenses. The Operations Manager shall be entitled to reimbursement for all reasonable and necessary out-of-pocket business, entertainment, and travel expenses incurred by the Operations Manager in connection with the performance of the Operations Manager duties hereunder in accordance with the Company's expense reimbursement policies and procedures.

4.6    Clawback Provisions. Notwithstanding any other provisions in this Agreement to the contrary, any incentive-based or other compensation paid to the Operations Manager under this Agreement or any other agreement or arrangement with the Company which is subject to recovery under any law, government regulation, or stock exchange listing requirement will be subject to such deductions and clawback as may be required to be made pursuant to such law, government regulation, or stock exchange listing requirement (or any policy adopted by the Company pursuant to any such law, government regulation or stock exchange listing requirement).

5.    Termination of Employment. The Employment Term and the Operations Manager employment hereunder may be terminated by either the Company or the Operations Manager at any time and for any reason; provided that, unless otherwise provided herein, either party shall be required to give the other party at least 90 days advance written notice of any termination of the Operations Managers employment. On termination of the Operations Manager employment during the Employment Term, the Operations Manager shall be entitled to the compensation and benefits described in this Section 5 and shall have no further rights to any compensation or any other benefits from the Company or any of its affiliates.

5.1    Expiration of the Term or For Cause.

(a)The Operations Manager employment hereunder may be terminated upon either party's failure to renew the Agreement in accordance with Section 1 or by the Company for Cause. If the Operations Manager employment is terminated upon either party's failure to renew this Agreement or by the Company for Cause, the Operations Manager shall be entitled to receive:

(i)    any accrued but unused vacation which shall be paid on the pay date immediately following the Termination Date (as defined below) in accordance with the Company's customary payroll procedures;

(ii)    reimbursement for unreimbursed business expenses properly incurred by the Operations Manager, which shall be subject to and paid in accordance with the Company's expense reimbursement policy; and

(iii)  such employee benefits (including equity compensation), if any, to which the Operations Manager may be entitled under the Company's employee benefit plans as of the Termination Date; provided that, in no event shall the Operations Manager be entitled to any payments in the nature of severance or termination payments except as specifically provided herein.

Items 5.1(a)(i) through 5.1(a)(iii) are referred to herein collectively as the "*Accrued Amounts*".

(b)For purposes of this Agreement, "***Cause***" shall mean:

(i)    the Operations Manager failure to perform Operations Manager duties (other than any such failure resulting from incapacity due to physical or mental illness);

(ii)    the Operations Manager failure to comply with any valid and legal directive of the AccessHeat CEO;

(iii)    the Operations Manager engagement in dishonesty, illegal conduct, or misconduct, which is, in each case, injurious to the Company Group (as defined below) or their respective affiliates;

(iv)    the Operations Manager embezzlement, misappropriation, or fraud, whether or not related to the Operations Manager employment with the Company;

(v)    the Operations Manager conviction of or plea of guilty or nolo contendere to a crime that constitutes a felony (or state law equivalent) or a crime that constitutes a misdemeanor involving moral turpitude;

(vi)    the Operations Manager violation of the written policies or codes of conduct of the Company or AccessHeat, including written policies related to discrimination, harassment, performance of illegal or unethical activities, and ethical misconduct;

(vii)    the Operations Manager unauthorized disclosure of Confidential Information (as defined below);

(viii)    the Operations Manager material breach of any material obligation under this Agreement or any other written agreement between the Operations Manager and the Company; or

(ix)    the Operations Manager engagement in conduct that brings or is reasonably likely to bring the Company negative publicity or into public disgrace, embarrassment, or disrepute.

Except for a failure, breach, or refusal which, by its nature, cannot reasonably be expected to be cured, the Operations Manager shall have five business days from the delivery of written notice by the Company within which to cure any acts constituting Cause; provided however, that, if the Company reasonably expects irreparable injury from a delay of five business days, the Company may give the Operations Manager notice of such shorter period within which to cure as is reasonable under the circumstances, which may include the termination of the Operations Manager employment without notice and with immediate effect.

5.2.    Without Cause. The Employment Term and the Operations Manager employment hereunder may be terminated by the Company without Cause. In the event of such termination, the Operations Manager shall be entitled to receive the Accrued Amounts and, subject to the Operations Manager compliance with Section 6, Section 7, Section 8, and Section 9 of this Agreement and the Operations Manager execution of a release of claims in favor of the Company Group and their respective officers and directors in a form provided by the Company (the "*Release*"), the Operations Manager shall be entitled to receive the following:

(a)    a payment equal to the product of (i) the Annual Bonus, if any, that the Operations Manager would have earned for the fiscal year in which the Termination Date (as determined in accordance with Section 5.5) occurs based on achievement of the applicable performance goals for such year and (ii) a fraction, the numerator of which is the number of days the Operations Manager was employed by the Company during the year of termination and the denominator of which is the number of days in such year (the "*Pro-Rata Bonus*"). This amount shall be paid on the date that annual bonuses are paid to similarly situated executives.

5.3    Death or Disability.

(a)    The Operations Manager employment hereunder shall terminate automatically on the Operations Manager's death during the Employment Term, and the Company may terminate the Operations Manager's employment on account of the Operations Manager's Disability.

(b)    If the Operations Manager's employment is terminated during the Employment Term on account of the Operations Manager's death or Disability, the Operations Manager (or the Operations Manager's estate and/or beneficiaries, as the case may be) shall be entitled to receive the Accrued Amounts. Notwithstanding any other provision contained herein, all payments made in connection with the Operations Manager's Disability shall be provided in a manner which is consistent with federal and state law.

(c)    For purposes of this Agreement, "*Disability*" shall mean the Operations Manager's inability, due to physical or mental incapacity, to perform the essential functions of the Operations Manager's job, for 90 days out of any 365-day period. Any question as to the existence of the Operations Manager's Disability as to which the Operations Manager and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to the Operations Manager and the Company. If the Operations Manager and the Company cannot agree as to a qualified independent physician, each shall appoint such a physician and those two physicians shall select a third who shall make such determination in writing. The determination of Disability made in writing to the Company and the Operations Manager shall be final and conclusive for all purposes of this Agreement.

5.4    Notice of Termination. Any termination of the Operations Manager's employment hereunder by the Company or by the Operations Manager during the Employment Term (other than termination pursuant to Section 5.3(a) on account of the Operations Manager's death) shall be communicated by written notice of termination ("*Notice of Termination*") to the other party hereto in accordance with Section 24. The Notice of Termination shall specify:

(a)    The termination provision of this Agreement relied upon;

(b)    To the extent applicable, the facts and circumstances claimed to provide a basis for termination of the Operations Manager's employment under the provision so indicated; and

(c)    The applicable Termination Date.

5.5    Termination Date. The Operations Manager's "*Termination Date*" shall be:

(a)    If the Operations Manager's employment hereunder terminates on account of the Operations Manager's death, the date of the Operations Manager's death;

(b)    If the Operations Manager's employment hereunder is terminated on account of the Operations Manager's Disability, the date that it is determined that the Operations Manager has a Disability;

(c)    If the Company terminates the Operations Manager's employment hereunder for Cause, the date the Notice of Termination is delivered to the Operations Manager; or

(d)    If the Company terminates the Operations Manager's employment hereunder without Cause, the date specified in the Notice of Termination.

5.6    Resignation of All Other Positions. On termination of the Operations Manager's employment hereunder for any reason, the Operations Manager shall be deemed to have resigned from all positions that the Operations Manager holds as an officer or member of the Board (or a committee thereof) of the Company or any of its affiliates.

6.    Cooperation. The parties agree that certain matters in which the Operations Manager will be involved during the Employment Term may necessitate the Operations Manager's cooperation in the future. Accordingly, following the termination of the Operations Manager's employment for any reason, to the extent reasonably requested by the Board, the Operations Manager shall cooperate with the Company in connection with matters arising out of the Operations Manager's service to the Company.

7.    Confidential Information. The Operations Manager understands and acknowledges that during the Employment Term, the Operations Manager will have access to and learn about Confidential Information, as defined below.

7.1    Confidential Information Defined.

(a)    Definition. For purposes of this Agreement, "*Confidential Information*" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, device configurations, embedded data, compilations, metadata, technologies, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, and buyer lists of the Company Group or its businesses or any existing or prospective customer, supplier, investor or other associated third party, or of any other person or entity that has entrusted information to the Company Group in

confidence. The Operations Manager understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used. The Operations Manager understands and agrees that Confidential Information includes information developed by Operations Manager in the course of employment by the Company as if the Company furnished the same Confidential Information to the Operations Manager in the first instance. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to the Operations Manager: provided that, such disclosure is through no direct or indirect fault of the Operations Manager or person(s) acting on the Operations Manager's behalf.

(b)    Company Creation and Use of Confidential Information. The Operations Manager understands and acknowledges that the Company Group has invested, and continues to invest, substantial time, money, and specialized knowledge into developing its resources, creating a customer base, generating customer and potential customer lists, training its employees, and improving its offerings in the field of its businesses. The Operations Manager understands and acknowledges that as a result of these efforts, the Company Group has created, and continues to use and create Confidential Information. This Confidential Information provides the Company Group with a competitive advantage over others in the marketplace.

(c)    Disclosure and Use Restrictions. The Operations Manager agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company Group) not having a need to know and authority to know and use the Confidential Information in connection with the business of the Company Group and, in any event, not to anyone outside of the direct employ of the Company Group except as required in the performance of the Operations Manager's authorized employment duties to the Company or with the prior consent of the AccessHeat CEO acting on behalf of the Company Group in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company Group, except as required in the performance of the Operations Manager's authorized employment duties to the Company or with the prior consent of the Live Ventures CEO acting on behalf of the Company Group in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent). Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. The Operations Manager shall promptly provide written notice of any such order to the AccessHeat CEO.

(d)    Permitted Disclosures. Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. The Operations Manager shall promptly provide written notice of any such order to the AccessHeat CEO.

8.    Restrictive Covenants.

8.1    Acknowledgement. The Operations Manager understands that the nature of the Operations Manager's position gives the Operations Manager access to and knowledge of Confidential Information and places the Operations Manager in a position of trust and confidence with the Company. The Operations Manager understands and acknowledges that the intellectual and other services the Operations Manager provides to the Company are unique, special, or extraordinary. The Operations Manager further understands and acknowledges that the Company's ability to reserve these for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company, and that improper use or disclosure by the Operations Manager is likely to result in unfair or unlawful competitive activity.

8.2    Non-Competition. Because of the Company's legitimate business interest as described herein and the good and valuable consideration offered to the Operations Manager, during the Employment Term and for the five years, to run consecutively, beginning on the last day of the Operations Manager's employment with the Company, regardless of the reason for the termination and whether employment is terminated at the option of the Operations Manager or the Company, the Operations Manager agrees and covenants not to engage in Prohibited Activity within the State of North Carolina.

For purposes of this Section 8, "***Prohibited Activity***" is activity in which the Operations Manager contributes the Operations Manager's knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, employee, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity to an entity engaged in the same or similar business as the Company. Prohibited Activity also includes activity that may require or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information.

This Section 8 does not, in any way, restrict or impede the Operations Manager from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. The Operations Manager shall promptly provide written notice of any such order to the AccessHeat CEO.

8.3    Non-Solicitation of Employees. The Operations Manager agrees and covenants not to directly or indirectly solicit, hire, recruit, attempt to hire or recruit, or induce the termination of employment of any employee of the Company, or attempt to do so, during five years, to run consecutively, beginning on the last day of the Operations Manager's employment with the Company.

8.4    Non-Solicitation of Customers. The Operations Manager understands and acknowledges that because of the Operations Manager's experience with and relationship to the Company, the Operations Manager will have access to and learn about much or all of the Company's customer information. "***Customer Information***" includes, but is not limited to, names, phone numbers, addresses, email addresses, order history, order preferences, chain of command, decisionmakers, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to sales and/or services. The Operations Manager understands and acknowledges that loss of this customer relationship and/or goodwill will cause significant and irreparable harm. The Operations Manager agrees and covenants, during five years, to run consecutively, beginning on the last day of the Operations Manager's employment with the Company, not to directly or indirectly solicit, contact (including but not limited to email, regular mail, express mail, telephone, fax, instant message, or social media), attempt to contact, or meet with the Company's current, former, or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company.

9.    Non-Disparagement. The Operations Manager agrees and covenants that the Operations Manager will not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning the Company Group, or any Company Group affiliates, businesses, employees, officers, and existing and prospective customers, suppliers, investors and other associated third parties. "**Company Group**" means, collectively, the Company, AccessHeat, and any of their respective direct or indirect subsidiaries or affiliates. This Section 9 does not, in any way, restrict or impede the Operations Manager from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order.

10.    Acknowledgement. The Operations Manager acknowledges and agrees that the services to be rendered by the Operations Manager to the Company are of a special and unique character; that the Operations Manager will obtain knowledge and skill relevant to the Company's industry, methods of doing business and marketing strategies by virtue of the Operations Manager's employment; and that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interest of the Company Group. The Operations Manager further acknowledges that the benefits provided to the Operations Manager under this Agreement, including the amount of the Operations Manager's compensation, reflects, in part, the Operations Manager's obligations and the Company's rights under Section 7, Section 8, and Section 9 of this Agreement; that the Operations Manager has no expectation of any additional compensation, royalties, or other payment of any kind not otherwise referenced herein in connection herewith; and that the Operations Manager will not suffer undue hardship by reason of full compliance with the terms and conditions of Section 7, Section 8, and Section 9 of this Agreement or the Company's enforcement thereof.

11.    Remedies. In the event of a breach or threatened breach by the Operations Manager of Section 7, Section 8, or Section 9 of this Agreement, the Operations Manager hereby consents and agrees that the Company shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, and that money damages would not afford an adequate remedy, without the necessity of showing any actual damages, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

12.    Proprietary Rights.

12.1 Work Product. The Operations Manager acknowledges and agrees that all right, title, and interest in and to all writings, works of authorship, technology, inventions, discoveries, processes, techniques, methods, ideas, concepts, research, proposals, materials, and all other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived, or reduced to practice by the Operations Manager individually or jointly with others during the Employment Term and relate in any way to the business or contemplated business, products, activities, research, or development of the Company or result from any work performed by the Operations Manager for the Company (in each case, regardless of when or where prepared or whose equipment or other resources is used in preparing the same), all rights and claims related to the foregoing, and all printed, physical and electronic copies, and other tangible embodiments thereof (collectively, "**Work Product**"), as well as any and all rights in and to US and foreign (a) patents, patent disclosures and inventions (whether patentable or not), (b) trademarks, service marks, trade dress, trade names, logos, corporate names, and domain names, and other similar designations of source or origin, together with the goodwill symbolized by any

of the foregoing, (c) copyrights and copyrightable works (including computer programs), mask works, and rights in data and databases, (d) trade secrets, know-how, and other confidential information, and (e) all other intellectual property rights, in each case whether registered or unregistered and including all registrations and applications for, and renewals and extensions of, such rights, all improvements thereto and all similar or equivalent rights or forms of protection in any part of the world (collectively, "*Intellectual Property Rights*"), shall be the sole and exclusive property of the Company. For purposes of this Agreement, Work Product includes, but is not limited to, Company Group information, including plans, publications, research, strategies, techniques, agreements, documents, contracts, terms of agreements, negotiations, know-how, computer programs, computer applications, software design, web design, work in process, databases, manuals, results, developments, reports, graphics, drawings, sketches, market studies, formulae, notes, communications, algorithms, product plans, product designs, styles, models, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, client information, customer lists, client lists, manufacturing information, marketing information, advertising information, and sales information.

12.2  Work Made for Hire; Assignment. The Operations Manager acknowledges that, by reason of being employed by the Company at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in 17 U.S.C. § 101 and such copyrights are therefore owned by the Company. To the extent that the foregoing does not apply, the Operations Manager hereby irrevocably assigns to the Company, for no additional consideration, the Operations Manager's entire right, title, and interest in and to all Work Product and Intellectual Property Rights therein, including the right to sue, counterclaim, and recover for all past, present, and future infringement, misappropriation, or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Company's rights, title, or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Company would have had in the absence of this Agreement.

12.3  Further Assurances; Power of Attorney. During and after the Employment Term, the Operations Manager agrees to reasonably cooperate with the Company to (a) apply for, obtain, perfect, and transfer to the Company the Work Product as well as any and all Intellectual Property Rights in the Work Product in any jurisdiction in the world; and (b) maintain, protect and enforce the same, including, without limitation, giving testimony and executing and delivering to the Company any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments as shall be requested by the Company. The Operations Manager hereby irrevocably grants the Company power of attorney to execute and deliver any such documents on the Operations Manager's behalf in his name and to do all other lawfully permitted acts to transfer the Work Product to the Company and further the transfer, prosecution, issuance, and maintenance of all Intellectual Property Rights therein, to the full extent permitted by law, if the Operations Manager does not promptly cooperate with the Company's request (without limiting the rights the Company shall have in such circumstances by operation of law). The power of attorney is coupled with an interest and shall not be affected by the Operations Manager's subsequent incapacity.

12.4  No License. The Operations Manager understands that this Agreement does not, and shall not be construed to, grant the Operations Manager any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software, or other tools made available to the Operations Manager by the Company.

13.  Security.

13.1  Security and Access. The Operations Manager agrees and covenants (a) to comply with all Company Group security policies and procedures as in force from time to time including without limitation those regarding computer equipment, telephone systems, voicemail systems, facilities access, monitoring, key cards, access codes, internet, social media and instant messaging systems, computer systems, email systems, computer networks, document storage systems, software, data security, encryption, firewalls, passwords and any and all other Company Group facilities, IT resources and communication technologies ("*Facilities and Information Technology Resources*"); (b) not to access or use any Facilities and Information Technology Resources except as authorized by the Company; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of the Operations Manager's employment by the Company, whether termination is voluntary or involuntary. The Operations Manager agrees to notify the Company promptly in the event the Operations Manager learns of any violation of the foregoing by others, or of any other misappropriation or unauthorized access, use, reproduction, or reverse engineering of, or tampering with any Facilities and Information Technology Resources or other Company Group property or materials by others.

13.2  Exit Obligations. Upon (a) voluntary or involuntary termination of the Operations Manager's employment or (b) the Company's request at any time during the Operations Manager's employment, the Operations Manager shall (i) provide or return to the Company any and all Company Group property, including keys, key cards, access cards, identification cards, security devices, employer credit cards, network access devices, computers, cell phones, smartphones, PDAs, fax machines, equipment, speakers, webcams, manuals, reports, files, books, compilations, work product, email messages, recordings, thumb drives or other removable information storage devices, hard drives, and data and all Company Group documents and materials belonging to the Company and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Work Product, that are in the possession or control of the Operations Manager, whether they were provided to the Operations Manager by the Company Group or any of its business associates or created by the Operations Manager in connection with the Operations Manager's employment by the Company; and (ii) delete or destroy all copies of any such documents and materials not returned to the Company that remain in the Operations Manager's possession or control, including those stored on any non-Company Group devices, networks, storage locations, and media in the Operations Manager's possession or control.

14.    Publicity. The Operations Manager hereby irrevocably consents to any and all uses and displays, by the Company Group and its agents, representatives and licensees, of the Operations Manager name, voice, likeness, image, appearance, and biographical information in, on or in connection with any pictures, photographs, audio and video recordings, digital images, websites, television programs and advertising, other advertising and publicity, sales and marketing brochures, books, magazines, other publications, CDs, DVDs, tapes, and all other printed and electronic forms and media throughout the world, at any time during or after the Employment Term, for all legitimate commercial and business purposes of the Company Group ("*Permitted Uses*") without further consent from or royalty, payment, or other compensation to the Operations Manager. The Operations Manager hereby forever waives and releases the Company Group and its directors, officers, employees, and agents from any and all claims, actions, damages, losses, costs, expenses, and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after the Employment Term, arising directly or indirectly from the Company Group's and its agents', representatives', and licensees' exercise of their rights in connection with any Permitted Uses.

15.    Governing Law; Jurisdiction and Venue. This Agreement, for all purposes, shall be construed in accordance with the laws of the State of North Carolina without regard to conflicts of law principles. Any action or proceeding by either of the parties to enforce this Agreement shall be brought only in a state or federal court located in the State of North Carolina. The parties hereby irrevocably

submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

16.    Entire Agreement. Unless specifically provided herein, this Agreement contains all of the understandings and representations between the Operations Manager and the Company pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter. The parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

17.    Modification and Waiver. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by the Operations Manager and by another officer of the Company as designated in writing by the AccessHeat CEO. No waiver by either of the parties of any breach by the other party hereto of any condition or provision of this Agreement to be performed by the other party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the parties in exercising any right, power, or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

18.    Severability. Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement.

The parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law.

The parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

19.    Captions. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

20.    Counterparts. This Agreement may be executed in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

21.    Tolling. Should the Operations Manager violate any of the terms of the restrictive covenant obligations articulated herein, the obligation at issue will run from the first date on which the Operations Manager ceases to be in violation of such obligation.

22.    Notification to Subsequent Employer. When the Operations Manager's employment with the Company terminates, the Operations Manager agrees to notify any subsequent employer of the restrictive covenants sections contained in this Agreement. The Operations Manager will also deliver a copy of such notice to the Company before the Operations Manager commences employment with any subsequent employer. In addition, the Operations Manager authorizes the Company to provide a copy of the restrictive covenants sections of this Agreement to third parties, including but not limited to, the Operations Manager's subsequent, anticipated, or possible future employer.

23.    Successors and Assigns. This Agreement is personal to the Operations Manager and shall not be assigned by the Operations Manager. Any purported assignment by the Operations Manager shall be null and void from the initial date of the purported assignment. The Company may assign this Agreement to any successor or assign (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or substantially all of the business or assets of the Company. This Agreement shall inure to the benefit of the Company and permitted successors and assigns.

24.    Notice. Notices and all other communications provided for in this Agreement shall be in writing and shall be delivered personally or sent by overnight carrier or electronic mail to the parties at the addresses set forth below (or such other addresses as specified by the parties by like notice):

If to the Company:

Protech Metals, LLC
c/o AccessHeat, Inc.

3619 Murdocksville Road

Pinehurst, NC 28374

Attn: Ruth Berenstein, Partner
Email: Rberenstein@accessheatmail.com

If to the Operations Manager:

William R. Hall

[ADDRESS]    9391 Aberdeen Rd. ABardeen N<sup>c</sup> 28315

25.    Representations of the Operations Manager. The Operations Manager represents and warrants to the Company that:

(a)    The Operations Manager's acceptance of employment with the Company and the performance of duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which the Operations Manager is a party or is otherwise bound.

(b)    The Operations Manager's acceptance of employment with the Company and the performance of duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer.

26.   Withholding. The Company shall have the right to withhold from any amount payable hereunder any Federal, state, and local taxes in order for the Company to satisfy any withholding tax obligation it may have under any applicable law or regulation.

27.   Survival. Upon the expiration or other termination of this Agreement, the respective rights and obligations of the parties hereto shall survive such expiration or other termination to the extent necessary to carry out the intentions of the parties under this Agreement.

28.   Acknowledgement of Full Understanding. THE OPERATIONAL MANAGERS ACKNOWLEDGES AND AGREES THAT THE OPERATIONAL MANAGERS HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. THE OPERATIONAL MANAGERS ACKNOWLEDGES AND AGREES THAT THE OPERATIONAL MANAGERS HAS HAD AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF THE OPERATIONAL MANAGER'S CHOICE BEFORE SIGNING THIS AGREEMENT.

*(Remainder of this page intentionally left blank; signatures begin on the next page.)*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

Protech Metals LLC
c/o AccessHeat Inc.

By: _____
Name: Ruth Berenstein
Title: Partner


Signature: _____

William R. Hall

**Exhibit B**

**Form of Stockholder Release**

(attached)

**Exhibit C**

Promissory Note

(attached)

# EXHIBIT D

**EXHIBIT D**

## PROMISSORY NOTE

| | |
|---|---|
| **$1,150,000** | Wilmington, Delaware, USA |
| | April 19th, 2022 |

FOR VALUE RECEIVED, Protech Metals, LLC, a North Carolina corporation (the "***Borrower***"), hereby unconditionally promises to pay to the order of William R. Hall (the "***Noteholder***") the principal amount of $1,150,000 (the "***Loan***"), together with all accrued interest thereon, as provided in this Promissory Note (this "***Note***"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in that certain Stock Purchase Agreement dated the date hereof (the "***Stock Purchase Agreement***") by and among AccessHeat, Inc., a Delaware corporation ("***AccessHeat***"), the Borrower, and the Noteholder.

1.    Payment Dates.

(a)    Payment Date. The purchase price shall be paid as follow: (i) 36 monthly installments with a debt service coverage ratio of 1.35 [monthly EBITDA / 1.35 = payment amount] with the first payment to be made on the date that is the first Business Day following the 30th day following the Closing Date (the "***First Payment Date***") and each of the remaining 35 payments on thirtieth succeeding day, and (ii) remainder of agreed upon purchase price due on the third anniversary of the First Payment Date.

(b)    If Borrower fails to make a payment required by Section 1(a) other than because of a breach of the representations and warranties made by the Sellers in the Stock Purchase Agreement then within 30 days after such payment is due, then the Noteholder may exercise its right to unwind the purchase and sale of the Stock as contemplated by the Stock Purchase Agreement and reacquire the Stock from Access Heat for no additional consideration by providing written notice of same ("***Default Notice***"). Within five Business Days of Borrower's receipt of the Default Notice, Borrower shall notify Noteholder in writing of Borrower's agreement to return to the Noteholder the Stock for no additional consideration or that the Borrower desires to negotiate in good faith a settlement with the Noteholder with respect to such payment default. If the Borrower exercises its right to negotiate in a good faith a settlement with Noteholder to remedy such payment default, the Borrower and the Noteholder shall for a period of 30 days negotiate in good faith to reach a settlement with respect to such payment default. If at the end of such 30 day period the Borrower and the Noteholder are unable to reach an agreement, the Borrower and the Noteholder shall submit the matter to a mutually agreeable mediator to assist the parties in reaching such settlement. If the Borrower and the Noteholder are unable to agree on a mediator within 10 Business Days, then the Borrower shall choose a mediator and the Noteholder shall choose a mediator, and the two chosen meditators shall choose a third mediator who shall serve as the mediator of the dispute. The mediator shall use its reasonable best efforts to assist the parties in resolving the issue within 45 days of being engaged. If, at the end of such 45 day period the parties have been unable to resolve the dispute, then the parties shall have the option to have the dispute heard in the federal or state courts in the State of North Carolina.

(c)    Prepayment. The Borrower may prepay the Loan in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment.

2.    Interest.

(a)    Interest Rate, principal amounts outstanding under this Note shall bear interest at a rate of 1% per annum.

(b)    Default Interest. If any amount payable hereunder is not paid when due (without regard to any applicable grace period), whether at stated maturity, by acceleration, or otherwise, such overdue amount shall bear interest at the Interest Rate plus 2.0%) (the "*Default Rate*").

(c)    Computation of Interest. All computations of interest hereunder shall be made on the basis of a year of 365/366 days, as the case may be, and the actual number of days elapsed. Interest shall begin to accrue on the Loan on the date of this Note. On any portion of the Loan that is repaid, interest shall not accrue on the date on which such payment is made.

(a)    Interest Rate Limitation. If at any time the interest rate payable on the Loan shall exceed the maximum rate of interest permitted under applicable law, such interest rate shall be reduced automatically to the maximum rate permitted.

2.    Payment Mechanics.

(a)    Manner of Payment. All payments of principal and interest shall be made in US dollars no later than 12:00 p.m., Eastern time, on the date on which such payment is due. Such payments shall be made by cashier's check, certified check, or wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Borrower from time to time.

(b)    Application of Payments. All payments shall be applied, *first*, to fees or charges outstanding under this Note, *second*, to accrued interest, and, *third*, to principal outstanding under this Note.

3.    Events of Default. The occurrence and continuance of any of the following shall constitute an "*Event of Default*" hereunder:

(a)    Failure to Pay. The Borrower fails to pay (i) any principal amount of the Loan within five Business Days when due; (ii) any interest on the Loan within five Business Days after the date such amount is due; or (iii) any other amount due hereunder within 10 Business Days after such amount is due.

(b)    Breach of Representations and Warranties. Any representation or warranty made by the Borrower to the Noteholder herein contains an untrue or misleading statement of a material fact as of the date made; *provided, however*, no Event of Default shall be deemed to have occurred pursuant to this Section 5(b) if, within 30 days of the date on which the Borrower receives notice (from any source) of such untrue or misleading statement, Borrower shall have addressed the adverse effects of such untrue or misleading statement to the reasonable satisfaction of the Noteholder.

(c)    Bankruptcy; Insolvency.

(i)    The Borrower institutes a voluntary case seeking relief under any law relating to bankruptcy, insolvency, reorganization, or other relief for debtors.

RB

DocuSign Envelope ID: A704A22C-671E-4B35-B2C0-6E351607DF76

(ii)   An involuntary case is commenced seeking the liquidation or reorganization of the Borrower under any law relating to bankruptcy or insolvency, and such case is not dismissed or vacated within 90 days of its filing.

(iii)   The Borrower makes a general assignment for the benefit of its creditors.

(iv)   The Borrower is unable, or admits in writing its inability, to pay its debts as they become due.

(v)   A case is commenced against the Borrower or its assets seeking attachment, execution, or similar process against all or a substantial part of its assets, and such case is not dismissed or vacated within 90 days of its filing.

4.   Notice of Event of Default. As soon as possible after it becomes aware that an Event of Default has occurred, and in any event within five Business Days, the Borrower shall notify the Noteholder in writing of the nature and extent of such Event of Default and the action, if any, it has taken or proposes to take with respect to such Event of Default.

5.   Remedies. Upon the occurrence and during the continuance of an Event of Default, the Noteholder may, at its option, by written notice to the Borrower declare the outstanding principal amount of the Loan, accrued and unpaid interest thereon, and all other amounts payable hereunder immediately due and payable; *provided, however*, if an Event of Default described in Sections 5(c)(i), (iii), or (iv) shall occur, the outstanding principal amount, accrued and unpaid interest, and all other amounts payable hereunder shall become immediately due and payable without notice, declaration, or other act on the part of the Noteholder.

6.   Notices. Any notices, requests, consents, claims, demands, waivers, and other communications under this Note shall be in writing and shall be deemed to have been duly given if (i) delivered in person, (ii) transmitted by facsimile or e-mail (with confirmation of transmission) during regular business hours during a business day, or (iii) sent by a nationally recognized overnight courier service to the party at the physical or e-mail address or facsimile number shown below. Notices personally delivered in accordance with clause (i) above shall be deemed to have been given on the date so delivered; notices transmitted in accordance with clause (ii) above shall be deemed delivered on the same Business Day, if sent during regular business hours, and, if not, on the next Business Day; and notices sent in accordance with clause (iii) above shall be deemed to have been given on the next Business Day after delivery to the courier.

(a)   If to the Borrower:

Protech Metals, LLC
c/o AccessHeat, Inc.
913 N. Market Street, Unit 200

Wilmington, DE 19809 I

Attention: Ruth Berenstein

Email: Rberenstein@accessheatmail.com

(b)   If to the Noteholder:

*RB*

DocuSign Envelope ID: A704A22C-671E-4B35-B2C0-6E351607DF76

William R. Hall
3619 Murdocksville Road
Pinehurst, NC 28374
E-mail: [EMAIL PERSONAL]



Rick@Protechmetals.net

6/9/2022

7.   Governing Law. This Note and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based on, arising out of, or relating to this Note and the transactions contemplated hereby shall be governed by and construed in accordance with the laws of the State of North Carolina.

8.   Disputes.

(a)   Submission to Jurisdiction. The Borrower irrevocably and unconditionally (A) agrees that any action, suit, or proceeding arising from or relating to this Note may be brought in the state or federal courts fo the State of North Carolina, and (B) submits to the exclusive jurisdiction of such courts in any such action, suit, or proceeding. Final judgment against the Borrower in any such action, suit, or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)   Venue. The Borrower irrevocably and unconditionally waives, to the fullest extent permitted by law, (i) any objection that it may now or hereafter have to the laying of venue in any action, suit, or proceeding relating to this Note in any court referred to in Section 10(a), and (ii) the defense of inconvenient forum to the maintenance of such action, suit, or proceeding in any such court.

(c)   Waiver of Jury Trial. THE BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

9.   Successors and Assigns. This Note may not be assigned or transferred by the Noteholder without the prior written consent of the Borrower.

10.   Integration. This Note constitutes the entire contract between the Borrower and the Noteholder with respect to the subject matter hereof and supersedes all previous agreements and understandings, oral or written, with respect thereto.

11.   Amendments and Waivers. No term of this Note may be waived, modified, or amended, except by an instrument in writing signed by the Borrower and the Noteholder. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

12.   No Waiver; Cumulative Remedies. No failure by the Noteholder to exercise and no delay in exercising any right, remedy, or power hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The rights, remedies, and powers herein provided are cumulative and not exclusive of any other rights, remedies, or powers provided by law.

13.   Severability. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or render such term or provision invalid or unenforceable in any other jurisdiction.

RB

DocuSign Envelope ID: A704A22C-671E-4B35-B2C0-6E351607DF76

14.   Counterparts. This Note and any amendments, waivers, consents, or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Note by facsimile or in electronic ("pdf") format shall be as effective as delivery of a manually executed counterpart of this Note.

15.   Electronic Execution. The words "execution," "signed," "signature," and words of similar import in this Note shall be deemed to include electronic and digital signatures and the keeping of records in electronic form, each of which shall be of the same effect, validity, and enforceability as manually executed signatures and paper-based recordkeeping systems, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S.C. § 7001 *et seq.*) and any other similar state laws based on the Uniform Electronic Transactions Act.

*(Remainder of this page intentionally left blank; signatures begin on the next page.)*

In Process

DocuSign Envelope ID: A704A22C-671E-4B35-B2C0-6E351607DF76

IN WITNESS WHEREOF, the Borrower has executed this Note as of April 19 th, 2022.

AccessHeat Inc.

By: _____                June 9th, 2022

Name: Ruth Berenstein

Title: Partner

ACKNOWLEDGED AND ACCEPTED BY
NOTEHOLDER

_____

William R. Hall

# EXHIBIT E

**EXHIBIT E**



ACCESSHEAT INC
913 N MARKET ST STE 200, WILMINGTON, DE 19801, USA

## SHARE TRANSFER AGREEMENT

### in relation to

### Protech Metals LLC

**THIS AGREEMENT** is made on the 9th day of June, 2022 by and between:

(1) **William Rickey Hall** of, [ADDRESS] 9391 Aberdeen Rd. Aberdeen NC28315
    (" Seller")

AND:

6·9·2022 *(signature)*

(2) **Access-Heat Inc,** a Delaware corporation,

("**Buyer**")

**IT IS AGREED** as follows:

**1   Definitions and interpretation**

**1.1   Definitions**

In this Agreement unless the context requires otherwise:

**SEC** means Securities Exchange Commission of the United States.

**"COMPANY"** means the shares of Protech Metals LLC.

**"Completion"** means completion of the transfer of the Transfer Shares in accordance with clause 4;

**"Encumbrance"** means any mortgage, charge, pledge, lien, option, restriction, right of first refusal, right of pre-emption, claim, right, interest or preference granted to any third party, or any other encumbrance or security interest of any kind (or an agreement or commitment to create any of the same);

**"USD"** means United States of American dollars;

**ACCESSHEAT INC**
913 N MARKET ST STE 200, WILMINGTON, DE 19801, USA

**"Proceedings"** means any proceeding, suit or action arising out of or in connection with this Agreement;

**"Purchase Price"** means $1,150,000 USD

8-9.2022

**"Transfer Shares"** means the [AMOUNT OF TOTAL SHARES] common shares of nominal value US$0.001 each in the capital of the Company (Protech Metals LLC) legally and beneficially owned by the Seller as the context requires;

**"US$"** means United States dollars, the lawful currency of the United States of America; and

**"Warranties"** means the warranties and representations set out in the Schedule and referred to in clause 5, **"Warranty"** means any or a specific one of them.

### 1.2
### Interpretation

In this Agreement, unless the context requires otherwise:
(a)  the schedule to this Agreement forms part of this Agreement and shall have effect as if set out in full in the body of this Agreement;

(b)  references to this Agreement or any provision of it or any other document are to this Agreement, that provision or that document as amended from time to time in accordance with the terms of this Agreement or that document or otherwise with the agreement of the relevant parties;

(c)  references to any US legal term or any legal concept or thing shall in respect of any jurisdiction other than US be deemed to include what most nearly approximates in that jurisdiction to the US legal term;

## 2   Transfer of the Transfer Shares

### 2.1
### Transfer
2.1.   1. The Seller as legal and beneficial owner shall transfer to the Buyer and the Buyer (relying on the representations, warranties, undertakings and indemnities contained in this Agreement) shall accept the transfer of the Transfer Shares free from all Encumbrances unless agreed to otherwise.

2.1.   2. The Buyer shall not be obliged to complete the transfer of any of the Transfer Shares unless the transfer of all the Transfer Shares is completed simultaneously.

## 3.   Consideration

3.1  The consideration for the transfer of the Transfer Shares shall be the payment of the



**ACCESSHEAT INC**

913 N MARKET ST STE 200, WILMINGTON, DE 19801, USA

Purchase Price on Completion by the Buyer to the Seller and the execution of the Stock Purchase Agreement with respect to the Promissory Note.

**4    Completion**

**4.1  Completion**

Completion shall take place after the signing of this Agreement.

**4.2    Completion obligations**

4.2.1    At Completion, the Seller shall deliver to or to the order of the Buyer:

    (a) a duly executed instrument of transfer in respect of the Transfer Shares completed in favor of the Buyer (or as it may direct);

    (b) all share certificates in respect of the Transfer Shares;

    (c) all powers of attorney or other authorities (if any) under which the instrument of transfer in relation to the Transfer Shares have been executed, together with such other documents as may be required to give a good title to the Transfer Shares and to enable the Buyer or its nominees to become the registered holder of them; and

4.2.2    At Completion, the Buyer shall:

    (a) deliver to the Seller a signed Promissory Note along with the relevant Stock Purchase Agreement.

**5    Warranties**

**5.1    Warranties and representations**

5.1.1    The Seller:

    (a) warrants and represents to the Buyer (for itself and as trustee for its successors in title) that each of the Warranties is true and accurate in all respects and not misleading in any respect; and

    (b) acknowledges that the Buyer has entered into this Agreement in reliance on, among other things, the Warranties.

5.1.2 The Seller shall indemnify the Buyer and keep it indemnified against all claims, damages, losses, outgoings and liabilities whatsoever which may arise out of any breach of the Warranties, together with all costs, charges, interest, penalties and expenses relating thereto.

**5.2    Warranties separate**



**ACCESSHEAT INC**

913 N MARKET ST STE 200, WILMINGTON, DE 19801, USA

Each of the paragraphs in the Schedule:

(a) shall be construed as a separate and independent warranty and representation; and

(b) unless expressly provided in this Agreement, shall not be limited by reference to another paragraph of the Schedule or by any other provision of this Agreement and the Buyer shall have a separate claim and right of action in respect of every breach of a Warranty.

### 5.3 Effect of completion

The Warranties shall not in any respect be extinguished or affected by Completion.

## 6  Costs

Except as provided in this Agreement, each of the parties to this Agreement shall pay its own respective legal and other costs and expenses in connection with the negotiation, preparation, execution and performance by it of this Agreement and all ancillary documents.

## 7  Governing law and submission to jurisdiction

7.1 This Agreement shall be governed by and construed in accordance with the laws the United States of America.

7.2 The parties to this Agreement irrevocably agree that the courts of the USA are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and that accordingly any Proceedings may be brought in such courts.

**THIS AGREEMENT** has been executed on the date stated at the beginning.

**SIGNED by** William R. Hall
for himself and on behalf of
**Protech Metals LLC**

/s/William R. Hall
*Authorized Signature*

4



**SIGNED** by
Ruth Berenstein
**Access-Heat Inc.** of Delaware

_____
*Authorized Signature*

## Schedule

### The Warranties

The Seller warrants and represents to the Buyer that:

**1    Transfer Shares**

1.1   It is the sole legal and beneficial owner of the Transfer Shares.

1.2   There is no Encumbrance on, over or affecting the Transfer Shares and no person has made any claim to be entitled to any right over or affecting the Transfer Shares.

END DOCUMENT

# EXHIBIT F

DocuSign Envelope ID: 3D72ABEC-83A3-4357-82FE-DF681D216AA4

**EXHIBIT F**

# EMPLOYMENT AGREEMENT

This Employment Agreement (this "***Agreement***") is made and entered into as of June 9th, 2022, by and between William R. Hall (the "***Operations Manager***") and Protech Metals, LLC, a North Carolina corporation (the "***Company***").

WHEREAS, the Company desires to employ the Operations Manager on the terms and conditions set forth herein, and

WHEREAS, the Operations Manager desires to be employed by the Company on such terms and conditions.

NOW, THEREFORE, in consideration of the mutual covenants, promises, and obligations set forth herein, the parties agree as follows:

1.    **Term.** The Operations Manager employment hereunder shall be effective as of the date hereof and shall continue until the first anniversary thereof, unless terminated earlier pursuant to Section 5 of this Agreement. The period during which the Operations Manager is employed by the Company hereunder is hereinafter referred to as the "***Employment Term***".

2.    **Position and Duties.**

2.1    **Position.** During the Employment Term, the Employee shall serve as the Operations Manager of the Company, reporting to the Chief Executive Officer (the "***AccessHeat CEO***") of AccessHeat, Inc., a Delaware corporation ("***AccessHeat***"), the parent of the Company. In such a position, the Operations Manager shall have such duties, authority, and responsibilities as shall be determined from time to time by the AccessHeat CEO.

2.2    **Duties.** During the Employment Term, the Operations Manager shall devote substantially all of Operations Manager business time and attention to the performance of the Operations Manager duties hereunder and will not engage in any other business, profession, or occupation for compensation or otherwise which would conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of the Board. Notwithstanding the foregoing, the Operations Manager will be permitted to with the prior written consent of the Board act or serve as a director, trustee, committee member, or principal of any type of business, civic, or charitable organization as long as such activities are disclosed in writing to the AccessHeat CEO, provided that such activities do not interfere with the performance of the Operations Manager duties and responsibilities to the Company as provided hereunder, including, but not limited to, the obligations set forth in Section 2 hereof.

3.    **Place of Performance.** The principal place of Operations Manager employment shall be the Company's principal executive office currently located at 3619 Murdocksville Rd. Pinehurst, NC 28374; provided that the Operations Manager may be required to travel on Company business during the Employment Term.

4.    **Compensation.**

4.1    **Base Salary.** The Company shall have been deemed to pay the Operations Manager an annual base salary of $54,000

4.2    **Fringe Benefits and Perquisites.** During the Employment Term, the Operations Manager shall be entitled to fringe benefits and perquisites consistent with the practices of the Company

*RB*

DocuSign Envelope ID: 3D72ABEC-83A3-4357-82FE-DF881D216AA4

and governing benefit plan requirements (including plan eligibility provisions), and to the extent the Company provides similar benefits or perquisites (or both) to similarly situated executives of the Company.

4.3    Employee Benefits. During the Employment Term, the Operations Manager shall be entitled to participate in all employee benefit plans, practices, and programs maintained by the Company, as in effect from time to time (collectively, "*Employee Benefit Plans*"), to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. The Company reserves the right to amend or terminate any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law.

4.4    Vacation; Paid Time Off. During the Employment Term, the Operations Manager shall be entitled to [2] weeks of paid vacation day per calendar year (prorated for partial years) in accordance with the Company's vacation policies, as in effect from time to time.

4.5    Business Expenses. The Operations Manager shall be entitled to reimbursement for all reasonable and necessary out-of-pocket business, entertainment, and travel expenses incurred by the Operations Manager in connection with the performance of the Operations Manager duties hereunder in accordance with the Company's expense reimbursement policies and procedures.

4.6    Clawback Provisions. Notwithstanding any other provisions in this Agreement to the contrary, any incentive-based or other compensation paid to the Operations Manager under this Agreement or any other agreement or arrangement with the Company which is subject to recovery under any law, government regulation, or stock exchange listing requirement will be subject to such deductions and clawback as may be required to be made pursuant to such law, government regulation, or stock exchange listing requirement (or any policy adopted by the Company pursuant to any such law, government regulation or stock exchange listing requirement).

5.    Termination of Employment. The Employment Term and the Operations Manager employment hereunder may be terminated by either the Company or the Operations Manager at any time and for any reason; provided that, unless otherwise provided herein, either party shall be required to give the other party at least 90 days advance written notice of any termination of the Operations Managers employment. On termination of the Operations Manager employment during the Employment Term, the Operations Manager shall be entitled to the compensation and benefits described in this Section 5 and shall have no further rights to any compensation or any other benefits from the Company or any of its affiliates.

5.1    Expiration of the Term or For Cause.

(a) The Operations Manager employment hereunder may be terminated upon either party's failure to renew the Agreement in accordance with Section 1 or by the Company for Cause. If the Operations Manager employment is terminated upon either party's failure to renew this Agreement or by the Company for Cause, the Operations Manager shall be entitled to receive:

(i)    any accrued but unused vacation which shall be paid on the pay date immediately following the Termination Date (as defined below) in accordance with the Company's customary payroll procedures;

(ii)    reimbursement for unreimbursed business expenses properly incurred by the Operations Manager, which shall be subject to and paid in accordance with the Company's expense reimbursement policy; and

RB

DocuSign Envelope ID: 3D72ABEC-83A3-4357-82FE-DF681D216AA4

(iii) such employee benefits (including equity compensation), if any, to which the Operations Manager may be entitled under the Company's employee benefit plans as of the Termination Date; provided that, in no event shall the Operations Manager be entitled to any payments in the nature of severance or termination payments except as specifically provided herein.

Items 5.1(a)(i) through 5.1(a)(iii) are referred to herein collectively as the *"Accrued Amounts".*

(b) For purposes of this Agreement, *"Cause"* shall mean:

(i) the Operations Manager failure to perform Operations Manager duties (other than any such failure resulting from incapacity due to physical or mental illness);

(ii) the Operations Manager failure to comply with any valid and legal directive of the AccessHeat CEO;

(iii) the Operations Manager engagement in dishonesty, illegal conduct, or misconduct, which is, in each case, injurious to the Company Group (as defined below) or their respective affiliates;

(iv) the Operations Manager embezzlement, misappropriation, or fraud, whether or not related to the Operations Manager employment with the Company;

(v) the Operations Manager conviction of or plea of guilty or nolo contendere to a crime that constitutes a felony (or state law equivalent) or a crime that constitutes a misdemeanor involving moral turpitude;

(vi) the Operations Manager violation of the written policies or codes of conduct of the Company or AccessHeat, including written policies related to discrimination, harassment, performance of illegal or unethical activities, and ethical misconduct;

(vii) the Operations Manager unauthorized disclosure of Confidential Information (as defined below);

(viii) the Operations Manager material breach of any material obligation under this Agreement or any other written agreement between the Operations Manager and the Company; or

(ix) the Operations Manager engagement in conduct that brings or is reasonably likely to bring the Company negative publicity or into public disgrace, embarrassment, or disrepute.

Except for a failure, breach, or refusal which, by its nature, cannot reasonably be expected to be cured, the Operations Manager shall have five business days from the delivery of written notice by the Company within which to cure any acts constituting Cause; provided however, that, if the Company reasonably expects irreparable injury from a delay of five business days, the Company may give the Operations Manager notice of such shorter period within which to cure as is reasonable under the circumstances, which may include the termination of the Operations Manager employment without notice and with immediate effect.

RB

5.2    Without Cause. The Employment Term and the Operations Manager employment hereunder may be terminated by the Company without Cause. In the event of such termination, the Operations Manager shall be entitled to receive the Accrued Amounts and, subject to the Operations Manager compliance with Section 6, Section 7, Section 8, and Section 9 of this Agreement and the Operations Manager execution of a release of claims in favor of the Company Group and their respective officers and directors in a form provided by the Company (the "*Release*"), the Operations Manager shall be entitled to receive the following:

(a)    a payment equal to the product of (i) the Annual Bonus, if any, that the Operations Manager would have earned for the fiscal year in which the Termination Date (as determined in accordance with Section 5.5) occurs based on achievement of the applicable performance goals for such year and (ii) a fraction, the numerator of which is the number of days the Operations Manager was employed by the Company during the year of termination and the denominator of which is the number of days in such year (the "*Pro-Rata Bonus*"). This amount shall be paid on the date that annual bonuses are paid to similarly situated executives.

5.3    Death or Disability.

(a)    The Operations Manager employment hereunder shall terminate automatically on the Operations Manager's death during the Employment Term, and the Company may terminate the Operations Manager's employment on account of the Operations Manager's Disability.

(b)    If the Operations Manager's employment is terminated during the Employment Term on account of the Operations Manager's death or Disability, the Operations Manager (or the Operations Manager's estate and/or beneficiaries, as the case may be) shall be entitled to receive the Accrued Amounts. Notwithstanding any other provision contained herein, all payments made in connection with the Operations Manager's Disability shall be provided in a manner which is consistent with federal and state law.

(c)    For purposes of this Agreement, "*Disability*" shall mean the Operations Manager's inability, due to physical or mental incapacity, to perform the essential functions of the Operations Manager's job, for 90 days out of any 365-day period. Any question as to the existence of the Operations Manager's Disability as to which the Operations Manager and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to the Operations Manager and the Company. If the Operations Manager and the Company cannot agree as to a qualified independent physician, each shall appoint such a physician and those two physicians shall select a third who shall make such determination in writing. The determination of Disability made in writing to the Company and the Operations Manager shall be final and conclusive for all purposes of this Agreement.

5.4    Notice of Termination. Any termination of the Operations Manager's employment hereunder by the Company or by the Operations Manager during the Employment Term (other than termination pursuant to Section 5.3(a) on account of the Operations Manager's death) shall be communicated by written notice of termination ("*Notice of Termination*") to the other party hereto in accordance with Section 24. The Notice of Termination shall specify:

(a)    The termination provision of this Agreement relied upon;

(b)    To the extent applicable, the facts and circumstances claimed to provide a basis for termination of the Operations Manager's employment under the provision so indicated; and

(c)    The applicable Termination Date.

DocuSign Envelope ID: 3D72ABEC-83A3-4357-82FE-DF681D216AA4

5.5     Termination Date. The Operations Manager's "***Termination Date***" shall be:

(a)     If the Operations Manager's employment hereunder terminates on account of the Operations Manager's death, the date of the Operations Manager's death;

(b)     If the Operations Manager's employment hereunder is terminated on account of the Operations Manager's Disability, the date that it is determined that the Operations Manager has a Disability;

(c)     If the Company terminates the Operations Manager's employment hereunder for Cause, the date the Notice of Termination is delivered to the Operations Manager; or

(d)     If the Company terminates the Operations Manager's employment hereunder without Cause, the date specified in the Notice of Termination.

5.6     Resignation of All Other Positions. On termination of the Operations Manager's employment hereunder for any reason, the Operations Manager shall be deemed to have resigned from all positions that the Operations Manager holds as an officer or member of the Board (or a committee thereof) of the Company or any of its affiliates.

6.     Cooperation. The parties agree that certain matters in which the Operations Manager will be involved during the Employment Term may necessitate the Operations Manager's cooperation in the future. Accordingly, following the termination of the Operations Manager's employment for any reason, to the extent reasonably requested by the Board, the Operations Manager shall cooperate with the Company in connection with matters arising out of the Operations Manager's service to the Company.

7.     Confidential Information. The Operations Manager understands and acknowledges that during the Employment Term, the Operations Manager will have access to and learn about Confidential Information, as defined below.

7.1     Confidential Information Defined.

(a)     Definition. For purposes of this Agreement, "***Confidential Information***" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, device configurations, embedded data, compilations, metadata, technologies, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, and buyer lists of the Company Group or its businesses or any existing or prospective customer, supplier, investor or other associated third party, or of any other person or entity that has entrusted information to the Company Group in

DocuSign Envelope ID: 3D72ABEC-83A3-4357-82FE-DF681D216AA4

confidence. The Operations Manager understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used. The Operations Manager understands and agrees that Confidential Information includes information developed by Operations Manager in the course of employment by the Company as if the Company furnished the same Confidential Information to the Operations Manager in the first instance. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to the Operations Manager; provided that, such disclosure is through no direct or indirect fault of the Operations Manager or person(s) acting on the Operations Manager's behalf.

      (b)    Company Creation and Use of Confidential Information. The Operations Manager understands and acknowledges that the Company Group has invested, and continues to invest, substantial time, money, and specialized knowledge into developing its resources, creating a customer base, generating customer and potential customer lists, training its employees, and improving its offerings in the field of its businesses. The Operations Manager understands and acknowledges that as a result of these efforts, the Company Group has created, and continues to use and create Confidential Information. This Confidential Information provides the Company Group with a competitive advantage over others in the marketplace.

      (c)    Disclosure and Use Restrictions. The Operations Manager agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company Group) not having a need to know and authority to know and use the Confidential Information in connection with the business of the Company Group and, in any event, not to anyone outside of the direct employ of the Company Group except as required in the performance of the Operations Manager's authorized employment duties to the Company or with the prior consent of the AccessHeat CEO acting on behalf of the Company Group in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company Group, except as required in the performance of the Operations Manager's authorized employment duties to the Company or with the prior consent of the Live Ventures CEO acting on behalf of the Company Group in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent). Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. The Operations Manager shall promptly provide written notice of any such order to the AccessHeat CEO.

      (d)    Permitted Disclosures. Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. The Operations Manager shall promptly provide written notice of any such order to the AccessHeat CEO.

    8.     Restrictive Covenants.

DS
RB

DocuSign Envelope ID: 3D72ABEC-83A3-4357-82FE-DF681D216AA4

8.1   Acknowledgement. The Operations Manager understands that the nature of the Operations Manager's position gives the Operations Manager access to and knowledge of Confidential Information and places the Operations Manager in a position of trust and confidence with the Company. The Operations Manager understands and acknowledges that the intellectual and other services the Operations Manager provides to the Company are unique, special, or extraordinary. The Operations Manager further understands and acknowledges that the Company's ability to reserve these for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company, and that improper use or disclosure by the Operations Manager is likely to result in unfair or unlawful competitive activity.

8.2   Non-Competition. Because of the Company's legitimate business interest as described herein and the good and valuable consideration offered to the Operations Manager, during the Employment Term and for the five years, to run consecutively, beginning on the last day of the Operations Manager's employment with the Company, regardless of the reason for the termination and whether employment is terminated at the option of the Operations Manager or the Company, the Operations Manager agrees and covenants not to engage in Prohibited Activity within the State of North Carolina.

For purposes of this Section 8, "*Prohibited Activity*" is activity in which the Operations Manager contributes the Operations Manager's knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, employee, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity to an entity engaged in the same or similar business as the Company. Prohibited Activity also includes activity that may require or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information.

This Section 8 does not, in any way, restrict or impede the Operations Manager from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. The Operations Manager shall promptly provide written notice of any such order to the AccessHeat CEO.

8.3   Non-Solicitation of Employees. The Operations Manager agrees and covenants not to directly or indirectly solicit, hire, recruit, attempt to hire or recruit, or induce the termination of employment of any employee of the Company, or attempt to do so, during five years, to run consecutively, beginning on the last day of the Operations Manager's employment with the Company.

8.4   Non-Solicitation of Customers. The Operations Manager understands and acknowledges that because of the Operations Manager's experience with and relationship to the Company, the Operations Manager will have access to and learn about much or all of the Company's customer information. "*Customer Information*" includes, but is not limited to, names, phone numbers, addresses, email addresses, order history, order preferences, chain of command, decisionmakers, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to sales and/or services. The Operations Manager understands and acknowledges that loss of this customer relationship and/or goodwill will cause significant and irreparable harm. The Operations Manager agrees and covenants, during five years, to run consecutively, beginning on the last day of the Operations Manager's employment with the Company, not to directly or indirectly solicit, contact (including but not limited to email, regular mail, express mail, telephone, fax, instant message, or social media), attempt to contact, or meet with the Company's current, former, or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company.

9    Non-Disparagement. The Operations Manager agrees and covenants that the Operations Manager will not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning the Company Group, or any Company Group affiliates, businesses, employees, officers, and existing and prospective customers, suppliers, investors and other associated third parties. "*Company Group*" means, collectively, the Company, AccessHeat, and any of their respective direct or indirect subsidiaries or affiliates. This Section 9 does not, in any way, restrict or impede the Operations Manager from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order.

10.    Acknowledgement. The Operations Manager acknowledges and agrees that the services to be rendered by the Operations Manager to the Company are of a special and unique character; that the Operations Manager will obtain knowledge and skill relevant to the Company's industry, methods of doing business and marketing strategies by virtue of the Operations Manager's employment; and that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interest of the Company Group. The Operations Manager further acknowledges that the benefits provided to the Operations Manager under this Agreement, including the amount of the Operations Manager's compensation, reflects, in part, the Operations Manager's obligations and the Company's rights under Section 7, Section 8, and Section 9 of this Agreement; that the Operations Manager has no expectation of any additional compensation, royalties, or other payment of any kind not otherwise referenced herein in connection herewith; and that the Operations Manager will not suffer undue hardship by reason of full compliance with the terms and conditions of Section 7, Section 8, and Section 9 of this Agreement or the Company's enforcement thereof.

11.    Remedies. In the event of a breach or threatened breach by the Operations Manager of Section 7, Section 8, or Section 9 of this Agreement, the Operations Manager hereby consents and agrees that the Company shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, and that money damages would not afford an adequate remedy, without the necessity of showing any actual damages, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

12.    Proprietary Rights.

12.1  Work Product. The Operations Manager acknowledges and agrees that all right, title, and interest in and to all writings, works of authorship, technology, inventions, discoveries, processes, techniques, methods, ideas, concepts, research, proposals, materials, and all other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived, or reduced to practice by the Operations Manager individually or jointly with others during the Employment Term and relate in any way to the business or contemplated business, products, activities, research, or development of the Company or result from any work performed by the Operations Manager for the Company (in each case, regardless of when or where prepared or whose equipment or other resources is used in preparing the same), all rights and claims related to the foregoing, and all printed, physical and electronic copies, and other tangible embodiments thereof (collectively, "*Work Product*"), as well as any and all rights in and to US and foreign (a) patents, patent disclosures and inventions (whether patentable or not), (b) trademarks, service marks, trade dress, trade names, logos, corporate names, and domain names, and other similar designations of source or origin, together with the goodwill symbolized by any

RB

of the foregoing, (c) copyrights and copyrightable works (including computer programs), mask works, and rights in data and databases, (d) trade secrets, know-how, and other confidential information, and (e) all other intellectual property rights, in each case whether registered or unregistered and including all registrations and applications for, and renewals and extensions of, such rights, all improvements thereto and all similar or equivalent rights or form of protection in any part of the world (collectively, "**Intellectual Property Rights**"), shall be the sole and exclusive property of the Company. For purposes of this Agreement, Work Product includes, but is not limited to, Company Group information, including plans, publications, research, strategies, techniques, agreements, documents, contracts, terms of agreements, negotiations, know-how, computer programs, computer applications, software design, web design, work in process, databases, manuals, results, developments, reports, graphics, drawings, sketches, market studies, formulae, notes, communications, algorithms, product plans, product designs, styles, models, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, client information, customer lists, client lists, manufacturing information, marketing information, advertising information, and sales information.

12.2 Work Made for Hire; Assignment. The Operations Manager acknowledges that, by reason of being employed by the Company at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in 17 U.S.C. § 101 and such copyrights are therefore owned by the Company. To the extent that the foregoing does not apply, the Operations Manager hereby irrevocably assigns to the Company, for no additional consideration, the Operations Manager's entire right, title, and interest in and to all Work Product and Intellectual Property Rights therein, including the right to sue, counterclaim, and recover for all past, present, and future infringement, misappropriation, or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Company's rights, title, or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Company would have had in the absence of this Agreement.

12.3 Further Assurances; Power of Attorney. During and after the Employment Term, the Operations Manager agrees to reasonably cooperate with the Company to (a) apply for, obtain, perfect, and transfer to the Company the Work Product as well as any and all Intellectual Property Rights in the Work Product in any jurisdiction in the world; and (b) maintain, protect and enforce the same, including, without limitation, giving testimony and executing and delivering to the Company any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments as shall be requested by the Company. The Operations Manager hereby irrevocably grants the Company power of attorney to execute and deliver any such documents on the Operations Manager's behalf in his name and to do all other lawfully permitted acts to transfer the Work Product to the Company and further the transfer, prosecution, issuance, and maintenance of all Intellectual Property Rights therein, to the full extent permitted by law, if the Operations Manager does not promptly cooperate with the Company's request (without limiting the rights the Company shall have in such circumstances by operation of law). The power of attorney is coupled with an interest and shall not be affected by the Operations Manager's subsequent incapacity.

12.4 No License. The Operations Manager understands that this Agreement does not, and shall not be construed to, grant the Operations Manager any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software, or other tools made available to the Operations Manager by the Company.

13.    Security.

KB

DocuSign Envelope ID: 3D72ABEC-83A3-4357-82FE-DF681D216AA4

13.1  Security and Access. The Operations Manager agrees and covenants (a) to comply with all Company Group security policies and procedures as in force from time to time including without limitation those regarding computer equipment, telephone systems, voicemail systems, facilities access, monitoring, key cards, access codes, internet, social media and instant messaging systems, computer systems, email systems, computer networks, document storage systems, software, data security, encryption, firewalls, passwords and any and all other Company Group facilities, IT resources and communication technologies ("*Facilities and Information Technology Resources*"); (b) not to access or use any Facilities and Information Technology Resources except as authorized by the Company; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of the Operations Manager's employment by the Company, whether termination is voluntary or involuntary. The Operations Manager agrees to notify the Company promptly in the event the Operations Manager learns of any violation of the foregoing by others, or of any other misappropriation or unauthorized access, use, reproduction, or reverse engineering of, or tampering with any Facilities and Information Technology Resources or other Company Group property or materials by others.

13.2  Exit Obligations. Upon (a) voluntary or involuntary termination of the Operations Manager's employment or (b) the Company's request at any time during the Operations Manager's employment, the Operations Manager shall (i) provide or return to the Company any and all Company Group property, including keys, key cards, access cards, identification cards, security devices, employer credit cards, network access devices, computers, cell phones, smartphones, PDAs, fax machines, equipment, speakers, webcams, manuals, reports, files, books, compilations, work product, email messages, recordings, thumb drives or other removable information storage devices, hard drives, and data and all Company Group documents and materials belonging to the Company and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Work Product, that are in the possession or control of the Operations Manager, whether they were provided to the Operations Manager by the Company Group or any of its business associates or created by the Operations Manager in connection with the Operations Manager's employment by the Company; and (ii) delete or destroy all copies of any such documents and materials not returned to the Company that remain in the Operations Manager's possession or control, including those stored on any non-Company Group devices, networks, storage locations, and media in the Operations Manager's possession or control.

14.    Publicity. The Operations Manager hereby irrevocably consents to any and all uses and displays, by the Company Group and its agents, representatives and licensees, of the Operations Manager name, voice, likeness, image, appearance, and biographical information in, on or in connection with any pictures, photographs, audio and video recordings, digital images, websites, television programs and advertising, other advertising and publicity, sales and marketing brochures, books, magazines, other publications, CDs, DVDs, tapes, and all other printed and electronic forms and media throughout the world, at any time during or after the Employment Term, for all legitimate commercial and business purposes of the Company Group ("*Permitted Uses*") without further consent from or royalty, payment, or other compensation to the Operations Manager. The Operations Manager hereby forever waives and releases the Company Group and its directors, officers, employees, and agents from any and all claims, actions, damages, losses, costs, expenses, and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after the Employment Term, arising directly or indirectly from the Company Group's and its agents', representatives', and licensees' exercise of their rights in connection with any Permitted Uses.

15.    Governing Law; Jurisdiction and Venue. This Agreement, for all purposes, shall be construed in accordance with the laws of the State of North Carolina without regard to conflicts of law principles. Any action or proceeding by either of the parties to enforce this Agreement shall be brought only in a state or federal court located in the State of North Carolina. The parties hereby irrevocably

DocuSign Envelope ID: 3D72ABEC-83A3-4357-82FE-DF681D216AA4

submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

16.  Entire Agreement. Unless specifically provided herein, this Agreement contains all of the understandings and representations between the Operations Manager and the Company pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter. The parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

17.  Modification and Waiver. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by the Operations Manager and by another officer of the Company as designated in writing by the AccessHeat CEO. No waiver by either of the parties of any breach by the other party hereto of any condition or provision of this Agreement to be performed by the other party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the parties in exercising any right, power, or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

18.  Severability. Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement.

The parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law.

The parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

19.  Captions. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

20.  Counterparts. This Agreement may be executed in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

21.  Tolling. Should the Operations Manager violate any of the terms of the restrictive covenant obligations articulated herein, the obligation at issue will run from the first date on which the Operations Manager ceases to be in violation of such obligation.

RB

DocuSign Envelope ID: 3D72ABEC-83A3-4357-82FE-DF681D216AA4

22.   Notification to Subsequent Employer. When the Operations Manager's employment with the Company terminates, the Operations Manager agrees to notify any subsequent employer of the restrictive covenants sections contained in this Agreement. The Operations Manager will also deliver a copy of such notice to the Company before the Operations Manager commences employment with any subsequent employer. In addition, the Operations Manager authorizes the Company to provide a copy of the restrictive covenants sections of this Agreement to third parties, including but not limited to, the Operations Manager's subsequent, anticipated, or possible future employer.

23.   Successors and Assigns. This Agreement is personal to the Operations Manager and shall not be assigned by the Operations Manager. Any purported assignment by the Operations Manager shall be null and void from the initial date of the purported assignment. The Company may assign this Agreement to any successor or assign (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or substantially all of the business or assets of the Company. This Agreement shall inure to the benefit of the Company and permitted successors and assigns.

24.   Notice. Notices and all other communications provided for in this Agreement shall be in writing and shall be delivered personally or sent by overnight carrier or electronic mail to the parties at the addresses set forth below (or such other addresses as specified by the parties by like notice):

    If to the Company:

    Protech Metals, LLC
    c/o AccessHeat, Inc.

    3619 Murdocksville Road

    Pinehurst, NC 28374

    Attn: Ruth Berenstein, Partner
    Email: Rberenstein@accessheatmail.com

    If to the Operations Manager:

    William R. Hall

    [ADDRESS]   9391 Aberdeen Rd. Aberdeen Nc 28315

*(handwritten in right margin: (date) 6-9-2022)*

25.   Representations of the Operations Manager. The Operations Manager represents and warrants to the Company that:

        (a)   The Operations Manager's acceptance of employment with the Company and the performance of duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which the Operations Manager is a party or is otherwise bound.

        (b)   The Operations Manager's acceptance of employment with the Company and the performance of duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer.

*(handwritten initials at bottom right: KB)*

DocuSign Envelope ID: 3D72ABEC-83A3-4357-82FE-DF681D216AA4

26. Withholding. The Company shall have the right to withhold from any amount payable hereunder any Federal, state, and local taxes in order for the Company to satisfy any withholding tax obligation it may have under any applicable law or regulation.

27. Survival. Upon the expiration or other termination of this Agreement, the respective rights and obligations of the parties hereto shall survive such expiration or other termination to the extent necessary to carry out the intentions of the parties under this Agreement.

28. Acknowledgement of Full Understanding. THE OPERATIONAL MANAGERS ACKNOWLEDGES AND AGREES THAT THE OPERATIONAL MANAGERS HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. THE OPERATIONAL MANAGERS ACKNOWLEDGES AND AGREES THAT THE OPERATIONAL MANAGERS HAS HAD AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF THE OPERATIONAL MANAGER'S CHOICE BEFORE SIGNING THIS AGREEMENT.

*(Remainder of this page intentionally left blank; signatures begin on the next page.)*

In Process

RB

DocuSign Envelope ID: 3D72ABEC-83A3-4357-82FE-DF681D216AA4

IN WITNE **SS** WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**Protech Metals LLC**
c/o Access Heat Inc.

By: _____
**Name: Ruth Berenstein**
**Title: Partner**

Signature: _____

**William R. Hall**

# EXHIBIT G

**EXHIBIT G**

## MOORE COUNTY
## NORTH CAROLINA

### LEASE AGREEMENT

**THIS LEASE AGREEMENT** ("Lease") is made effective as of the _9_ day of _June_, 20 **22** by and between **WRH HOLDINGS, LLC**, a North Carolina limited liability company ("Lessor"), and **AccessHeat, Inc** a North Carolina corporation ("Lessee").

In consideration of the mutual covenants herein contained, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Lessor and Lessee, having had an opportunity to review this Lease and intending to be legally bound hereby, do agree as follows:

**1**       **Premises.** Lessor leases to Lessee, and Lessee leases from Lessor, subject to the terms and conditions of this Lease, the real property described in Exhibit "A," attached hereto and incorporated herein by reference, together with its improvements consisting of certain offices within a commercial building thereon, commonly known as 3619 Murdocksville Rd. West End, North Carolina 27376 ("Premises").

### 2       Term and Renewal.

2.1       The term of this Lease shall be five (5) years, beginning on the **1st day of _July_, 2022** ("Commencement Date"), and ending at 5:00 pm eastern time on the last day of the fifth (5th) consecutive full lease year thereafter ("Initial Term"). The term "lease year" as used herein shall mean a period of twelve (12) consecutive full calendar months. The first lease year shall begin on the Commencement Date. Each succeeding lease year shall commence upon the anniversary date of the first day of the first lease year.

2.2       Lessee shall have the right to renew the Lease for one (1) additional term of five (5) years ("Additional Term") upon Lessee's written notice of such intent, given to Lessor at least one hundred and eighty (180) days prior to the expiration of the Initial Term, with the Additional Term to commence immediately following the expiration of the Initial Term. The rent for the Additional Term shall increase by three percent (3.0%) over the rent for the Initial Term.

### 3       Rent.

3.1       Lessee agrees to pay to Lessor, during the Initial Term of this Lease, the sum of Sixty Thousand Dollars ($60,000.00) per year, in equal monthly installments of Five Thousand Dollars ($5000.00), in advance on the first day of each calendar month during the Initial Term. The foregoing shall be identified in this Lease as "Fixed Rent." Any payment received by Lessor after the first day of the then-current month shall require, and Lessee agrees to pay, a late fee of Fifty Dollars ($50.00).

3.2       In addition to the Fixed Rent, Lessee shall pay, the taxes, utility/repair/maintenance expenses, and insurance pursuant to the applicable provisions of this Lease.

### 4       Taxes and Utility Expenses.

4.1       Lessee shall pay, when due and payable, all taxes, impositions, and charges over the present ad valorem tax liability that are caused by or are attributable to Lessee's improvements to the Premises and/or to Lessee's personal property located on or about the Premises ("Taxes"), together with any interest and penalties thereon, under or by virtue of all present or future laws, ordinances, requirements, orders, directives, rules or regulations of any and all governmental authorities whatsoever (all of which shall also be included in the term "Taxes" as heretofore defined). Lessee shall promptly produce and exhibit to Lessor satisfactory evidence of payment under this section 4.1, if Lessor

1

shall demand the same in writing.

4.2 Lessor shall pay, when due and payable, water service. Lessee shall pay, when due and payable, any and all rents and charges for electricity, telephone, data, internet or other communication service used, and for any and all other service or services furnished to the Premises or the occupants thereof during the term of this Lease (hereinafter referred to as "Utility Expenses"), together with any interest and penalties thereon. Lessee shall promptly produce and exhibit to Lessor satisfactory evidence of payment under this section 4.2, if Lessor shall demand the same in writing.

## 5 Use and Care of Premises by Lessee

5.1 Lessee shall use the Premises only for the operation of a metal fabrication & metal finishing business or related activities. Lessee agrees that it will not use or permit the use of the Premises or any part thereof for any other business or purpose. Lessee will not use or permit the Premises to be used for any unlawful, disreputable or immoral purpose or in any way that will injure the reputation of the building in which the Premises is situated.

5.2 Lessee shall use and occupy the Premises in a careful, safe and proper manner and shall keep the Premises in a clean, safe and undamaged condition. Lessee will not utilize any unethical method of business operation. Lessee will not use or permit the use of any apparatus for sound reproduction or transmission of music in such manner that any sounds so reproduced, transmitted or procured shall be unreasonably audible beyond the exterior of the Premises.

5.3 Lessee agrees that it will not do or keep, or allow to be done or kept, anything in, upon or about the Premises that will contravene Lessee's policies insuring against loss or damage by fire or other hazards, or that will prevent Lessee from procuring such policies from companies acceptable to Lessor.

5.4 Lessee shall not permit the Premises to be occupied in whole or in part by any other person or entity, except as otherwise provided herein. Notwithstanding the foregoing, the Premises may be used and occupied by persons or entities engaged in metal fabrication & metal finishing services, and other associated services.

5.5 Lessee will not paint or decorate any part of the exterior of the Premises, or change the architectural treatment thereof, without first obtaining Lessor's written approval of such painting or decoration; and Lessee will remove promptly upon order of Lessor any paint or any such decoration that has been so applied or installed without Lessor's prior written approval. Lessee shall have the right during the Term of this Lease to make such alterations or improvements to the Premises, excepting structural alterations or improvements, as may be proper and necessary for the conduct of its business and for the full use of the Premises permitted herein, provided that (a) Lessor provides prior written consent for such alterations or improvements, which consent shall not be unreasonably withheld, conditioned or delayed (b) the value of the Premises is not impaired by such alterations or improvements, and (iii) Lessee pays all costs, expenses and charges thereof, makes such alterations and improvements in accordance with applicable building codes and in a good and workmanlike manner, and fully and completely indemnifies, defends and holds Lessor harmless against any mechanic's lien or other liens or claims in connection with the making of such alterations and improvements. Lessee shall not make, or permit to be made, any alterations, additions or improvements of a structural nature to the interior, exterior or front of the Premises. Lessee shall promptly repair any damage to the Premises caused by any alterations, additions or improvements of the Premises by Lessee.

5.6 Lessee shall remove all snow and ice from sidewalks and parking areas on the Premises and shall not obstruct said sidewalks or parking areas, or allow them to be or become obstructed.

5.7 Lessee shall not permit the accumulation of rubbish, trash, garbage and other refuse in and around the Premises.

2

5.8    Lessee may place, erect and maintain a sign at the exterior of the Premises, but only in a place and of a style and size that conforms to any governmental or historical ordinance and is approved in advance by Lessor, which approval shall not be unreasonably withheld, conditioned or delayed.  Lessee shall maintain any sign permitted hereunder in a good state of repair at Lessee's expense.

# 6      Insurance.

6.1      Lessee shall, during the entire Lease Term, keep in full force and effect a policy or policies of commercial general liability insurance and property damage insurance with respect to the Premises and the business operated by Lessee, and any subtenant of Lessee in the Premises, for which the combined single limit of liability shall be not less than One Million Dollars ($1,000,000). Such commercial general liability policy shall name Landlord and Landlord's lender as additional insureds and contain a clause that the insurer shall endeavor not to cancel or to reduce the insurance coverage limits below the levels required herein without first giving Landlord thirty (30) days' prior written notice, except cancellation for nonpayment of premium, in which case only ten (10) days' prior written notice shall be required. Lessee's insurance policies shall be carried with an insurance company or companies with a general policy holders' rating of not less than "A-VII" as rated in the most current available Best's Key Rating Guide and which are qualified to do business in the state in which the Premises are located.

6.2      Lessee shall maintain workers' compensation insurance as required by North Carolina workers' compensation laws.

6.3      Lessee shall require any contractor of Lessee performing work on the Premises to carry and maintain, at no expense to Lessor: (a) commercial general liability insurance, including contractors liability coverage, completed operations coverage, and broad form property damage endorsement, providing protection with limits for each occurrence of not less than Two Million Dollars ($2,000,000); and (b) workers' compensation or similar insurance in form and amounts required by North Carolina workers' compensation laws.

6.4      Lessor will carry and maintain general liability and property insurance as set forth herein. Lessor agrees to carry during the Lease Term commercial general liability insurance with a combined single limit of not less than One Million Dollars ($1,000,000) per occurrence, insuring against any and all liability of Lessor with respect to the ownership, operation and/or use of the Premises. Lessor also agrees to carry during the term of the lease special form – causes of loss property insurance covering the building of which the Premises are a part for the full replacement value thereof (exclusive of the cost of excavations, foundations and footings) as may be determined from time to time during the Lease Term and insuring the improvements and betterments located in the building within which the Premises is located, including the Premises and all appurtenances thereto (excluding Lessee's personal property, trade fixtures and equipment). Lessor shall maintain deductibles at commercially reasonable levels. In the event Lessor carries foundation insurance on the Premises, the increased portion of the premium therefore shall be at Lessor's sole cost and expense. Said insurance policies shall be carried with an insurance company or companies with general policy holders' rating of not less than "A-VII" as rated in the most current available Best's Key Rating Guide and which are qualified to do business in the state in which the Premises are located. Lessor shall, upon request, furnish Lessee a certificate of such Lessor's Insurance Policies.

7        **Removal of Improvements.** Except as otherwise herein provided, all alterations, decorations, additions, improvements, furnishings and other equipment installed in or on the Premises by Lessee and paid for by Lessee shall remain the property of Lessee, and may be removed by Lessee upon the termination of this Lease, provided that any of such items as are affixed to the Premises may be removed only if Lessee shall repair any damage caused by such removal.  If the Lessee fails to remove any of the foregoing from the Premises prior to the date of termination of this Lease, all such alterations, decorations, additions, improvements, furnishings and other equipment shall be deemed abandoned and become the property of the Lessor to dispose of as Lessor deems appropriate in its sole discretion.

8        **Access to Premises.**  Lessor may have access to the Premises at all reasonable times during business hours

3

for the purpose of examining the Premises, and, during the last One Hundred Eighty (180) days of the Term of this Lease, Lessor may have access to the Premises for the purpose of exhibiting the Premises for sale or rent, any notices of which shall not be removed, obliterated or hidden by Lessee, provided, however, that any such notice by Lessor shall be as unobtrusive as reasonably practicable. Such action shall not be deemed an eviction or disturbance of Lessee, nor shall Lessee be allowed any abatement of rent, or damages for any injury or inconvenience occasioned thereby.

9       **Repairs.**    Lessor shall keep and maintain the foundation, roof and structural portions of the walls, the exterior doors, windows and window frames of the Premises in good condition and repair, except that Lessee shall make and pay for such repairs as may be required by reason of the acts or inaction of Lessee, its employees, agents, invitees, licensees, or contractors, and except that Lessee shall make and pay for such repairs as may be required to any walls that are installed or caused to be installed by Lessee. Lessee agrees to give Lessor prompt written notice of the necessity for repairs. The provisions of this Section shall not apply in the case of damage or destruction by fire or other casualty or by eminent domain, in which events the obligations of Lessor shall be controlled by the applicable provisions of this Lease. Lessee shall keep in good condition, maintain, repair, and if necessary, replace, any fixtures, facilities or equipment on or about the Premises, including, without limitation, the heating, air conditioning, electrical, plumbing and sewer systems. If Lessee refuses or neglects to commence or complete repairs promptly and adequately, Lessor may, but shall not be required to do so, make or complete said repairs, and Lessee shall pay the cost thereof to Lessor promptly upon demand.

10      **Reservation of Lessor Rights.**   Lessor reserves the right to place, maintain, repair and replace such utility lines, pipes, tunneling, and the like, in, under, over and upon the Premises as may be reasonably necessary or advisable for the servicing of the Premises or for the remainder of the building in which the Premises is located.

11      **No Lessor Liability**   To the extent that the following matters are not covered by Lessor's hazard insurance, Lessor shall not be liable for any damage done by or from the electrical system, the heating or air conditioning system, the plumbing and sewer systems in, upon or about the Premises or for damages occasioned by water, snow or ice being upon or coming through the roof, walls, windows, doors or otherwise, or for the acts of any owners or occupants of adjoining or contiguous property. Further, Lessor shall not be liable for any damage to Lessee's leasehold improvements, fixtures, or merchandise resulting from fire or other insurable hazards, regardless of the cause thereof, and Lessee hereby releases Lessor from any and all liability for such damage.

12      **Lessee Default**   This Lease is made upon the condition that the Lessee shall punctually perform all its covenants and agreements under this Lease. If any of the following events of default shall occur: (a) any installment of Fixed Rent, additional rent or any other sums required to be paid by the Lessee hereunder, or any part thereof, shall at any time be in arrears and unpaid for five (5) days after the same becomes due and payable, whether or not demand is made therefor; or (b) there be any default on the part of the Lessee in the observance or performance of any of the other covenants, agreements, or conditions of this Lease on the part of the Lessee to be kept and performed, and said default shall continue for a period of five (5) days after written notice thereof from Lessor to Lessee; or (c) the Lessee shall file a petition in bankruptcy or be adjudicated a bankrupt, or file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future Federal, State or other statute, law or regulation, or make an assignment for the benefit of creditors; or (d) any trustee, receiver of liquidator of Lessee or of all or any substantial part of its properties or of the Premises shall be appointed in any action, suit or proceeding by or against Lessee and such proceeding or action shall not have been dismissed within thirty (30) days after such appointment; or (e) the leasehold estate hereby created shall be taken on execution or by other process of law; or (f) Lessee shall vacate or abandon the Premises, then and in any of said cases, Lessor at its option may terminate this Lease and re-enter upon the Premises and take possession thereof with full right to sue for and collect all sums or amounts with respect to which Lessee may then be in default and accrued up to the time of such entry, including damages to the Lessor by reason of any breach or default on the part of the Lessee, or the Lessor may, if he elects so to do, bring suit for collection of such rents and damages without entering into possession of the Premises or avoiding this Lease.

4

In addition to, but not in limitation of, any of the remedies set forth in this Lease or given to the Lessor by law or in equity, the Lessor shall also have the right and option, in the event of any default by the Lessee under this Lease and the continuance of such default after the period of notice above provided (if any), to retake possession of the Premises from the Lessee by summary proceedings or otherwise, and it is agreed that the commencement and prosecution of any action by the Lessor in forcible entry and detainer, ejectment or otherwise, or any execution of any judgment or decree obtained in any action to recover possession of the Premises, shall not be construed as an election to terminate this Lease unless the Lessor expressly exercises its option hereinbefore provided to declare the term hereof ended, whether or not such entry or re-entry be had or taken under summary proceedings or otherwise, and shall not be deemed to have absolved or discharged the Lessee from any of its obligations and liabilities for the remainder of the term of this Lease, and the Lessee shall, notwithstanding such entry or re-entry, continue to be liable for the payment of the rents and the performance of the other covenants and conditions hereof and shall pay to the Lessor all monthly deficits after any such re-entry in monthly installments as the amounts of such deficits from time to time are ascertained and, if in the event of any such ouster, the Lessor rents or leases the Premises to some other person, firm or corporation (whether for a term greater, less than or equal to the unexpired portion of the term created hereunder) for an aggregate rent during the portion of such new lease co-extensive with the term created hereunder which is less than the rent and other charges which the Lessee would pay hereunder for such period, Lessor may immediately upon the making of such new lease or the creation of such new tenancy sue for and recover the difference between the aggregate rental provided for in said new lease for the portion of the term co-extensive with the term created hereunder and the rent which Lessee would pay hereunder for such period, together with any expense to which the Lessor may be put for brokerage commission, placing the Premises in leasable condition or otherwise, including, without limitation, reasonable attorneys' fees. If such new lease or tenancy is made for a shorter term than the balance of the Term of this Lease, any such action brought by the Lessor to collect the deficit for that period shall not bar the Lessor from thereafter suing for any loss accruing during the balance of the unexpired term of this Lease.

If Lessee at any time shall fail to pay any taxes, assessments, or liens as required under Section 4/1 of this Lease, or to make any payment or perform any act required by this Lease to be made or performed by it, then Lessor, without waiving or releasing Lessee from any obligation or default under this Lease, may (but shall be under no obligation to) at any time thereafter make such payment or perform such act for the account and at the expense of Lessee. All sums so paid by Lessor and all costs and expenses so incurred, including, without limitation, reasonable attorneys' fees, together with interest thereon at the maximum rate of interest permitted by law, from the date of payment or incurring thereof, shall constitute additional rent payable by Lessee under this Lease and shall be paid by Lessee to Lessor on demand. All rights and remedies of Lessor herein enumerated shall be cumulative, and none shall exclude any other remedies allowed at law or in equity.

**13      Notice.**  Any notice, demand, request or other communication ("Notice") required to be given or that may be given hereunder shall be in writing and shall be sent, addressed to the recipient party at its last known address, by (a) certified or registered mail, return receipt requested, postage prepaid, or (b) national overnight delivery service, or (c) personal delivery.  Any Notice so sent shall be deemed given on the date of receipt or refusal by the intended recipient as indicated on the return receipt, or the receipt of the national overnight delivery service or personal delivery service. Notice may be given either by a party or by such party's attorney.

**14      Damage and Destruction.**  In the event that the Premises is damaged by fire, explosion or other casualty or occurrence to an extent that is less than fifty percent (50%) of the cost of replacement of the Premises, the damage shall promptly be repaired by Lessor at Lessor's expense; provided, however that Lessor shall not be obligated to expend for such repairs an amount in excess of the insurance proceeds recovered or recoverable as a result of such damage, or for damage or other casualty caused by the negligence or willful misconduct of Lessee, including any of its agents and employees. In the event of such damage and (a) Lessor is not required to repair as hereinabove provided, or (b) the Premises is damaged by fire, explosion or any other casualty or occurrence to the extent of fifty percent (50%) or more of the cost of replacement of the Premises, Lessor may elect either to repair or rebuild the  Premises, or to terminate this Lease upon giving notice of such election in writing to Lessee within ninety (90) days after the happening of the event causing the damage. If the casualty, repairing, or rebuilding shall render the  Premises unleasable, in whole or in part, a proportionate abatement of the Fixed Rent shall be determined and allowed from the date when the damage occurred until the date Lessor completes the repairs or rebuilding, said proportion to be

5

computed by Lessor on the basis of the relation which the gross square foot floor area of the space rendered unleasable bears to the gross square foot area of the Premises then actively used by Lessee for the conduct of its business.

**15**     **Mortgage Subordination.** Upon written request or notice by Lessor, concurred in by any mortgagee or trustee of the Premises or by any person, firm or corporation intending to become such a mortgagee or trustee, Lessee agrees to subordinate its rights under this Lease to the lien or liens of any mortgages or deeds of trust that may hereafter be placed upon the Premises and to any and all advances to be made thereunder, and to the interest thereon, and all renewals, replacements and extensions thereof, provided the mortgagee or trustee named in said mortgages or deeds of trust shall agree to recognize the lease of Lessee in the event of foreclosure if Lessee is not in default. Lessee also agrees that any mortgagee or trustee may elect to have this Lease a prior lien to its mortgage or deed of trust, and in the event of such election and upon notification by such mortgagee or trustee to Lessee to that effect, this Lease shall be deemed prior in lien to the said mortgage or deed of trust, whether this Lease is dated prior to or subsequent to the date of said mortgage or deed of trust. Lessee agrees that, upon the requests of Lessor, any mortgagee, or any trustee named in such mortgages or deed of trust, it shall execute and deliver whatever instruments may be required for such purposes and to carry out the intent of this Section 15.

**16**     **Eminent Domain.** In the event the Premises or any part thereof shall be taken or condemned either permanently or temporarily for any public or quasi-public use or purpose by any competent authority in appropriation proceedings or by any right of eminent domain, the entire compensation award therefor, including, but not limited to, all damages as compensation for diminution in value of the leasehold, reversion, and fee, shall belong to the Lessor without any deduction therefrom or any present or future estate of Lessee, and Lessee hereby assigns to Lessor all its right, title and interest to any such award. Although all damages in the event of any condemnation are to belong to the Lessor, whether such damages are awarded as compensation for diminution in value of the leasehold, reversion or to the fee of the Premises, Lessee shall have the right to claim and recover from the condemning authority, but not from Lessor, such compensation as may be separately awarded or recoverable by Lessee in Lessee's own right on account of any and all damage to Lessee's business by reason of the condemnation and for or on account of any cost or loss to which Lessee might be put in removing Lessee's merchandise, furniture, fixtures, leasehold improvements and equipment.

If the whole of the Premises shall be taken by any public authority under the power of eminent domain, this Lease shall terminate as of the day possession shall be taken by such public authority, and Lessee shall pay rent up to that date with an appropriate refund by Lessor of such rent as shall have been paid in advance for a period subsequent to the date of the taking. If less than fifty percent (50%) of the floor space of the building which.is part of the Premises shall be so taken, this Lease shall terminate only with respect to the part so taken as of the day possession shall be taken by such public authority, and Lessee shall  pay rent  up to that  day  with an appropriate refund by Lessor of such rent as may have been paid in advance for a period subsequent to the date of the taking, and thereafter, the Fixed Rent shall be equitably adjusted, and Lessor shall at its expense make all necessary repairs or alterations to the basic building and exterior work so as to constitute the remainder of the Premises a complete architectural unit. If more than fifty percent (50%) of the floor space of the building shall be so taken, either party shall have the right to terminate this Lease upon notice in writing within ninety (90) days after such taking of possession and, in the event of such termination, Lessee shall pay rent up to that day with an appropriate refund by Lessor of such rent as may have been paid in  advance  for a period subsequent  to the date of the taking; provided, however, no event of default then exists. If neither party does not so terminate, this Lease shall terminate with respect to the part so taken from the day possession shall be taken by such public authority and all of the terms herein provided shall continue in effect except that the rent shall be equitably abated with respect to the taken portion of the Premises, and Lessor shall make all necessary repairs or alterations to the basic building and exterior work so as to constitute a complete architectural unit.

**17**     **Assignment and Subletting.** Lessee shall not sublet the Premises or any part thereof or assign this Lease or any part thereof, without in each case obtaining the prior written consent of Lessor, which consent  may be withheld in Lessor's sole discretion. Any transfer of this Lease from Lessee by merger, consolidation, liquidation or otherwise by operation of law shall constitute an assignment for the purpose of this Lease and shall require the written consent of Lessor, which may be withheld in Lessor's sole discretion.  Lessee shall not permit any business to be operated in or on the Premises by any concessionaire or licensee without the prior written consent of Lessor, which may be withheld
6

in Lessor's sole discretion. Any consent by Lessor to any assignment or subletting, or to the operation by a concessionaire or licensee, shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting, or operation by a concessionaire or licensee. In the event that Lessee shall at any time, during the term of this Lease, sublet all or any part of said Premises or assign this Lease, either with the consent of Lessor as hereinbefore provided or without the consent of Lessor, then, and in such event, it is hereby mutually agreed that Lessee shall nevertheless remain fully liable under all of the terms, covenants and conditions of this Lease. If this Lease be assigned, or if the Premises or any part thereof be subleased or occupied by anybody other than Lessee, Lessor may collect from the assignee, sublease or occupant any rent or other charges payable by Lessee under this Lease, and apply the amount collected to the rent and other charges herein reserved, but such collection by Lessor shall not be deemed an acceptance of the assignee, sublessee or occupant as a Lessee nor a release of Lessee from the performance by Lessee under this Lease. If Lessor should sell or otherwise transfer its interest in the Premises upon an undertaking by the purchaser or transferee to be responsible for all of the covenants and undertakings of Lessor, Lessee agrees that Lessor shall thereafter have no liability to Lessee under this Lease or any modification or amendments thereof, or extensions or renewals thereof, including any such liabilities which might have accrued prior to the date of such sale or transfer of Lessor's interest.

Notwithstanding anything contained herein to the contrary, Lessee shall have the right to assign the Lease in its entirety or to sublease all or a portion of the Premises without the consent of Lessor to: (i) any entity resulting from a merger or consolidation with Lessee; (ii) any entity succeeding to a significant portion of the Lessee's business stock, assets or offices of Lessee in the geographic area where the Premises are located; or (iii) any parent, subsidiary or affiliate of Lessee having direct or indirect common ownership or control with Lessee (each a "Permitted Transfer"). Permitted Transfers also include (i) Lessee's going from a publicly held corporation to a privately held corporation; (b) any public offering of Lessee's stock; or (c) any change in ownership of stock of Lessee. In the event of a Permitted Transfer, Lessee shall not be released from its obligations under the Lease unless the person/entity to which the Lease is to be assigned or subleased has a net worth of at least $2 million.

**18**      **Accord and Satisfaction.** No payment by Lessee or receipt by Lessor of a lesser amount than the Fixed Rent, additional rent, or any other amount owing from Lessee to Lessor herein stipulated shall be deemed to be other than on account of the earliest stipulated Fixed Rent, additional rent, or other amount owing from Lessee to Lessor, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Fixed Rent, additional rent, or other amount owing from Lessee to Lessor be deemed an accord and satisfaction, and Lessor may accept such check or payment without prejudice to Lessor's right to recover the balance of such Fixed Rent, additional rent, or other amount owing from Lessee to Lessor or pursue any other remedy provided for in this Lease or available at law or in equity.

**19**      **Estoppel Certificates.** At any time and from time to time, within ten (10) days following written notice, Lessee shall deliver to Lessor a signed and acknowledged written statement in recordable form certifying as true:  (i) that copies of the documents constituting this Lease have been provided to Lessor, together with a schedule, to be attached to the estoppel, identifying all such documents; (ii) that this Lease is in full force and effect and unmodified except as stated; (iii) stating the last dates that Fixed Rent, additional rent, or any other amounts owing from Lessee to Lessor have been  paid to Lessor, the amount(s) thereof and  the extent any  Fixed Rent  has been paid  in advance; (iv) stating whether Lessor has completed all work or  installations required  under the Lease; (v) stating whether or not Lessor is in default in the performance of any  covenant, agreement or condition  contained  in this Lease, and, if so, specifying each such default, offset, defense, or counterclaim that is claimed or could be claimed, specifying the specific nature and default; (vi) stating whether Lessee has knowledge of any event which  with  the giving of notice and the passage of  time or both  would  constitute a default  by Lessor  under the Lease; and (vii) stating or certifying as to such other matters with respect to this Lease, the Premises or the respective parties' obligations  hereunder as may be requested by Lessor or by any present or prospective mortgagee or purchaser of the Premises. Any such certificate may be relied upon by Lessor, any mortgagee, proposed mortgagee, assignee, purchaser and any other party to whom such certificate is addressed. Notwithstanding the foregoing, Lessor shall be entitled to pursue any other remedy as a result of Lessee's failure to comply with this Section 19 pursuant to this Lease, at law, and/or in equity.

7

**20**       **Representations of the Parties**. The parties hereto hereby represent and warrant the following to each other: (a) each party has all requisite power and authority to execute and deliver this Lease, and to perform its obligations hereunder, (b) neither the execution and delivery by the parties hereto of this Lease nor the consummation by the parties of the transactions contemplated hereby and thereby, will (i) conflict with or violate any provision of the organizational documents of such party, (ii) require on the part of the party any filing with, or permit, authorization, consent or approval of, any third party, (iii) conflict with, result in breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party any right to terminate, modify or cancel, or require any notice, consent or waiver under, any contract or instrument to which either party is a party or by which it is bound or to which its assets are subject, or (iv) violate any order, writ, injunction, decree, statute, rule or regulation applicable to such party or any of its properties or assets, and (c) by virtue of its execution of this Lease, any individual executing this Lease on behalf of an entity represents and warrants that he/she holds the title noted below his/her signature and that he/she is authorized and empowered by all necessary legal means, including corporate, partnership, or company action (as applicable), and under applicable law, to execute and deliver this Lease on behalf of such entity and to bind such entity to its obligations hereunder. The individuals further represent and warrant that the entity they are an agent for will remain qualified to do business in good standing in the State of North Carolina throughout the Term. If the applicable entity is not qualified as stated herein, or is not duly existing, the individual(s) signing on behalf of such entity hereby acknowledge and agree that they individually, jointly and severally, shall be responsible for all terms, covenants, and obligations of this Lease, in addition to said entity until such time as the applicable entity is properly qualified or duly existing.

**21**      **Waiver.** No waiver of any condition or legal right or remedy shall be implied by the failure of Lessor to declare forfeiture, or for any other reason, and no waiver of any condition or covenant shall be valid unless it is in writing signed by Lessor. No waiver of a breach of any condition or covenant shall be claimed or pleaded to excuse a future breach of the same condition or covenant. The mention in this Lease of any specific right or remedy shall not preclude Lessor from exercising any other right or from having any other remedy or from maintaining any action to which it may be otherwise entitled either at law or in equity; and for the purpose of any suit by Lessor brought or based on this Lease, this Lease shall be construed to be a divisible contract, to the end that successive actions may be maintained as successive periodic sums shall mature under this Lease and it is further agreed that failure to include in any suit or action any sum or sums then matured shall not be a bar to the maintenance of any suit or action for the recovering of said sum or sums so omitted.

**22**      **Quiet Enjoyment.** Lessor hereby covenants and agrees that if Lessee shall perform all the covenants and agreements herein stipulated to be performed on Lessee's part, Lessee shall at all times during the continuance hereof have the peaceable and quiet enjoyment and possession of the Premises without any manner of hindrance from Lessor or any person or persons lawfully claiming the Premises.

**23**      **Exceptions.** Notwithstanding anything to the contrary herein contained, this Lease is subject to recorded utility easements and any other restrictions of record.

**24**      **Headings** **The** paragraph headings are inserted only as a matter of convenience and for reference and in no way, define, limit or describe the scope or intent of this Lease or in any way affect this Lease.

**25**      **Lease Inures to Assignees' Benefit**. This Lease and all the covenants, provisions and conditions herein contained shall inure to the benefit of and be binding upon the heirs, personal representatives, successors and assigns, respectively, of the parties hereto; provided, however, that no assignment by, from, through or under Lessee in violation of the provisions hereof shall vest in the assigns any right, title or interest whatever.

**26**      **Entire Agreement**. This Lease and the exhibits attached hereto and forming a part hereof, set forth all covenants, promises, agreements, conditions and understandings between Lessor and Lessee concerning the Premises,

8

and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them other than are herein set forth. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Lessor or Lessee unless in writing and signed by Lessor and Lessee. Lessee agrees that Lessor and its agents have made no representations or promises with respect to the Premises or property of which the same are a part except as herein expressly set forth and neither party has relied on any representation or promise with respect to the Premises or the building or property in entering into this Lease. This Lease shall be interpreted without reference to any industry or trade custom, unless expressly provided herein.

**27      Surrender and Holding Over.**  Lessee shall deliver and surrender to Lessor possession of the Premises upon the expiration of the Lease, or its termination in any way, in as good condition and repair as the same shall be at the commencement of said Term (damage by fire and ordinary wear and decay only excepted as provided herein), and shall deliver the keys at the office of Lessor or Lessor's agent. Should Lessee or any party claiming under Lessee remain in possession of the Premises, or any part thereof, after any termination of this Lease, no tenancy or interest in the Premises shall result therefrom but such holding over shall be an unlawful detainer and all such parties shall be subject to immediate eviction and removal.

**28      Lessor Liability**  If Lessor shall fail to perform any covenant, term or condition of this Lease upon Lessor's part to be performed and, as a consequence of such default, Lessee shall recover a money judgment against Lessor, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Lessor in the Premises and out of rents or other income from such property receivable by Lessor or out of the consideration received by Lessor from the sale or other disposition of all or any part of Lessor's right, title and interest in the Premises, and neither Lessor nor any party associated with Lessor in any fashion shall be liable for any deficiency.

**29      Indemnification.**

29.1 Lessee Indemnification. Except to the extent of the negligence or willful acts or omissions of Lessor or its employees, agents, tenants, or contractors and subject to Section 31 below, to the extent permitted by Applicable Law, Lessee agrees to indemnify, defend and save harmless Lessor and Lessor's agents, officers, directors, employees, and contractors from and against any and all claims, actions, demands, damages, injuries, injunctions, suits, fines, penalties, costs and expenses and liability whatsoever (including reasonable attorneys' fees), arising in connection with any and all third party claims arising out of (a) injuries occurring within the Premises; (b) any negligent or intentional act or omission of Lessee or Lessee's agents, contractors, servants or employees; (c) any breach or default by Lessee in the performance of any of its obligations under this Lease; or (d) the failure of any representation or warranty made by Lessee in this Lease to be true when made.

29.2 Lessor Indemnification. Except to the extent of the negligence or willful acts or omissions of Lessee or its employees, agents, or contractors and subject to Section 31 below, to the extent permitted by Applicable Law, Lessor agrees to indemnify, defend and save harmless Lessee and Lessee's agents, officers, directors, employees and contractors from and against any and all claims, actions, demands, damages, injuries, injunctions, suits, fines, penalties, costs and expenses and liability whatsoever (including reasonable attorneys' fees), by or on behalf of any person, entity, or governmental authority arising in connection with any and all third party claims arising out of (a) injuries occurring within the Common Areas or any area outside the Premises; (b) any negligent or intentional act or omission of Lessor, its agents, contractors, servants, employees, or tenants (other than Lessee); (c) the construction of the commercial building in which the Premises is located, and any defect in or failure of the structure or structural portions of the Premises or commercial building in which the Premises is located, except to the extent that such defect or failure is attributable in full or in part to any work undertaken by Lessee; (d) any breach or default by Lessor in the performance of any of its obligations under this Lease; or (e) the failure of any representation or warranty made by Lessor in this Lease to be true when made.

29.3 Survival. The obligations of Lessee and Lessor under this Section arising by reason of any occurrence taking place during the Lease Term shall survive the expiration or earlier termination of this Lease.

9

**30      Arbitration.** Any controversy or claim arising out of, relating to or based on this Lease, including the interpretation of this Section 30, or the breach or claimed breach thereof, will be settled solely by binding arbitration in accordance with Commercial Arbitration Rules of the American Arbitration Association before a single arbitrator from the American Arbitration Association acceptable to both parties. The arbitrator will not award damages that are inconsistent with this Agreement. Any award of the arbitrator will be final and binding upon the parties, and both parties will comply with said award without delay. The award may be enforced by any court having jurisdiction over the party against which the award has been rendered. Neither party will resort to any court except to compel arbitration, enforce a rendered award or to seek injunctive relief. In any proceeding hereunder, the prevailing party will be entitled to recover its costs of enforcing the other party's obligations hereunder, including reasonable attorneys' fees incurred at all levels and proceedings, including settlement and appeal, in addition to other relief to which the prevailing party may be entitled. For the purposes of this Section 30, "prevailing party" shall mean the party prevailing on substantially all of the significant issues raised by the dispute. LESSEE HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY OF ANY OR ALL CLAIMS, CAUSES OF ACTION AND/OR ISSUES IN ANY ACTION OR PROCEEDING BETWEEN LESSEE AND LESSOR OR THEIR PERMITTED SUCCESSORS, ASSIGNS, PERSONAL OR LEGAL REPRESENTATIVES AND HEIRS UNDER OR IN CONNECTION WITH THIS LEASE OR ANY OF ITS PROVISIONS AND ATTACHMENTS. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY LESSEE, AND LESSEE ACKNOWLEDGES THAT NEITHER LESSOR NOR ANY PERSON ACTING ON BEHALF OF LESSOR HAS MADE ANY REPRESENTATIONS OF FACT OR LAW TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. LESSEE FURTHER ACKNOWLEDGES THAT HE, SHE OR IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS LEASE AND THIS WAIVER WITH LEGAL COUNSEL.

**31      Waiver of Subrogation.** Lessor and Lessee hereby mutually release each other from liability and waive all right of recovery against each other for any loss or damage to property in or about or constituting a part of the Premises or the Project, as the case may be, to the extent such loss or damage is required under this Lease to be, or is actually, insured against under the injured party's policy, including deductibles and any "all risk" endorsements thereof, whether due to negligence or any other cause. Either Lessor or Lessee shall, at the request of the other party, execute and deliver to such requesting party a waiver of subrogation in the form and content as reasonably required by the requesting party's insurance carrier. This waiver shall take priority over any indemnity obligations and other liabilities or obligations of the parties under this Lease and shall apply notwithstanding such provisions. This waiver also applies to each party's directors, officers, employees, and agents.

**32      Lessor Waiver of Lien.** Lessor hereby waives any and all lien rights it may have, statutory or otherwise, concerning the personal property or fixtures of Lessee which shall be considered personal property for purposes of this Lease.

**33      Recording.** Lessee may record a memorandum of lease in a form reasonably acceptable to Lessor. Lessee will pay all recording fees, costs, taxes, and other expenses for the recording. lessor shall execute such memorandum of lease within ten (10) days after written request by Lessee.

**34      Originals.** This Lease may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same document. This Lease may also be executed in duplicate, each of which shall be deemed an original. Facsimile or email copies of signatures will be binding on the parties as if they were original signatures. The executed counterparts together shall be considered an original and shall be binding on the parties. The parties will cooperate in exchanging original (non-facsimile) signature pages with each other.

**35      Survival.** All of the representations, warranties, covenants, conditions and agreements contained in this Lease or in any instrument delivered pursuant to this Lease which either are expressly designated as surviving the expiration or termination of this Lease or, by their nature, are to be performed or observed, in whole or in part, after the termination or expiration of this Lease, shall survive the termination or expiration of this Lease, including any rights arising out of any breach of the same. The extension of any applicable statute of limitations by Lessor or Lessee

10

shall not affect such survival.

**36      Time of Essence.**   Time is of the essence of this Lease and each and all of its provisions.

**37      Severability.** In the event that any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Lease, but this Lease shall be construed as if such invalid, illegal or unenforceable provisions had never been contained herein, unless the deletion of such provision or provisions would result in such a material change so as to cause completion of the transactions contemplated herein to be unreasonable.

**38      Governing Law; Venue.** This Agreement shall be construed under and interpreted in accordance with and governed by the laws of the State of North Carolina without regard to the conflicts of law provisions thereof.

**IN WITNESS WHEREOF,** the Lessor and Lessee have caused this Lease to be executed under seal in duplicate as of the day and year first above written.

# [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

11

LESSOR:
By:___**WRH HOLDINGS, LLC**.

Name:_____**William Rickey Hall, Sr.**_____

Signature:___*William R. Hall*_____

Date:___**May 10, 2022**_____


LESSEE:

**ACCESSHEAT, INC**

By:_____

Name: *Ruth   Berenstein*_____

Signature: __*Ruth Berenstein*_____

Date: *June  9, 2022*_____

12

# **<u>EXHIBIT H</u>**

**EXHIBIT H**

Protech Metals, LLC.
3619 Murdocksville Rd,
West End, NC 27376
06/21/2022

Dear William R. Hall,

I regret to inform you that, due to recent aggressive behavior with employees including your own manager and the continuous behavior of such acts including alcohol consumption and intoxication during work hours, it has become necessary for the company to temporarily lay you off from your duties for the safety of the staff.

Due to the above statement you will be notified via email of your return date.

Thank you for your continued contributions to the company. If you have any further questions about your rights and layoff benefits, please get in contact with your CEO Ruth Berenstein.

Sincerely,

Ruth Berenstein

Managing Principal / CEO

# **EXHIBIT I**

**EXHIBIT I**

## MINUTES OF
## SPECIAL MEETING OF THE MEMBERS AND
## MANAGERS OF PROTECT METALS LLC

A special meeting of the Members and Manager of PROTECH METALS LLC (the "Company") was held at the its principal office location on December 24, 2020.

The following Members, constituting a majority of Members of the Company, and a quorum, were present in person:

**William "Rick" Hall**

William "Rick" Hall, acted as the Manager of the Company, and presided at the meeting. William "Rick" Hall is presently the sole Member of the Company.

The Manager, with the consent of all Members, presented at the meeting a proposed Assignment of 51% of Membership Interests in the Company to Dr. Myra Hall, a proposed Loan and Security Agreement and Promissory Note. These documents are in consideration of Dr. Hall's infusion of capital into the Company and shall be booked on the Company records as a loan, and payable upon the terms of a certain Promissory Note under the same date. After discussion and on motion duly made and seconded, the aforementioned documents were unanimously adopted in accordance with the terms and condition contained therein.

**RESOLVED**, that it is advisable and in the best interests of this Company that the aforementioned documents be executed on the terms and conditions set forth in those documents;

**RESOLVED**, that a copy of the aforementioned documents be annexed to the minutes of this meeting; and

**RESOLVED**, that Company shall henceforth be managed and operated and maintained in accordance with the aforementioned documents.

There being no further business the Manager thereby adjourned the meeting.

We, the undersigned Members, agree to and waive any and all irregularities in the Notice and Call of this Special Meeting of PROTECH METALS, LLC, if any exist.

Dated: December 24, 2020.

William "Rick" Hall, Manager

William "Rick" Hall, Member

Dr. Myra Hall

# **<u>EXHIBIT J</u>**

**EXHIBIT J**

# PROTECH METALS, LLC

## Assignment of Membership Interest

I, <u>William "Rick" Hall</u>, in accordance with North Carolina General Statutes Section 57D and any purported Operating Agreement of PROTECH METALS, LLC (whether now existing or later discovered), by execution of this document, hereby (i) assigns, transfers, and conveys to <u>Dr. Myra Hall</u>, <u>51% of my Membership Interests in PROTECH METALS, LLC</u>, free and clear of any and all encumbrances. Said Assignment grants all right, title, and interests in and membership rights (A) in the Company's capital, (B) to receive distributions of the Company's assets, (C) to vote as a member of the Company, and (D) to participate in the Company's management, all to the extent provided in the North Carolina Limited Liability Company Act and consistent with the purported Operating Agreement of the Company.

It is my intention, by execution of this document, to transfer 51% of my Membership Interests, including and without limitation the aforesaid rights, as well as any rights as assignee which I may have in and to PROTECH METALS, LLC, pursuant to North Carolina General Statutes and the purported Operating Agreement of the Company.

_____ (SEAL)
William "Rick" Hall


Assignment Accepted and Approved by:

_____ (SEAL)
Dr. Myra Hall


Date: <u>December 24, 2020</u>

# **EXHIBIT K**

**EXHIBIT K**

## PROTECH METALS, LLC
### CONSENT BY MEMBERS AND MANAGER
### FOR REALLOCATION OF MEMBERSHIP INTERESTS

I, William "Rick" Hall, the undersigned Member, constituting all Members of PROTECH METALS, LLC, hereby unanimously agree, contemporaneously executed with a Company Assignment of Interests to Dr. Myra Hall, Loan and Security Agreement, and Promissory Note to allow the following reallocation of Membership Interests in PROTECT METALS, LLC, for valuable consideration given. The annexed "new" Schedule I, by unanimous consent, shall be incorporated into the Company's Operating Agreement, replacing the existing Schedule I.

~~50%~~ of Membership Interests to WILLIAM "RICK" HALL
51% of Membership Interests to DR. MYRA HALL.
This the __24__ day of __December__, 2020.

MANAGER:                                MEMBERS:

_(signature)_                           _(signature)_
_____                 _____
William "Rick" Hall                     William "Rick" Hall

## SCHEDULE I
### Names and Membership Interests of Members

### PROTECH METALS LLC

William "Rick" Hall ........................................................................... 50% 49%

Dr. Myra Hall ..................................................................................... 51%

Manager(s):    William "Rick" Hall

Date: December 24, 2020